## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                                                     **PLAINTIFFS**


**v.**                                           **CIVIL ACTION NO. 3:18-cv-441-CWR-FKB**


**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
**Secretary of State of the State of Mississippi;**
**and JIM HOOD, Attorney General of the**
**State of Mississippi, all in their official capacities**
**of their own offices and in their official capacities**
**as members of the State Board of Election Commissioners**                     **DEFENDANTS**


## MEMORANDUM OF LAW IN SUPPORT OF DEFEDANTS' MOTION
## FOR SUMMARY JUDGMENT

Defendants Governor Phil Bryant, Secretary of State Delbert Hosemann and Attorney General Jim Hood, in their official capacities of their respective offices and in their official capacities as members of the State Board of Election Commissioners, file this their Memorandum of Law in Support of Motion for Summary Judgment and state:

## I.     INTRODUCTION

Joseph Thomas, Vernon Ayers and Melvin Lawson ("Plaintiffs") assert a singular allegation that State Senate District 22 ("District 22"), a district that encompasses six counties, violates Section 2 of the Voting Rights Act of 1965, as amended and extended ("Section 2"). This is, despite District 22 being drawn, adopted and precleared by the United States Department of Justice ("DOJ") in 2012, and being used without challenge in the statewide legislative elections held in 2015. Only now, six years after the adoption and preclearance of the district, do Plaintiffs challenge the composition of District 22 on the eve of the final statewide legislative

elections and just prior to the redistricting process commencing once again in 2020. Other than the natural population shifts that occur continually, nothing has recently transpired within District 22 to justify Plaintiffs' delay in bringing this Section 2 claim that counters the extreme prejudice to be suffered by Defendants, local officials and the voters if the redistricting of District 22 was ordered at this late hour. Simply put, Plaintiffs' six-year delay in bringing this Section 2 claim is time-barred by the applicable statute of limitations and by the doctrine of laches.

Alternatively, the Defendants are not the proper parties to this action. None of the Defendants, in any capacity, participated or had any role in drawing or approving of the State Senate districts, including District 22. And, neither can the Defendants provide any relief to the alleged Section 2 violation. Plaintiffs sued the wrong parties and Defendants must be dismissed from this action.

## II.    FACTS

On May 2, 2012, the Mississippi Senate adopted Joint Resolution 201 ("2012 Senate Plan") to reapportion the Senate, which included the current District 22.[1] On May 3, 2012, the Mississippi House of Representatives adopted the 2012 Senate Plan. In accordance with Section 5 of the Voting Rights Act of 1965, then in effect, the State of Mississippi ("State") submitted the 2012 Senate Plan to the DOJ for preclearance. On September 14, 2012, the DOJ interposed no objection to the submitted plan, thereby granting preclearance of the proposed plan. *See* Exhibit A.[2]

Upon preclearance of the 2012 Senate Plan, election commissioners, circuit clerks and consultants for all 82 counties in the State began the arduous process of implementing the new

---

[1] District 22 is comprised of all or parts of 6 counties: Bolivar, Washington, Issaquena, Humphreys, Yazoo and Madison.
[2] Copies of the referenced exhibits are attached to the companion Motion for Summary Judgment.

senate lines into the Statewide Election Management System ("SEMS"). *See* Exhibit B, Affidavit of Madalan Lennep. All of this had to be incorporated into SEMS prior to the 2015 statewide legislative elections and local county elections. *See id.* Voting rolls, pollbooks and registration cards were created and voters in District 22 were notified of their respective locations. *See id.*

For the 2015 statewide legislative elections, the qualifying period ran from January 2, 2015 through February 27, 2015.[3] Candidates for Senate in District 22 determined their residency based on the lines in the 2012 Senate Plan as approved by the Legislature and precleared by the DOJ in 2012. After the qualifying deadline, party executive committees qualified their candidates for the District 22 party primaries that occurred on August 4, 2015. Subsequently, the State Board of Election Commissioners, also utilizing the 2012 Senate Plan for Senate District 22, qualified the respective candidates for the general election held on November 3, 2015. In each instance, voters from District 22, including Plaintiffs in this suit, went to the polls and cast their ballots based upon the current configuration of District 22 from the 2012 Senate Plan. *See id.*

The next and final statewide legislative election cycle utilizing District 22 and the 2012 Senate Plan commences with the opening of the qualifying period for candidates on January 2, 2019 and runs through March 1, 2019. *See* Miss. Code Ann. § 23-15-299. The primary will occur on August 6, 2019 and the general election on November 5, 2019. *See* Miss. Code Ann. §§ 23-15-191 and 23-15-833.

