# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                                              **PLAINTIFFS**

**v.**                                                      **CIVIL ACTION NO. 3:18-cv-441-CWR-FKB**

**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
**Secretary of State of the State of Mississippi;**
**and JIM HOOD, Attorney General of the**
**State of Mississippi, all in their official capacities**
**of their own offices and in their official capacities**
**as members of the State Board of Election Commissioners**       **DEFENDANTS**

## DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have failed to offer any plausible reason for their inexcusable delay in waiting six years to bring this suit. Essentially, the crux of Plaintiffs' Response [doc. # 24] is that their delay is irrelevant because their Section 2 claim is an ongoing, continual violation for which any applicable statute of limitations or the doctrine of laches cannot apply, and that they filed their suit almost 13 months before the August primaries in 2019. Yet, pertinent case law rebuts their "ongoing, continual violation" argument and the Plaintiffs have seemingly forgotten that the immediate and pertinent deadline certain to prejudice voters and potential candidates if interfered with, is the commencement of the qualifying period on January 2, 2019—which is only 14 weeks away. Further, Plaintiffs have offered little in distinguishing Defendants' pertinent laches cases, much less an actual analysis of the laches factors. Defendants' motion for summary judgment should be granted.

### I. Plaintiffs' "continual violation" argument is contrary to well-settled reapportionment and laches case law.

Plaintiffs cannot point to any excusable reason for their six year delay in bringing the instant action on the cusp of critical election deadlines. They attempt to minimize the delay and its assured prejudicial impact if allowed to proceed by alleging that "statutory violations embedded in redistricting plans … are ongoing violations" not subject to any statute of limitations or laches defense. Plntfs' Resp. Memo. [doc. #24], at 2. But, the two primary cases relied upon by Plaintiffs for such a proposition, come from the same district court in Arkansas. *See Smith v. Clinton*, 687 F. Supp. 1310 (E.D. Ark. 1988); *Jeffers v. Clinton*, 730 F. Supp. 196 (E.D. Ark. 1989). And, as noted by Plaintiffs, one of the main reasons the district court excused the plaintiffs' delay in *Smith* and *Jeffers* is that the Voting Rights Act was amended in 1982, which led to the Supreme Court's interpretation of such amendment in *Thornburg v. Gingles*, 478 U.S. 30 (1986). In the instant case, however, there is no excusable explanation present to justify Plaintiffs' extended delay.

More importantly, the court in *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (3 judge panel), from which the Supreme Court affirmed, directly contradicts Plaintiffs' "ongoing, continual violation" proposition in the context of redistricting suits:

> The Plaintiffs assert that there was no delay because the continuing existence of racially gerrymandered districts is an ongoing violation of citizens' constitutional rights. The Plaintiffs only cite to a single district court case in support of this argument. *See Dotson v. City of Indianola*, 514 F. Supp. 397 (N.D. Miss.1981). Indeed, **the Plaintiffs' "ongoing violation" argument is contrary to well settled reapportionment and laches case law**. *See e.g. White v. Daniel*, 909 F.2d 99 (4th Cir. 1990). Therefore, the Plaintiffs' theory of "on going violation" fails to preclude a finding of delay. Accordingly, we find that the Defendants have established that the Plaintiffs delayed bringing this action for at least five years.

*Fouts v. Harris,* 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000) (emphasis added). As Defendants have previously demonstrated in their

Memorandum [doc. #20] supporting summary judgment, courts have applied the doctrine of laches in the context of redistricting suits irrespective of the continuing violation theory. *See White v. Daniel*, 909 F.2d 99 (4th Cir. 1990) (applying the doctrine of laches to bar a Section 2 claim notwithstanding the continuing violation argument); *see also Lewis v. Ascension Par. Sch. Bd.*, 2009 WL 10681443, at *10-11 (M.D. La. Aug. 5, 2009), *report and recommendation adopted*, 2009 WL 10681441 (M.D. La. Sept. 29, 2009), *aff'd in part on other grounds, rev'd in part on other grounds*, 662 F.3d 343 (5th Cir. 2011) (applying the doctrine of laches over a reapportionment claim despite a continuing violation argument as the doctrine was "the appropriate equitable doctrine to apply in addressing the delay between the time a claim arises under the Voting Rights Act and the filing of a lawsuit based upon such claims.") Further to the point, the "continuing violation theory is rarely successful outside of the Title VII employment discrimination arena." *Lewis*, 2009 WL 10681443, at *12, n.43 (internal quotation marks omitted). This is so because a plaintiff must show "a series of related acts" for the continuing violation theory to be present. *See Messer v. Meno*, 130 F.3d 130, 134-35 (5th Cir. 1997).