The very next year, 2020, the decennial census will occur triggering the Legislature's duty to redistrict the senate and the house based on those numbers. *See* MISS. CONST. art. 13, § 254 ("The Legislature shall at its regular session in the second year following the 1980 decennial

---

[3] *See* Mississippi Secretary of State, *2015 Candidate Qualifying Guide*, https://www.sos.ms.gov/Elections.../2015%20Candidate%20Qualifying%20Guide.pdf (last visited Aug. 23, 2018).

census and every ten (10) years thereafter, and may, at any other time, by joint resolution, by majority vote of all members of each house, apportion the state in accordance with the Constitution of the state and of the United States into consecutively numbered senatorial and representative districts of contiguous territory.").

### III.   <u>SUMMARY JUDGMENT STANDARD</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is "genuine" if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party. *Roberson v. Alltel Information Services*, 373 F. 3d 647, 651-52 (5th Cir. 2004). A fact issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). All facts and inferences are construed in the light most favorable to the non-moving party when reviewing a summary judgment. *Id.*

"Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington,* 276 F.3d 754, 759 (5th Cir. 2002) (citations omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Self-serving allegations without supporting evidence cannot not defeat a properly supported motion for summary judgment. *See Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346-47 (5th Cir. 2011) (citing *DIRECTV, Inc. v.*

*Budden*, 420 F.3d 521, 531 (5th Cir. 2005)).

## IV.   ARGUMENTS AND AUTHORITIES

Plaintiffs seek to have this Court order a new districting plan for District 22 for one election cycle despite: its current existence since 2012; preclearance by the DOJ; the election held in 2015; the impending statewide redistricting commencing in 2020; voter familiarity with the lines; costs and confusion associated with redistricting; the ripple effects to a number of adjacent districts; and, the practical time constraints facing a redistricting at this late hour. For the reasons set forth below, such relief is time-barred or inequitable and, thus, improper.

**A.  Plaintiffs' claim is barred by the analogous statute of limitations.**

Plaintiffs' Section 2 claim is time-barred by the analogous state statute of limitations, Miss. Code Ann. § 15-1-49. When a federal claim has no express limitations period, the courts must "fill in the gap" by typically utilizing an appropriate state statute of limitations unless it conflicts with federal law or policy. *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *UAW v. Hoosier Cardinal Corp*., 383 U.S. 696, 703 (1966); *see also Ballard v. Taylor*, 358 F. Supp. 409, 411 (N.D. Miss. 1973) ("Where a federal act does not contain a statute of limitations, the courts must rely upon the limitations period prescribed for analogous actions by the state in which the cause of action arose"). For example, in § 1983 civil rights cases Congress did not specify a limitations period for the federal claims, so the federal courts borrow from the forum state's analogous period. *See Cuvillier v. Taylor*, 503 F. 3d 397, 401 (5th Cir. 2007); *Piotrowski v. City of Houston*, 51 F.3d 512, 514 n. 5 (5th Cir. 1995); *see also James v. Sadler*, 909 F. 2d 834, 836 (5th Cir.1990). Likewise, because the Voting Rights Act of 1965 ("Act") does not contain a

limitations period for claims brought under the Act, federal courts should borrow the forum state's analogous limitations period.[4]

Accordingly, Mississippi's general three-year "catch-all" limitations statute, Section 15-1-49, should apply. Section 15-1-49(1) provides that "[a]ll actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." Miss. Code Ann. § 15-1-49(1). Plaintiffs' Section 2 claim accrued on September 14, 2012—the day the DOJ precleared the 2012 Senate Plan, which included District 22. On this day, the 2012 Senate Plan, with its public data, demographics, voting age population and elections history, became effective. Thus, under Section 15-1-49, Plaintiffs had three years to bring their Section 2 claim from September 14, 2012. Such a claim now—six years from the accrual period—is barred under Mississippi's analogous limitations period of Section 15-1-49. This is consistent with public policy behind limitations periods:

> Statutes of limitations are designed to protect defendants by giving them repose. Defendants do not have to live their entire lives fearing that they will be sued for past deeds. As a result, time-bars help stabilize commercial and property transactions. With a known period of liability, defendants can arrange their personal and commercial lives accordingly. They can also collect and preserve evidence against the possibility of suit while the evidence is fresh. Moreover, time bars protect defendants from unfair surprise and the prejudice of having to defend themselves years after the claim arose when the evidence and witnesses may be scarce or lost. Statutes of limitations thus force plaintiffs to assert their claims in a timely fashion when the evidence and witnesses' memories are fresh.
>
> Periods of limitations also assist the courts, and thus society, by preserving resources and promoting the legitimacy for the judicial process. . . .
>
> More importantly, statutes of limitations promote accuracy and fairness. Through time-bars the courts avoid dealing with unreliable witnesses and stale, or even false, evidence.