      The *Lewis* court's analysis addressing the continuing violation theory provides guidance. In *Lewis*, the plaintiff brought numerous causes of action surrounding the defendant school district's modification to its feeder system plan. *See Lewis*, 2009 WL 10681443, at *3. The plan had been in place since at least 1972 and was modified by the school district in 2002. *See id.* at *12. A separate and unrelated plan to reduce school crowding was adopted by the school district in 2008. *See id.* Subsequently, in 2008, the plaintiff brought suit challenging the feeder system plan that was initially implemented in 1972 and modified in 2002. *See id*. The school district argued that the plaintiff's claims related to the 2002 modification were time barred by the pertinent prescription period. *See id.* In response, the plaintiff argued that the continuing

violation theory applied to his claims to save them from the prescription bar because the school board's alleged wrong actions commenced with the adoption of the feeder plan in 2002 and that such wrongful actions culminated with the adoption of the school crowding plan in 2008. *See id.*

However, the court determined that while the school district's 2002 modification to its feeder plan affected students each and every year, there was no evidence that it "systematically and repeatedly revisited" the issue on an annual basis so to constitute a series of related acts by the school district leading up to the 2008 adoption of the school crowding plan, which was wholly unrelated to the feeder plan. *See id.* at *12, n.43. Even though the plaintiff's children had been attending schools within the school district in accordance with the feeder plan since 2002, the year in which it was modified, and had allegedly been suffering from its "continuing ill effects," their claims were "nevertheless time-barred because they did not challenge the *discrete event* in question, the actual adoption/modification of the feeder plan in 2002." *Id.* (emphasis added). Thus, the continuing violation theory was not applicable as the plaintiff never specifically asserted "that the school district took any other discrete, wrongful acts between the adoption/modification of the feeder plan in 2002 and the adoption/implementation of … [the school crowding plan] in 2008, which could link those events together and render their claims timely." *Id.*

In supporting its decision and in efforts to explain a complex area of the law over the continuing violation theory, the *Lewis* court examined two relevant Court of Appeals cases. Though somewhat lengthy, the full analysis from *Lewis* is instructive:

> The Sixth Circuit Court of Appeals discussed the reason for that lack of success [of the continuing violation theory] in *Tolbert v. State of Ohio Dept. of Transp.*, 172 F.2d 934 (6th Cir. 1999). In that case, residents of a predominantly African-American community brought a civil rights action against the city, the state transportation department, and the department director, alleging they acted in a racially discriminatory manner by allocating limited funds to erect sound barriers

for a highway construction project in a predominantly Caucasian neighborhood, while not providing such barriers for a similar project in a predominantly African-American community, called Cherrywood. The decision not to provide such barriers to the residents' neighborhood was based upon an Environmental Impact Statement ("EIS") adopted in 1984 that recommended against building the barriers near the Cherrywood community. Construction of a federally-funded highway approximately 75 to 100 feet from Cherrywood began in 1996, and the plaintiffs requested that the Ohio Department of Transportation ("ODOT") reconsider the issue of whether to provide noise-mitigation measures near their neighborhood. When the ODOT refused, the plaintiffs filed their suit and alleged their claims were timely under the "continuing violation" theory.

The Sixth Circuit found that such theory did not apply to the plaintiffs' claims for several reasons. First, the court found that the ODOT's alleged wrongful act, the approval of the EIS, was a "discrete event." **The court noted that a "continuing violation" is characterized by "continual unlawful acts, not continual ill effects from an original violation."** Although the Cherrywood residents complained of continual injury as a result of the ODOT's failure to recommend sound-mitigation measures in the EIS, the continuing lack of such measures was held to constitute a "continuing ill effect," and was not the result of "continuing unlawful acts." In reaching that conclusion, the Sixth Circuit referred to the Seventh Circuit Court of Appeals' case, *Palmer v. Board of Educ.*, 46 F.3d 682 (7th Cir. 1995). In *Palmer*, the Seventh Circuit addressed the issue of whether an allegedly discriminatory school-closing plan constituted a "continuing violation." In the school district at issue in *Palmer*, there had been two junior high schools (one predominately African-American and the other predominantly Causasian [sic]). The district closed the predominantly African-American school and bussed the students to the other. The parents of an African-American student sued, claiming that the closing was discriminatory. In *Palmer*, the Seventh Circuit found that the plaintiffs' claim was not time-barred because each year the school board made a decision not to reopen the predominantly African-American school; the court compared that annual decision to the implementation of a discriminatory pay scale, which generates a wrongful act with each pay period.

The Sixth Circuit, in *Tolbert*, noted that, while under the theory articulated in *Palmer*, the ODOT's continuing adherence to the EIS "arguably constitute[d]" a series of decisions not to build sound barriers, *Tolbert* was nevertheless distinguishable from *Palmer* in that the EIS sound-barrier decision **had not been "systematically and repeatedly revisited."** Although the school board in *Palmer* had to make a choice between two options—the predominantly Caucasian school and the predominantly African-American school—at the beginning of each school year, there was no indication that the ODOT revisited the EIS issue at regular intervals. Thus, any claims relating to the creation and adoption of the EIS were considered time-barred as they did not satisfy the requirements for a "continuing violation."