---

[4] In 1990, Congress adopted 28 U.S.C. § 1658, the federal "fallback" statute of limitations, for all prospective federal statutory claims that otherwise do not have an express limitations period. However, Section 1658 applies only to civil actions arising under federal statutes enacted after December 1, 1990. While Section 1658 may not be applicable herein due to Section 2's last reauthorization and amendment coming in 1982, it is apparent that Congress's intent under Section 1658 was to apply a clearer limitations period for all federal claims. Thus, application of the three year "catch-all" limitations period under Miss. Code Ann. § 15-1-49 is consistent with Congress's intent for federal claims.

Katharine F. Nelson, *The 1990 Federal "Fallback" Statute of Limitations: Limitations by Default*, 72 Neb. L. Rev. (1993) available at https://digitalcommons.unl.edu/nlr/vol72/iss2/3 (internal citations and footnotes omitted).

Plaintiffs' Section 2 claim and requested injunctive relief are time-barred and should be dismissed.

**B. Plaintiffs' Section 2 claim and corresponding injunctive relief are barred by the doctrine of laches.**

Notwithstanding the application of any applicable statute of limitations, the Plaintiffs' claim and relief are barred by the doctrine of laches. "Laches is an equitable doctrine that, if proved, is a complete defense to an action irrespective of whether the analogous state statute of limitation has run." *Mecom v. Levingston Shipbuilding Co.*, 622 F. 2d 1209, 1215 (5th Cir. 1980). Laches "is not, like limitation, a mere matter of time; but principally a question of the equity or inequity of permitting the claim to be enforced." *Barrios v. Faye*, 597 F.2d 881, 884 (5th Cir. 1979). Laches can be invoked when there is "[a] failure to do something which should be done or to claim or enforce a right at a proper time." *Maxwell v. Foster*, 1999 WL 33507675, *2 (W.D. La. Nov. 24., 1999) (quoting *Lauderdale County Sch. Dist. v. Enterprise Consol. Sch. Dist.*, 24 F.3d 671, 691 (5th Cir. 1994)). In fact, the seminal redistricting case of *Reynolds v. Sims*, 377 U.S. 533 (1964) supports equitable considerations or remedies in the context of voting rights cases:

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from

7

requiring precipitate changes that could make unreasonable or embarrassing demands on a state in adjusting to the requirements of the court's decree.

*Id.* at 585; *see also Arizona Minority Coalition for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 908 (D. Ari. 2005) ("The defense [of laches] applies to redistricting cases as it does to any other.").

Thus, the doctrine of laches applies "when plaintiffs (1) delay in asserting a right or claim; (2) the delay was not excusable; and (3) there was undue prejudice to the party against whom the claim was asserted." *Tucker v. Hosemann*, 2010 WL 4384223, at *4 (N.D. Miss. Oct. 28, 2010) (citing *Save Our Wetlands, Inc. v U.S. Army Corps of Engineers*, 549 F. 2d 1021, 1026 (5th Cir. 1977).

### 1. *Plaintiffs delayed in asserting their claim.*

In discussing the first laches prong concerning the delay in asserting a right or claim, such a period begins when Plaintiffs knew or should have known of Defendants' injurious conduct. *See Brown v. Bridges*, 692 Fed. Appx. 215, 216 (5th Cir. 2017); *Elvis Presley Enters., Inc. v. Capece*, 141 F. 3d 188, 205 (5th Cir. 1998); *see also Save Our Wetlands*, 549 F. 2d at1028. Plaintiffs knew or should have known of the alleged Section 2 violation in District 22 upon approval of the 2012 Senate Plan by the DOJ on September 14, 2012. The demographic makeup, voting age populations, election history and data, and deviation were made public at this time and those reported numbers have not changed since 2012. In fact, the corresponding maps of the districts were published on multiple websites, including the website of the Standing Joint Legislative Committee on Reapportionment.[5] Plaintiffs participated as active voters in the electoral process for District 22 as established by their voter profiles for the elections held in

---

[5] *See* Standing Joint Legislative Committee on Reapportionment, http://www.msjrc.state.ms.us/ (last visited Aug. 22, 2018).

2007, 2011 and 2015.[6] *See* Exhibit B, Affidavit of Madalan Lennep. Additionally, plaintiff

Joseph Thomas ran as an actual candidate for Senate in District 22 during the 2015 election

cycle, which utilized the 2012 Senate Plan. Furthermore, there was open litigation in 2012 that

contested the 2012 Senate Plan from which Plaintiffs could have lodged their very claim. *See*

*Mississippi State Conf. of the NAACP v. Barbour*, No. 3:11-cv-00159 (S.D. Miss. 2012) (3 judge

panel) (denying plaintiffs' motion to set aside 2011 elections).