*Lewis*, 2009 WL 10681443, at *12, n.43 (emphasis added).

Likewise, Plaintiffs' alleged Section 2 violation derives from a single, discrete act—the preclearance of the 2012 Mississippi Senate Plan ("2012 Senate Plan") by the United States Department of Justice on September 14, 2012 that made effective such plan as earlier adopted by both chambers of Mississippi's Legislature. Once the 2012 Senate Plan was precleared, the task of the Standing Joint Committee Legislative Committee on Reapportionment, the Mississippi Senate and the Mississippi House was complete. There have been no "continual unlawful acts" and no systematic and repeated revisits over the 2012 Senate Plan. No further action has occurred at any level and by any party over the 2012 Senate Plan since its adoption and preclearance in 2012.[1] In actuality, what Plaintiffs complain of are the continual ill effects from such alleged original violation that occurred in 2012—not continual unlawful and related acts to trigger the continual violation theory under *Lewis*, *Tolbert* and *Palmer*.

*Fouts*, *White* and their progeny make clear that the continual violation theory is contrary to reapportionment and laches case law. *Lewis*, *Tolbert* and *Palmer* explain in detail why the continual violation theory has no application to the facts herein. Accordingly, Plaintiffs' Section 2 claim and requested injunctive relief are barred by the applicable statute of limitations and by the doctrine of laches.

### II. Plaintiffs cannot escape the undue prejudice to Defendants and related parties as a result of their inexcusable delay.

As stated, the two primary cases cited by Plaintiffs in efforts to support their position that the doctrine of laches does not apply come from the same district court in Arkansas. Plaintiffs attempt to use these two cases to not only omit their inexcusable delay, but to minimize and

---

[1] Even if the 2015 election was held to be a continuing violation, the doctrine of laches still applies as Plaintiffs have presented no evidence explaining their inexcusable delay in waiting almost three years to bring this suit, which will now certainly interfere with the established election deadlines and procedure due to such delay.

ignore any associated prejudice to Defendants, local officials and voters because "**most importantly**, the injury alleged … is continuing, suffered anew each time a[n] … election is held under the [illegal] structure." Plntfs' Resp. Memo. [doc. #24], at 8 (emphasis added). This is telling because as demonstrated above, the "continuing violation theory" has no application in reapportionment and laches cases to justify delay and, likewise, the associated prejudice.

Plaintiffs make much of the fact that any redistricting of District 22 will supposedly only affect two districts, thereby reducing or minimizing the ensuing prejudice to the impacted parties. But, the doctrine of laches requires "undue prejudice *to the party* against whom the claim was asserted." *Tucker v. Hosemann*, 2010 WL 4384223, at *4 (N.D. Miss. Oct. 28, 2010) (citing *Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir. 1977)) (emphasis added). So, whether it is prejudice to one or prejudice to many, it does not matter. And, even taking Plaintiffs' allegation that District 22 can be redistricted to only affect two districts as true, which is no small feat as such a determination will be initially left to the legislature, Plaintiffs' expert still proposes impacting four counties. That impacts four circuit clerks, numerous election officials, potential candidates and thousands of voters. Prejudice is prejudice and Plaintiffs' inexcusable delay will unquestionably cause its exacerbation.

Finally, Plaintiffs argue that their Section 2 claim was brought almost 13 months prior to the August primaries of 2019, so any associated prejudice will be minimal. Once more, Plaintiffs neglect the impending qualifying period which commences January 2, 2019, that will undoubtedly be impacted should this case successfully proceed. Impacting that period has a domino effect on all other relevant deadlines. As more particularly set forth in Defendants' Memorandum [doc. #20] accompanying its motion for summary judgment, this domino effect is the exact electoral interruption, chaos and confusion that courts have avoided by correctly

applying the doctrine of laches. Plaintiffs' claim is not only inexcusable; it inflicts undue prejudice on Defendants and related parties.

## CONCLUSION

Defendants' motion for summary judgment should be granted thereby dismissing Plaintiffs' Section 2 claim and requested relief.

RESPECTFULLY SUBMITTED, this the 25th day of September, 2018.

            Governor Phil Bryant, Secretary of State Delbert Hosemann, and Attorney General Jim Hood in their official capacities of their respective offices and in their official capacities as members of the State Board of Election Commissioners

BY: */s/ Tommie S. Cardin*
     TOMMIE S. CARDIN (MB # 5863)
     CHARLES E. GRIFFIN (MB #5015)
     BENJAMIN M. WATSON (MB # 100078)
     B. PARKER BERRY (MB # 104251)

       THEIR ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
Suite 1400
1020 Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: charles.griffin@butlersnow.com
E-mail: ben.watson@butlersnow.com
E-mail: parker.berry@butlersnow.com

## CERTIFICATE OF SERVICE

I, Tommie S. Cardin, hereby certify that on this day I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this, the 25th day of September, 2018.

/s/ Tommie S. Cardin
TOMMIE S. CARDIN

44244156.v1