Plaintiffs knew or should have known the viability of their claim in 2012, when it became

cognizable. Yet, despite this, Plaintiffs waited six years until the eve of qualifying for the 2019

statewide legislative elections and just prior to the commencement of statewide redistricting in

2020, to bring their challenge.[7] Not only is this delay evident, which satisfies the first laches

prong, but it is also inexcusable.

### 2. *Plaintiffs' delay is inexcusable.*

In *Maxwell v. Foster*, a case strikingly similar to the facts herein, plaintiffs brought a

challenge in 1998 to Louisiana's statewide legislative reapportionment plan that was adopted and

precleared by the DOJ in 1991. *Maxwell v. Foster,* 1999 WL 33507675 (W.D. La. Nov. 24,

1999). There had been several elections held under the plan and the suit was now on the cusp of

the constitutionally required legislative redistricting based on the 2000 census. *See id.* at *1. The

defendants asserted that the claim was barred by the doctrine of laches due to the plaintiffs'

inexcusable delay in waiting seven years to bring their suit after adoption of the reapportionment

plan at issue. *See id.* at *3. In reviewing whether plaintiffs committed inexcusable delay, the

---

[6] While Thomas and Lawson voted in the 2007, 2011 and 2015 elections in District 22, Ayers only voted in the 2015 election. *See* Exhibit B, Affidavit of Madalan Lennep.

[7] Furthermore, plaintiff Joseph Thomas was a candidate for senate for District 22 in the 2015 statewide legislative elections and voted in the same, all as established by the 2012 Senate Plan. *See id.* Additionally, plaintiffs Vernon Ayers and Melvin Lawson also voted in the 2015 statewide legislative elections for District 22. *See id.* Despite participating in the 2015 legislative election cycle for District 22, Plaintiffs waited almost three additional years to assert their Section 2 challenge.

Court determined that the plaintiffs knew or had relevant knowledge of the reapportionment plan in 1991 or were aware that reapportionment occurred during that time but did not pay attention to the specific effects of such reapportionment. *Id*. at *3. The Court determined that there was no compelling reason advanced by plaintiffs as to why the suit had not been filed earlier and "given the level of knowledge attributable to [plaintiffs], the delay *cannot be anything but inexcusable*." *Id.* (emphasis added).

Likewise, in *White v. Daniel*, the plaintiffs waited seventeen years to challenge a districting plan. *White v. Daniel*, 909 F. 2d 99 (4th Cir. 1990). The districting plan at issue was adopted in 1971 and after the 1980 census, the local governing authority, in 1981, decided to continue the 1971 plan with no changes. *See id*. at 102. Plaintiffs waited until 1988 to file their Section 2 claim over the districting plan. *See id*. In the face of a laches defense, the plaintiffs argued that their delay was justified on the grounds that the additional time provided them with more elections and data to establish the existence of racially polarized voting under Section 2. *See id*. at 103. The Fourth Circuit did not find the plaintiffs' justification persuasive and held the delay as inexcusable: "plaintiffs, in the exercise of reasonable diligence, could have discovered at a much earlier time the facts upon which they now base their claim … [and] the analysis to support their allegations should have been conducted earlier and well before the last election to be held under the 1981 plan." *Id.*

Additional support for Plaintiffs' inexcusable delay herein comes from *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (3 judge panel) *aff'd by Chandler v. Harris,* 529 U.S. 1084, 120 S. Ct. 1716 (2000). In *Fouts*, plaintiffs brought a 1998 gerrymandering challenge over two congressional districts that had been in effect since 1992 and utilized for three election cycles. There was to be one more election utilizing the districts prior to the upcoming statewide

redistricting based on the 2000 census. In finding that plaintiffs had committed inexcusable delay under the doctrine of laches, the Court reasoned that plaintiffs' claims were cognizable "for at least five years." *Id.*

And, finally, in *Arizona Minority Coalition*, plaintiffs brought their Section 2 claim two years after the legislative reapportionment plan at issue was adopted. *Arizona Minority Coalition for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887 (D. Ariz. 2005). The Court, in determining the plaintiffs' delay was inexcusable under the doctrine of laches, stated the following:

> The Court finds that Plaintiffs unreasonably delayed raising their § 2 challenge to the IRC's [(Arizona Independent Redistricting Commission)] 2002 Legislative Plan. The IRC finalized the 2002 Plan on August 14, 2002. That Plan increased the Hispanic voting age of District 14 to 58.11% from ... 55.18%, and Plaintiffs do not deny that they were aware of the increase. Plaintiffs' Superior Court action challenged the 2002 Plan on state law grounds only. When the IRC removed that case to federal court in June 2003, Plaintiffs disavowed any federal claims. And even in their original Complaint in this action, Plaintiffs made no claim under the [(Voting Rights Act)] VRA. Although they had ample opportunity to do so earlier, Plaintiffs did not raise a § 2 challenge to the IRC's 2002 Plan until the IRC indicated that it would be contesting federal jurisdiction. Plaintiffs' § 2 claim is a transparent attempt to gain a federal jurisdictional foothold and secure the use of a plan they prefer, and their two year delay in raising that claim is both inexcusable and unreasonable.

*Id.* at 908-09 (internal citations and quotation marks omitted).

Thus, like the plaintiffs in *Maxwell*, *White*, *Fouts* and *Arizona Minority Coalition*, Plaintiffs' delay in bringing their claim six years after the adoption and publication of District 22 from the 2012 Senate Plan, which during such time an election utilizing the plan was held in 2015, is inexcusable under the doctrine of laches. As a result, Plaintiffs' claim, if allowed, will cause undue prejudice to Defendants and others.

### 3. Defendants, local officials and the voters are prejudiced by Plaintiffs' inexcusable delay.

The final prong of the doctrine of laches concerns the undue prejudice to be suffered by Defendants and corresponding parties due to Plaintiffs' inexcusable delay. The *Maxwell* court, based on the analogous delay and pending statewide redistricting in the instant action, framed this analysis well:

> Given this litigation's temporal proximity to the next installment of census data and associated redistricting, the amount of time that has elapsed since the cause of action arose, and the fact that statewide elections were recently held, less prejudice is required to show laches in such an instance than had the [plaintiffs] expeditiously asserted their rights.

*Maxwell v. Foster,* 1999 WL 33507675, *4 (W.D. La. Nov. 24., 1999) (citing *White v. Daniel*, 909 F. 2d 99, 102 (4th Cir. 1990) ("[T]he defendant is aided by the inference of prejudice warranted by the plaintiff's delay" and the "greater the delay, the less prejudice required to show laches ....")).

After determining the plaintiffs had demonstrated inexcusable delay, the *Maxwell* court expressed the undesirability and prejudice involved in ordering reapportionment after the conduction of several elections under the plan at issue and on the eve of statewide redistricting based on the 2000 census. *Maxwell,* at *4. "This Court finds that rapid-fire reapportionment immediately prior to a scheduled census would constitute an undue disruption of the election process, the stability and continuity of the legislative system and would be highly prejudicial, not only to the citizens of Louisiana, but to the state itself." *Id.*; *see White*, 909 F.2d at 104 (precluding untimely Section 2 challenge under the doctrine of laches because "[w]e believe that two reapportionments within a short period of two years would greatly prejudice the County and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens."); *see also Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D.

Va. 1996) (finding plaintiffs "slept on their rights" in dismissing voting rights suit as barred by the doctrine of laches due to plaintiffs' inexcusable delay in bringing action 95 days prior to impending vote of primary, which such action could have been filed a year prior).

Equally, in *Fouts*, after demonstrating that the plaintiffs committed inexcusable delay in bringing their redistricting claim, as set forth above, the defendants asserted they were prejudiced by such delay because

> (1) over the six years and three election cycles voters have come to know their districts and candidates, and will be confused by change; and (2) requiring redistricting now, before the 2000 census will result in two redistrictings within a two year period, with resulting voter confusion, instability, dislocation, and financial and logistical burden on the state.

*Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999). The Court agreed in finding that the dangers of such frequent redistricting constituted undue prejudice and dismissed the action for laches. *See id.*

And, in *Arizona Minority Coalition*, after determining the plaintiffs committed inexcusable delay in bringing their Section 2 challenge, the Court concluded that laches barred the plaintiffs' claim because the prejudice to the defendants and others:

> The Defendants and the counties and voters of Arizona were prejudiced by the Plaintiffs' delay. The IRC finalized the 2002 Legislative Plan over two years ago before the Plaintiffs filed this suit, and the DOJ precleared the Plan over one year before. Arizona's counties conformed their precincts and readied their election machinery to implement that Plan.

*Arizona Minority Coalition for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 909 (D. Ariz. 2005); *see Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970) (finding injunctive relief unavailable to plaintiffs who filed a redistricting lawsuit thirteen weeks prior to a filing deadline for candidates for the state legislature).

The same analysis applies here to Plaintiffs' overdue claim. Redistricting District 22 at this juncture, six years after District 22's adoption via the 2012 Senate Plan and three years after the previous election cycle and on the eve of the next, would resort in undue prejudice on Defendants, local elections officials, the taxpayers and voters of this State. In essence, should Plaintiffs' requested relief be granted, District 22 and its surrounding senate districts would have to be reapportioned prior to the January 2, 2019 qualifying commencement period. And, to do so, it is longstanding judicial practice in redistricting jurisprudence to give the proper legislative body ample time to redistrict its pertinent boundaries before judicial intervention. *See Branch v. Smith*, 538 U.S. 254, 261-62 (2003) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court" and "[a]bsent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it.") (internal citations and quotations omitted).

However, due to the delay in Plaintiffs' challenge, the Mississippi Legislature does not reconvene until January 8, 2019—six days after the qualifying period begins. The only way to accord the relief sought by Plaintiffs without interfering with the qualifying period would be via the extraordinary act of the Governor ordering a special session of the Mississippi Legislature prior to the January 2, 2019 qualifying commencement period—and the ordering of a special session is quite expensive to the taxpayers of Mississippi.[8] If a special session is not convened,

---

[8] Further, this would be the second special legislative session required this calendar year. Proclamation by the Governor Convening Extraordinary Session, *available at* http://www.governorbryant.ms.gov/Pages/Proclamations.aspx (Aug. 21, 2018); *see also* Adam Ganucheau, *Gov. Bryant calls special session without deal between House and Senate*, MISSISSIPPI TODAY, Aug. 17, 2018, https://mississippitoday.org/2018/08/17/gov-bryant-calls-special-session-without-deal-between-house-and-senate/. The cost associated with a special legislative session "can run upwards of $100,000 a day when lawmakers are working at the Capitol …." Jimmie E. Gates and Geoff Pender, *Legislature passes funding bills, wraps up special session in a day*, THE CLARION LEDGER, June 5, 2017, *available at* https://www.clarionledger.com/story/news/2017/06/06/special-session/370133001/.

then the redistricting of District 22 and the surrounding districts would have to occur during the Legislature's regular session, which does not begin until after the commencement of the qualifying period. As evidenced by Plaintiffs' Motion for Expedited Schedule [doc. #17], Plaintiffs disregard the significance and associated prejudice of interfering with the qualifying deadlines, which will result in disruption to the established election machinery and processes of this State, while unnecessarily creating confusion among the voters. Plaintiffs contend that the Legislature can statutorily change the qualifying period or this Court can do so, without considering the prejudice to the local officials and voters of this State in altering such a period. *See* Plntfs' Mot. for Expedited Briefing [doc. #17], pp. 1-3. Either of these scenarios—redistricting via a special session or during the normal legislative calendar that impacts the qualifying period—are *only* in the realm of possibility because Plaintiffs' inexcusable, six-year delay.

Regardless, whenever the legislature convenes, the Standing Joint Legislative Committee on Reapportionment ("Standing Joint Committee"), pursuant to Miss. Code Ann. §§ 5-3-91 through 5-3-103, would have to be appointed and formed "by joint resolution of the Mississippi Legislature."[9] Miss. Code Ann. § 5-3-93. Upon formation, the Standing Joint Committee would meet and elect officers and proceed to initiate the redistricting process. Miss. Code Ann. § 5-3-91. Thereafter, the Standing Joint Committee would proceed to craft a new redistricting plan for District 22 and the other impacted districts. Once created and approved by the committee, such a proposed plan would be submitted to the full Senate for a vote on its approval. *See* Miss. Code Ann. § 5-3-103. Upon passage, the plan would then have to be concurred by the full House before it could be effective and implemented. *Id*.

---

[9] See *infra* pp. 18-19 for more discussion of the Standing Joint Committee.

All in total, such a process is time consuming. As such, the proposed relief is extraordinary considering the Plaintiffs' inexcusable delay, the costs to the taxpayers associated with holding a special session, the previously held 2015 elections, and the impending 2020 statewide redistricting cycle. And, complicating this process will be the ripple effect redistricting District 22 will have on other adjacent senate districts, in efforts to accommodate Plaintiffs' proposed relief for District 22.

Accordingly, redrawing District 22 has the ability to affect multiple counties, including their circuit clerks, election commissioners, poll workers and, most importantly, thousands of their voters. As demonstrated in the affidavit of Madalan Lennep, such changes must be implemented into SEMS well before the creation of any election materials or ballots, which automatically locks input and changes into SEMS until the completion of the pending election cycle. *See* Exhibit B, Affidavit of Madalan Lennep. Further, if Plaintiffs are afforded relief, Senate District 22 and the surrounding impacted senate districts will be redistricted for four consecutive statewide voting cycles.[10] It almost goes without saying that voter confusion over such late-round redistricting will be widespread. Thus, the undue disruption in the electoral process and the impact on the stability and continuity of the legislative system would be highly prejudicial and cannot be understated.

What's more, Plaintiffs seek a redistricting of District 22 based on census data that is eight years old. Such an approach with outdated data and information is not only prejudicial to the voters and candidates of District 22 and the other impacted districts, it is also futile at this late hour with the statewide legislative redistricting looming in 2020. *See Maxwell,* at *5 ("This

---

[10] The 2011 statewide Senate elections utilized the plan adopted and precleared in 2002. The 2015 statewide Senate elections utilized the 2012 Senate Plan. The 2019 statewide Senate elections for District 22 and the surrounding affected districts would, if Plaintiffs' relief is granted, utilize a new and separate plan. And, in the 2023 statewide Senate elections, every district will have been redistricted based on the results of the 2020 census.

Court finds it neither wise nor appropriate for any branch of government to reshuffle legislative districts at this late date considering the outdated information that would necessarily be used when new and accurate information is forthcoming."); *see also White*, 909 F.2d at 103 ("[A]ny reapportionment done now [(1988)] would use 1980 census figures, and such reapportionment might not provide fair and accurate representation for the citizens of the County."); *Fouts*, 88 F. Supp. 2d at 1354  (using census figures over eight years old would be "unduly prejudicial because they fail to provide a basis for fair and accurate representation for the citizens" (internal quotation marks omitted)); *Simkins v. Gessette*, 495 F. Supp. 1075, 1082 (D. S.C. 1980) (finding use of ten year old census data as not providing a fair representation of the people of South Carolina under the constitutional principles of the one man, one vote mandate).

Plaintiffs' inexcusable delay in bringing their Section 2 claim six years after it was cognizable and on the eve of the final statewide qualifying period utilizing District 22, coupled with the immense expense and extraordinary relief necessary to redistrict District 22 prior to the impending qualifying period, the related burden to local officials to implement such a new plan for one cycle and the corresponding voter confusion, highly prejudices Defendants, local officials and the voters of this State. Preventing this unfair prejudice is the very purpose of the doctrine of laches.

## C.     Alternatively, Defendants are not proper parties to this suit.

Governor Bryant, Secretary of State Hosemann and Attorney General Hood, as named in their official capacities of the offices held or in their capacities as members of the State Board of Election Commissioners, are improper parties and should be dismissed.  Plaintiffs claim that District 22 violates Section 2 of the VRA and, as a result, it should be redistricted. However, none of these officials have any role in drawing or approving the state senate districts, including

District 22.  The Mississippi Legislature has the constitutional duty to redistrict state legislative districts and none of the executive branch officials named as defendants participated in that process. *See* Miss. Const. Art. 13, Section 254.  Accordingly, the Defendants are not liable for any alleged violation of Section 2 nor can they effectuate the relief sought by Plaintiffs as they had no role in drawing or approving the district lines for District 22.

## The Process

The Mississippi Constitution requires that the legislature shall reapportion state house and senate districts every ten (10) years following the decennial census.  MISS. CONST. art. 13, § 254.  The procedure for achieving this constitutional mandate is set forth by statute.  As provided, the Standing Joint Committee is the body charged with the responsibility for redistricting both state legislative districts and congressional districts.  Miss. Code Ann. § 5-3-91.  This committee is comprised of the chair and vice chair of the elections committees from both the senate and the house as well as two members from each congressional district appointed by the speaker of the house and the lieutenant governor from their respective chambers.  *Id*.  The members serve until the end of the term of office for which they have been elected.  *Id*.  The committee is responsible for drawing a reapportionment plan using guidelines set forth in statute and presenting it to the full legislature for consideration.  *See* Miss. Code Ann §§ 5-3-93; 5-3-101; and 5-3-103.

The Standing Joint Committee performed its statutory duties in 2012 and presented plans, including the 2012 Senate Plan, to the Mississippi Legislature for consideration.  Once the plans were adopted by the Legislature and precleared by the DOJ, the Standing Joint Committee fulfilled its statutory responsibilities, and with the terms of members serving on the committee ending in 2015, the committee itself expired at that time.

18

## Governor

The governor's general powers and duties are set forth in the Mississippi Constitution and statutes. *See* MISS. CONST. art. 5, § 116; Miss. Code Ann. §§ 7-1-1 *et seq*. Nowhere in these provisions is there any mention of a role in the state legislative redistricting process.  In fact, the governor is specifically excluded from the process for state legislative redistricting as no plans adopted by the legislature have to be submitted to the governor. *See* Miss. Code Ann. § 5-3-103. This contrasts with the specific role that the governor plays in the congressional redistricting process whereby "upon completion of a redistricting plan, the committee shall present its plan to the governor and to the Mississippi legislature."  Miss. Code Ann. § 5-3-129.  Given the lack of any role in the redistricting process for state senate districts, Governor Bryant cannot be held to have violated Section 2 of the VRA as to District 22 and should, therefore, be dismissed with prejudice.

## Secretary of State

The general powers and duties of the secretary of state are set forth in Miss. Code Ann. §§ 7-3-1 *et seq.* Certain other specific duties are set forth in a variety of statutes.  *See e.g*., Miss. Code Ann. §§ 75-71-101 *et seq*. and 79-4-1.01 *et seq*. Having been designated as chief election officer for the state for purposes of the National Voter Registration Act of 1993, the secretary of state has the power to gather information on voting and report that to the legislature, governor, attorney general and the public.  Miss. Code Ann. § 23-15-211.1 None of these duties, however, involves drawing or approving state senate districts. While the Secretary of State maintains records and data pertaining to elections, his office plays no role in either the drawing of state senate districts or the adoption of district lines.  The duties and responsibilities of the Secretary of State regarding elections start after the legislature has adopted district lines and his office has

no responsibility beforehand. Accordingly, Secretary of State Hosemann cannot be held to have violated Section 2 of the VRA with regard to District 22 and, therefore, should be dismissed with prejudice.

## Attorney General

The office of attorney general is established under MISS. CONST. art. 6, § 173. The general powers and duties of the attorney general are found in Miss. Code Ann. §§ 7-5-1 *et seq.* As with other statewide elected officials, there are a variety of specific duties provided for throughout the Mississippi Code. *See e.g.*, Miss. Code Ann. §§ 23-17-1, *et seq.*; 53-1-5; 75-24-1 *et seq.*; and 81-1-79. In none of these duties, though, is the attorney general involved in the drawing or approval of state senate districts. Since Attorney General Hood is not involved in drawing or adopting state senate district lines, he cannot be held in violation of Section 2 of the VRA Act as to District 22 and, therefore, should be dismissed with prejudice.

## State Board of Election Commissioners

The State Board of Election Commissioners ("Board") consists of the governor, secretary of state and attorney general by virtue of their elected positions. *See* Miss. Code Ann. § 23-15-211 (1). The Board's duties include, but are not limited to, the following:

(a) Ruling on a candidate's qualifications to run for statewide … and other state district offices;
(b) Approving the state ballot for the offices stated in paragraph (a) of this subsection (2);
(c) Removing the names of candidates from the ballot for failure to comply with campaign finance filing requirements for the offices stated in paragraph (a) of this subsection (2) in previous election cycles; and
(d) Adopting any administrative rules and regulations as are necessary to carry out the statutory duties of the board.

*Id.*

Once again, while the Board has powers and duties post redistricting, it has no role in the redistricting process. It does not draw state senate district lines nor adopt them. Having no role in the redistricting process, as members of the Board, neither the governor, secretary of state, nor the attorney general can be held to have violated Section 2 of the VRA pertaining to District 22 and, therefore, should be dismissed with prejudice.

In summary, none of the Defendants had anything to do with drawing or adopting the district lines for District 22. Given their lack of involvement in the redistricting process, the Defendants cannot be held in violation of Section 2 of the VRA as to District 22. Consequently, all Defendants should be dismissed with prejudice.

## V.   CONCLUSION

Plaintiffs' Section 2 claim and requested injunctive relief are too late. Whether barred by the applicable statute of limitations or by the doctrine of laches, Plaintiffs self-instituted their own six-year delay and cannot now, after one election cycle and on the eve of another before the commencement of decennial redistricting in 2020, cause the electoral chaos and corresponding prejudice they so tardily seek. And, in the event this suit is allowed to continue, Defendants are not the proper parties to this action. As a result, Defendants' summary judgment motion should be granted.

## ORAL ARGUMENT REQUESTED

In accordance with Uniform Local Rule 7(b)(6), Movants request oral argument.

RESPECTFULLY SUBMITTED, this the 4th day of September, 2018.

Governor Phil Bryant, Secretary of State Delbert Hosemann, and Attorney General Jim Hood in their official capacities of their respective offices and in their official capacities as members of the State Board of Election Commissioners

BY: */s/ Tommie S. Cardin*

TOMMIE S. CARDIN (MB # 5863)
CHARLES E. GRIFFIN (MB #5015)
BENJAMIN M. WATSON (MB # 100078)
B. PARKER BERRY (MB # 104251)

ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
Suite 1400
1020 Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: charles.griffin@butlersnow.com
E-mail: ben.watson@butlersnow.com
E-mail: parker.berry@butlersnow.com

## CERTIFICATE OF SERVICE

I, Tommie S. Cardin, hereby certify that on this day I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this, the 4th day of September, 2018.

*/s/ Tommie S. Cardin*

TOMMIE S. CARDIN

43991559.v1