**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS; VERNON AYERS;
and MELVIN LAWSON**                                    **PLAINTIFFS**


**v.**                                    **CIVIL ACTION NO. 3:18-cv-441-CWR-FKB**


**PHIL BRYANT, Governor of the State of
Mississippi; DELBERT HOSEMANN,
Secretary of State of the State of Mississippi;
and JIM HOOD, Attorney General of the
State of Mississippi, all in their official capacities
of their own offices and in their official capacities
as members of the State Board of Election Commissioners**          **DEFENDANTS**


**DEFENDANTS' SUPPLEMENTAL AUTHORITY MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants file this supplemental authority memorandum in support of their motion for

summary judgment [doc. #19] ("Motion") as new and undisputed facts that go to the very crux of

Defendants' laches argument, and that might otherwise escape the Court's attention,  were only

recently revealed through discovery.

As a reminder, the doctrine of laches applies "when plaintiffs (1) delay in asserting a

right or claim; (2) the delay was not excusable; and (3) there was undue prejudice to the party

against whom the claim was asserted." *Tucker v. Hosemann*, 2010 WL 4384223, at \*4 (N.D.

Miss. Oct. 28, 2010) (citing *Save Our Wetlands, Inc. v U.S. Army Corps of Engineers*, 549 F. 2d

1021, 1026 (5th Cir. 1977).  Defendants' Motion and accompanying memorandum [doc. #20] lay

out in detail the facts and legal authorities supporting each prong of the laches defense. However,

additional information concerning the second laches prong—that the delay was not excusable—

has only recently come to light.  Because this new information bears greatly in support of

Defendants' laches argument, it is necessary to bring to the Court's attention.

On January 16, 2019, after oral argument on the Motion, Plaintiff Joseph Thomas

("Thomas") was deposed by counsel for Defendants. During the deposition, Thomas repeatedly

admitted that in 2012, as a long-standing participant in the electoral and political process in the

Mississippi Delta,[1] he was aware of the drafting and implementation of the 2012 Mississippi

Senate Reapportionment Plan ("Plan"), which included those lines of Senate District 22

("District 22"), that he now challenges. Specifically, the following exchange occurred between

Defendants' counsel and Thomas:

> Q.  In your own words, can you describe for me the claims that you and
> the other plaintiffs are making in this lawsuit?
> A.  We filed the lawsuit because we felt – I felt that and others likewise
> that we were in a situation that was unfair and unlawful.
> Q.  Can you elaborate on what that situation was and what about it made
> you feel that it was unfair and unlawful?
> A.  Well, I was in a district, District 21 that was a winnable district.  You
> know, when you say one thing and do something else, but I was in a district that
> was a winnable district.  When the state set up these districts, then it need [sic] to
> be done in a fair and lawful way.
> Q.  Okay.  So --
> A.  And I was moved out of 21 into 22 and the numbers changed in 22,
> but the common interest, our bond did not change.  It's a black district.  *Should
> have been a minority district, a winnable minority district and that wasn't the
> case.*
> Q.  So let's establish the timeframe that we're talking about.  When were
> you moved out of District 21 and into 22?
> A.  I was in 21 and they done the 2010 census. So probably when there
> was -- around 2012 when --
> Q.  Reapportionment was done?
> A.  Yeah.  So I was moved out and put into 22. *And when I start looking
> at the numbers in 22, that's when I picked up that that wasn't really a black
> district, a minority district.  I say a black, minority district.  It wasn't even
> reasonable to have a district like that.  And that's when I started to -- one of the
> things, you know, the district, you're looking at Washington, Bolivar, Humphreys,
> Sharkey, Yazoo and Madison was a sore spot.*

---

[1] Thomas served as state senator for Senate District 21 for one term from 2004 to 2008 until defeated in the primary in his bid for re-election. *See* Tr. of Depo. of Joseph Thomas, pp. 20-21 (attached hereto as "Exhibit 1").

Tr. of Depo. of Joseph Thomas, pp.19-20 (attached hereto as "Exhibit 1") (emphasis added).

Not only was Thomas aware of the composition of District 22 in 2012, he actively

engaged the United States Department of Justice ("DOJ") during that period to not preclear the

Plan:

> Q.   Okay.   Did you confer with anybody in the senate about your
> concerns over the district and the new configuration of the district from a racial
> standpoint?
> A.   I had, you know, as I got information, *I had been talking to people
> like Chris Herron, who is Chief of Civil Rights Division in Washington, DC*.
> Q.   At justice?
> A.   *Justice, yeah*.   People like Rush Noble, you know, trying to get them
> to intervene.   Because I think as far as the state, all of this was pretty much set.
> They had voted on this and all that.   I didn't have any say so in that.   I wasn't even
> there.   But it had already been agreed upon and all that had been done.   I was
> trying to keep the Justice Department from preclearing it or from approving that,
> which to no avail.
> Q.   Well, let me ask you this.   Why were you trying to keep the Justice
> Department from preclearing it?
> A.   Because it wasn't a minority district.
> Q.   Okay.
> A.   And we didn't have enough minority districts in the first place based
> on our population of this state.   It was just -- just wasn't fair.
> Q.   *Okay.   So did you contact the Justice Department to complain of a
> violation?*
> A.   **Yes.**

*Id.* at pp. 21-22 (emphasis added).

After this exchange, Thomas was presented with a letter dated August 20, 2012, that he

signed and submitted to Chris Herron at DOJ. *Id.* at p. 22. In this letter, which was marked as

Exhibit 2 to the transcript, Thomas wrote the following:

08/20/2012

Mr. Chris Herron
Chief, Voting-Civil Rights Division
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenues, N W
Washington, D C 20530

Dear Mr. Herron,

This letter is a request for the Department of Justice to look hard at the Mississippi Senate Redistricting plan. This plan has violated section 5and 2 of the Voting Right Bill. Please take at look at District 21, 22, 34, City of Yazoo MS, and the overall plan that reduce blacks voting strength.

Fact:
Mississippi has over 37% black population with a large percentage being in the Mississippi Delta. District 21 was moved out of Yazoo City which was the beginning of the Mississippi Delta.  Yazoo City was in District 21 which had a 66.02%- 18+BLK. Now the new State Plan reduces Yazoo City to a 50.77, which will not allow us to elect a black. District 22 is 50.77% black. This district consists of all black towns and cities in the Mississippi Delta. This includes Hollandale, Belzoni, Louise, Isola, Rolling folk, Yazoo City and many other smaller towns.  Most of these cities and towns are over 80 to 90% Black. Example- Yazoo City's population is around 11,000-85% black with a black Mayor and four out of five black Aldermen.

Mississippi's plan says District 22 is one of the 15 black senate Districts. They failed to tell that it is a Federal Prison in Yazoo City with a population way over 2000 inmates. These inmates cannot vote and will make this district fall below 50% black. The Senator in this District is white and lives in Hollandale a majority black city and no black has been able to win in this district. The reason is they all way go out of the community of common interest to fine white voters when they have enough black voters in these cities and towns. District 22 denies black voters by going over 80 miles from a white Senator's hometown, a rural community to an urban community in Madison County- (Gluckstadt MS) - nine miles from Jackson, Mississippi the State Capital. This area is an upscale white community, with no common interest to the very poor Mississippi Delta.

Finally, the State Plan clearly reduces over 17 impact districts with 30to 40% black population. These districts were doing well and had influences with numbers.

Once again please do not approve Mississippi's plan.

Sincerely,

Joseph C. Thomas

4

*Id.* at Exh. 2 to the Tr. (emphasis added). In discussing the letter and the Plan's alleged violation

of the Voting Rights Act, the following discussion occurred between Defendants' counsel and

Thomas:

> Q.   Will you explain to me who Mr. Herron is and why he's [sic] sending
> this letter?
> A.   Okay.  He was the Chief Voting -- over the Voting Civil Rights
> Division for US Department of Justice.
> Q.   Okay.  What made you send this letter to him?
> A.   He was over the division, so I wanted some help.
> Q.   Help to do what?
> A.   To -- not to get -- not to approve the State's plan.  Not to approve the
> State's plan.
> Q.   On what basis did you believe it shouldn't be approved?
> A.   Because it wasn't a black winnable district.  So why say it was a
> minority district?
> Q.   *Would it be fair to say that your concern was rooted in the fact that*
> *you didn't feel like it complied with the Voting Rights Act?*
> A.   *Yes.*
>
> …
>
> Q.   And you were trying to -- strike that. What were you trying to
> communicate through these letters and phone calls to the Justice Department
> about Mississippi's senate plan?
> A.   It wasn't fair.
> Q.   *When you say it wasn't fair, are you trying to say that it was illegal*
> *under the Voting Rights Act?*
> A.   *I'm going to say that the Voting Right Act, in my imagination would*
> *not allow this type of shenanigans.*

*Id.* at pp. 23; 25 (emphasis added).[2]

Finally, Thomas readily admitted that he was not surprised he lost the 2015 election for

state senator from District 22 because of the composition of the Plan, as submitted to DOJ in

2012:

> Q.   But is it fair to say that you're telling me you were not surprised by
> the result of the election in 2015, because that's what you expected would
> happen?

---

[2] Thomas also stated that other groups, like the Yazoo County chapter of the NAACP, also sent letters to DOJ in
2012 expressing his same concerns. *Id.* at pp. 26-28.

> A.   *Yeah, I think most people did.*
> Q.   Based on what?
> A.   Based on the plan that was submitted telling us that we had so many minority districts and presenting that [to] the Justice Department. And that wasn't the case.

Tr. at p.30 (emphasis added).

As required by the doctrine of laches, Plaintiffs have failed to even posit an excusable reason for their six-year delay in bringing the instant action. Not in their response in opposition to the Motion [doc. #23], not in the accompanying memorandum [doc. # 24], and not even at the oral argument on the Motion. But, as just laid bare, this is because there is no excusable reason—the lead Plaintiff, dating back to 2012, had actual knowledge of the Plan and openly contested it as violating Section 2 of the Voting Rights Act. *See Maxwell v. Foster,* 1999 WL 33507675 (W.D. La. Nov. 24, 1999). ("given the level of knowledge attributable to [plaintiffs], the delay *cannot be anything but inexcusable*.")*.* The other two plaintiffs, regardless of their actual knowledge, certainly should have known of the Plan in 2012 through reasonable diligence. *See White v. Daniel*, 909 F. 2d 99 (4th Cir. 1990) (finding the plaintiffs' delay as inexcusable because the "plaintiffs, in the exercise of reasonable diligence, could have discovered at a much earlier time the facts upon which they now base their claim …..").

All this and yet, here the parties are well over six years later, under an extremely compressed and challenging trial calendar and in the middle of current election deadlines, all of which could have been avoided had Plaintiffs not knowingly sat on their rights. This is the very reason the doctrine of laches exists. Plaintiffs' six year delay is simply, inexcusable. This, in addition to Defendants' full laches analysis in their Motion and accompanying memorandum only further strengthens Defendants' equitable position.

WHEREFORE, premises considered, Defendants pray this Court enter an Order granting their Motion for Summary Judgment.

RESPECTFULLY SUBMITTED, this the 25th day of January, 2019.

Governor Phil Bryant, Secretary of State Delbert Hosemann, and Attorney General Jim Hood in their official capacities of their respective offices and in their official capacities as members of the State Board of Election Commissioners

BY:  */s/ Tommie S. Cardin*

TOMMIE S. CARDIN (MB # 5863)
CHARLES E. GRIFFIN (MB #5015)
BENJAMIN M. WATSON (MB # 100078)
B. PARKER BERRY (MB # 104251)

ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
Suite 1400
1020 Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel:  (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: charles.griffin@butlersnow.com
E-mail: ben.watson@butlersnow.com
E-mail: parker.berry@butlersnow.com

## CERTIFICATE OF SERVICE

I, Tommie S. Cardin, hereby certify that on this day I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this, the 25th day of January, 2019.

/s/ Tommie S. Cardin
TOMMIE S. CARDIN

8

45807306.v1

"EXHIBIT 1"

# Joseph Thomas, et al. v. Phil Bryant, Governor of the State of MS, et al.

## Joseph Thomas

## January 16, 2019

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



## Mississippi - Louisiana - Tennessee - New York
## 1-800-245-3376

Joseph Thomas 1/16/2019

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOSEPH THOMAS; VERNON AYERS;
and MELVIN LAWSON                        PLAINTIFFS


v.            CIVIL ACTION NO. 3:18-cv-441-CWR-FKB


PHIL BRYANT, Governor of the State of
Mississippi; DELBERT HOSEMANN,
Secretary of State of the State of Mississippi;
and JIM HOOD, Attorney General of the
State of Mississippi, all in their official
capacities of their own offices and in their
official capacities as members of
the State Board of
Election Commissioners                  DEFENDANTS



DEPOSITION OF JOSEPH THOMAS



Taken at the instance of the Defendants at the
offices of Robert McDuff, 767 N. Congress Street,
Jackson, Mississippi on Wednesday, January 16, 2019,
beginning at 1:14 p.m.



REPORTED BY: LORI W. BUSICK
             Brooks Court Reporting
             12 Lakeland Circle, Suite A
             Jackson, Mississippi 39216
             (601)362-1995

## Page 2

```
1   APPEARANCES:
2   ROBERT MCDUFF, ESQ.
    767 N. Congress Street
3   Jackson, Mississippi 39202
    rbm@mcdufflaw.com
4
5   BETH L. ORLANSKY, ESQ. (VIA TELECONFERENCE)
    Mississippi Center for Justice
6   5 Old River Place, Suite 203 (39202)
    Post Office Box 1023
7   Jackson, Mississippi 39215-1023
    borlansky@mscenterforjustice.org
8
9   JON M. GREENBAUM, ESQ. (VIA TELECONFERENCE)
    POOJA CHAUDHURI, ESQ.
10  ARUSHA GORDON, ESQ.
    Lawyers Committee for Civil Rights
11  1500 K Street NW, Suite 900
    Washington, DC, 20005
12  jgreenbaum@lawyerscommittee.org
13          COUNSEL FOR PLAINTIFF
14
15  CHARLES E. GRIFFIN, ESQ.
    TOMMIE S. CARDIN, ESQ.
16  Butler Snow LLP
    Suite 1400
17  1020 Highland Colony Park
    Ridgeland, Mississippi 39157
18  Post Office Box 6010
    Ridgeland, Mississippi 39158-6010
19  charles.griffin@butlersnow.com
20          COUNSEL FOR DEFENDANT
21
22  DOUGLAS T. MIRACLE, ESQ.
    MS Attorney General's Office
23  Walter Sillers Building
    550 High Street, Suite 1200
    Jackson, Mississippi 39201
24
            COUNSEL FOR DEFENDANT, JIM HOOD
25
```

## Page 4

```
1              INDEX
2   Style and Appearances
3   Certificate of Deponent
4   Certificate of Court Reporter
5
6           EXAMINATIONS
7   Examination by Mr. Griffin....................4
8
9            EXHIBITS
10  EXHIBIT 1  Notice of Deposition ................6
11  EXHIBIT 2  Letter .............................25
12  EXHIBIT 3  Letter .............................25
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1       BENJAMIN E. GRIFFITH, ESQ.
        Griffith Law Firm
2       2086 Old Taylor Road, Suite 1023
        Oxford, Mississippi 38655
3
        CONSULTANT FOR DEFENDANTS
4
5   ALSO PRESENT: EMILY W. KRUGER, ESQ.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1            Joseph C. Thomas,
2   having been first duly sworn, was examined and
3   testified as follows:
4
5       MR. GRIFFIN:  For the court reporter, I
6   will ask everyone, for the record, to identify
7   themselves.  I'm Charles Griffin along with Tommie
8   Cardin representing the defendants.
9       MS. MIRACLE:  Douglas Miracle from the
10  Attorney General's Office, also on behalf of
11  Attorney General, Jim Hood.
12      MS. KRUGER:  Emily Kruger on behalf of
13  Governor, Phil Bryant.
14      MR. McDUFF:  Rob McDuff representing the
15  plaintiffs.  And on the telephone are Beth Orlansky,
16  who's cocounsel for the plaintiffs.  Also, Jon
17  Greenbaum, Arusha Gordon and Pooja Chaudhuri.  And I
18  can give you the spellings later.
19      MR. GRIFFITH:  I'm Ben Griffith appearing
20  on behalf of the defendants as a consultant.
21
22  EXAMINATION BY MR. GRIFFIN:
23      Q.  Would you identify yourself, for the
24  record, please?
25      A.  My name is Joseph C. Thomas.
```

2 (Pages 2 to 5)

Joseph Thomas 1/16/2019

**Page 6**

1    Q. And what's your address, Mr. Thomas?
2    A. My address is 820 Prentiss Avenue in Yazoo
3  City, Mississippi.
4    Q. And are you here pursuant to a Notice of
5  Deposition?
6    A. Yes.
7    Q. I want to ask that you look at this and
8  tell me if that's the Notice of Deposition that
9  you're here pursuant to? You can feel free to let
10 your counsel look at it.
11   A. Okay.
12      MR. GRIFFIN: I'd ask that that be marked
13 as Exhibit 1 to the deposition.
14      (Exhibit 1 marked for identification.)
15 BY MR. GRIFFIN:
16   Q. Mr. Thomas, please state your full name,
17 occupation, age and date of birth, for the record.
18   A. My full name is Joseph Charles Thomas, C
19 stands for Charles. I'm a retired banker of 30
20 years with Regions Bank.
21   Q. Which location?
22   A. Pretty much I was Yazoo, but I did work
23 statewide.
24   Q. And what was your title?
25   A. I was the vice president of the bank.

**Page 7**

1    Q. What's your current age?
2    A. Sixty-nine.
3    Q. Okay. And date of birth?
4    A. 6/25/49.
5    Q. How long have you lived in what is
6  currently Mississippi Senate District 22?
7    A. I lived in 21 and I was moved out of 21
8  into 22.
9    Q. When was that?
10   A. That was prior to 2015, after the 2012
11 census -- 2012 arrangement that was made.
12   Q. How long have you been a registered voter
13 in the state of Mississippi?
14   A. Since I was 18.
15   Q. Do you recall where you registered to
16 vote?
17   A. Yazoo County.
18   Q. Would you describe for me the process in
19 which you went through to register to vote?
20   A. At that time when I was 18 and I'm 69 now.
21 Basically --
22   Q. As best you can recall?
23   A. I went to the courthouse and registered.
24 Yeah.
25   Q. Did you have any trouble --

**Page 8**

1    A. Did I have any trouble? It was -- at that
2  time it was some trouble, not necessarily I had
3  trouble but my people had trouble.
4    Q. All right. When you say your people,
5  African Americans?
6    A. African American.
7    Q. Do you recall how many elections you've
8  voted in since you registered to vote?
9    A. Just about all. I mean, I went to
10 college. I might have missed some when I was in
11 school but most all of them.
12   Q. Where did you go to college?
13   A. Jackson State.
14   Q. What organizations are you involved in
15 either political, civic, charitable, educational,
16 social or otherwise?
17   A. Actively involved, have been involved
18 with?
19   Q. Both?
20   A. Okay.
21   Q. As you define them, describe whether or
22 not you're still activity involved?
23   A. Okay. Well, I've been a community leader
24 all my life basically even in college. So when I --
25 I decided to stay in Yazoo City back in 1970 -- in

**Page 9**

1  the '70s. So I was blessed to get a job at a local
2  bank. And the name of that bank was Delta National
3  Bank in Yazoo City, which we had the largest bank in
4  Yazoo County. So you know that was right up my
5  alley in terms of reaching out to our community.
6       So I was a representative of the bank and
7  loan officer. Basically I was involved in a lot of
8  activities. You're trying to wait on me to name
9  some. Yazoo County Fair Civic League would be one,
10 and I'm still activity involved. And we had a
11 community center for the community and we reached
12 out and we built houses for the elderly and
13 handicapped. So we have 238 units of housing for
14 elderly and handicapped citizens. That would be one
15 organization. Yazoo County Fair and Civic League.
16      Yazoo County Chapter of NAACP. We had,
17 you know, just -- I wore a lot of hats. Our Utility
18 Public Service Commission, Public Service Commission
19 of Yazoo City. I served on the board. And I was
20 the first black to -- from this region to serve on
21 the National Board of Directors of APPA, American
22 Public Power Association. That's cities that own
23 their own water, lights -- utilities, public
24 utilities. I started out by serving -- to serve on
25 that board you had to serve on your local utilities.

**Page 10**

1    So I served on local utility.  And then I was
2    elected to APPA National Advisory Board.  I chaired
3    the National Advisory Board for APPA, which United
4    States and about 20 countries.  Also, I was on the
5    National Board of Directors for American Public
6    Power Association.  All of this is in the past now.
7        Q.  Okay.
8        A.  I was basically -- Boys and Girls Club.  I
9    helped to organize our Boys and Girls Club in Yazoo
10   City.  I worked with -- let me back up.  I was -- on
11   the political side I worked with Robert Clark.  When
12   Robert ran for congress the numbers were not there,
13   but I helped him.  Mike Espy -- I done the FEC
14   filings to help Robert.  I was Treasurer for Mike
15   Espy when he ran for congress.  I done the FEC
16   filings for him while I was at the bank basically.
17   I worked with governor Bill Waller.  I was his
18   co-treasurer last time he ran for governor in I
19   believe 1987.
20        So I've been involved politically behind
21   the scenes with individuals.
22        Q.  Did you ever serve on a political action
23   committee or political executive committee?
24        A.  I've served like community action.  I was
25   on the board of Community Action Agency.  Head

**Page 11**

1    Start, I've worked with Head Start.
2        Q.  That's Yazoo County?
3        A.  Yeah.  Many years, yeah.  Public service,
4    I worked with the state -- when I was back with
5    Public Service Commission I also worked with various
6    organizations dealing with public utilities for
7    cities.
8        Q.  You worked for the Public Service
9    Commission?
10       A.  Not the state.
11       Q.  Okay.
12       A.  When I say cities that had their on trade
13   association dealing with public utilities.  For
14   instance, we're a generating city in Yazoo and we
15   had three sister cities, Clarksdale -- Greenwood and
16   Clarksdale.  But in our trade association we had
17   like seven cities that were part of our group.  And
18   we called that MEA, Mississippi Energy Association.
19       Q.  I got you.
20       A.  And so, we dealt mainly in transmission of
21   utility of electric.  Some cities had water and some
22   had lights and some had gas.  Canton is one our
23   cities.
24        But 45 years that's all I've done is
25   worked in community, not just our community -- one

**Page 12**

1    other thing.  I served on -- I helped to put
2    together the Appraisal Board for our state when we
3    had the Savings and Loan fiasco.
4        Q.  Right.
5        A.  And they mandated every state had to set
6    up their own appraisal board that was in line with
7    federal government.  So I helped to -- because I
8    wasn't a licensed appraiser to appraise real estate
9    or forestry.  So I helped to set up that board on
10   loan from my bank, Deposit Guaranty made me
11   available to help.  And we also invested funds to
12   help set that State Appraisal Board up.
13       Q.  Now, at what point did you transition form
14   being an employee of Delta National to Deposit
15   Guaranty?
16       A.  It was merger in 1981.  We went through a
17   lot of mergers.
18       Q.  Okay.
19       A.  Same bank.
20       Q.  Same bank?
21       A.  Uh-huh (affirmative response).
22       Q.  Were you a member of a fraternity during
23   this time period or a Masonic temple or anything
24   like that?
25       A.  No.  I've been a Mason, but no.

**Page 13**

1        Q.  Where were you a Mason and when?
2        A.  Yazoo City Lodge No. 216 back in the '70s.
3        Q.  So you're no longer active?
4        A.  No.
5        Q.  Do you recall what, if anything, you had
6    to do with the D.W. Wilburn Scholarship Foundation?
7        A.  I am one of the founders of the D.W.
8    Wilburn Foundation.  James Robinson was our
9    President and I was Vice President of the D.W.
10   Wilburn Foundation.
11       Q.  What does that foundation do?  What's the
12   charter?
13       A.  We give scholarships and book awards,
14   church awards to anybody that lives in Yazoo County,
15   Mississippi.
16       Q.  Who was D.W. Wilburn?
17       A.  He was a retired educator, long-time
18   retired.  He was dean of students at Jackson State
19   and he was -- he really retired from Alcorn State
20   under Dr. Walter Washington's tenure.  He was
21   long-time register at Alcorn State.  He was from
22   Yazoo County, too.
23       Q.  Did you know him before the bank?
24       A.  Yes.  I knew him and he -- like I said, we
25   set up -- James Robinson set up the foundation, but

**Page 14**

1    we had -- Dr. Walter Washington was one of the
2    founders, former President of Alcorn State.  And we
3    had Dr. Walter Reed former Athletic Director at
4    Jackson State.  We had several others that were on
5    that on our board.  All of them are pretty much
6    deceased except maybe two now.
7       Q.  Are you still active with it?
8       A.  Yeah, I'm the Vice President.  James
9    Robinson passed last year.  He lived in
10   Indianapolis, Indiana.  He passed, so we don't have
11   a President at this time.
12      Q.  Okay.
13      A.  But I was the Vice President.  And we made
14   available -- had a few scholarships to individuals,
15   we had two-folds.  On the Alcorn side, we give a
16   $5,000 scholarship to any student that want to
17   attend Alcorn each year.  And then we give book
18   awards and smaller scholarships to students that
19   want to attend Jackson State or Alcorn.
20      Q.  Would that be any student from Yazoo
21   County?
22      A.  From Yazoo County, yeah.  That was the
23   stipulation.  Mr. Wilburn -- well, Mr. Wilburn set
24   that up the way he -- in terms of the $5,000
25   scholarship, you had to be from Yazoo County.

**Page 15**

1         And Mr. Wilburn, he donated $100,000 to
2    Alcorn State and Tom Joiner (sic) Foundation matched
3    that with $100,000.  And they've gave $200,000 that
4    Alcorn State holds the funds we just designate who
5    get --
6       Q.  Interest?
7       A.  No, who get the scholarships.
8       Q.  Okay.
9       A.  And I don't chair that.  That's a
10   gentleman named Joe Smith, he chairs that in terms
11   of, he works with -- Mr. Wilburn was a trustee at
12   St. Stephen's United Methodist Church.  And so the
13   pastor of that church and the principal of high
14   school and Joe Smith and Ms. Kathryn Grant, they
15   decide who gets that $5,000 scholarship, not the
16   D.W. Wilburn Foundation.
17      Q.  Okay.  Now, you also have a relationship
18   with the National Development Foundation?
19      A.  Jackson State University.  And I'm a past
20   board member of the Jackson State National
21   Development Foundation.
22      Q.  Can you tell me what that is?
23      A.  We're talking about Jackson State, right?
24      Q.  Yes.
25      A.  Okay.  Jackson State Development

**Page 16**

1    Foundation, we raise money basically.  The former
2    governor Haley Barbour, he on the board.  Ronald,
3    Leland Speed.  We've had -- I'm just naming some
4    people.  We had a group and basically what we did --
5    the last fund I worked on before I went into the
6    senate was -- we had a $50 million capital fund.  We
7    was trying to raise $50 million for the school, for
8    the University.
9       Q.  Did you all achieve that goal?
10      A.  Yes, sir, as far as I know.  I left -- we
11   was pretty close when I left.
12      Q.  Do you recall what year you left?
13      A.  2004 probably.  Ronald, Dr. Ronald Mason
14   was the President at that time.  I left when I ran
15   for the senate.  And when I got elected in District
16   21 I left.  Also the utility, I got off the board of
17   the utility also.  I wanted to spend all of my time
18   or most of my time on serving my --
19      Q.  Constituents?
20      A.  That's right.
21      Q.  I believe you also were a member of the
22   Yazoo County Fair?
23      A.  I mentioned that.  The housing for the
24   elderly and handicapped.
25      Q.  That's not the same a commission that

**Page 17**

1    would have entertainment?
2       A.  No.
3       Q.  It's something else?
4       A.  We were the Yazoo -- T.J. Huddleston
5    Secretary Espy's grandfather was one of the founders
6    of the Yazoo County Fair Civic League.  And we had
7    the first -- well, he had the first hospital for
8    blacks in the state.  First -- we had a chain of
9    funeral homes and all of that.
10       But anyway, he started the Fair and Civic
11   League, Yazoo County Fair and Civic -- and at that
12   time you could not -- they had the negro fair and
13   the white fair.  And it was a fair, you know, county
14   fair.  Candy and activities and animals and all that
15   stuff.  And it evolved into a county fair where the
16   fair would come -- just like a county fair.  They
17   had the white county fair and the black county...
18       But later on we wanted to do more.  So
19   what we did -- we needed a community center.  So we
20   put together an application and got a grant from the
21   federal government to build a community center.  And
22   we named the community center Dr. L.T. Miller, who
23   was the first medical director at the black hospital
24   under T.J. Huddleston, director.  So that's where
25   the Fair and Civil League -- and then later on we

**5 (Pages 14 to 17)**

**Page 18**

1    did the housing for elderly and handicapped.  We
2    have a unit here in Jackson that's -- the
3    organization.  I'm not on the board anymore.  I got
4    off the board.  I'm still a member.
5        Q.  When did you get off the board?
6        A.  When I went into the senate.
7        Q.  Okay.
8        A.  I had so much, I had to get --
9        Q.  You had to get off?
10       A.  Yeah.  I had a lot of stuff going on.
11   So...
12       Q.  But you're still a member?
13       A.  Still a member.
14       Q.  Okay.
15       A.  Be we got a lot of members now.
16       Q.  What does your membership entail?
17       A.  For the Fair and Civic League.
18       Q.  Yes.
19       A.  It's -- basically anybody can be a member
20   of the Yazoo County -- we were the Negro Fair
21   Association and we had to drop the name negro to get
22   the funds from the federal government to build a
23   community center.  So instead of negro, we said
24   Yazoo County.  Same folks.
25          (Laughter.)

**Page 19**

1        Q.  Now, as you know we're here about a
2    lawsuit that you filed a long with Vernon Ayers and
3    Melvin Lawson, correct?
4        A.  Yes, sir.
5        Q.  In your own words, can you describe for me
6    the claims that you and the other plaintiffs are
7    making in this lawsuit?
8        A.  We filed the lawsuit because we felt -- I
9    felt that and others likewise that we were in a
10   situation that was unfair and unlawful.
11       Q.  Can you elaborate on what that situation
12   was and what about it made you feel that it was
13   unfair and unlawful?
14       A.  Well, I was in a district, District 21
15   that was a winnable district.  You know, when you
16   say one thing and do something else, but I was in a
17   district that was a winnable district.  When the
18   state set up these districts, then it need to be
19   done in a fair and lawful way.
20       Q.  Okay.  So --
21       A.  And I was moved out of 21 into 22 and the
22   numbers changed in 22, but the common interest, our
23   bond did not change.  It's a black district.  Should
24   have been a minority district, a winnable minority
25   district and that wasn't the case.

**Page 20**

1        Q.  So let's establish the timeframe that
2    we're talking about.  When were you moved out of
3    District 21 and into 22?
4        A.  I was in 21 and they done the 2010 census.
5    So probably when there was -- around 2012 when --
6        Q.  Reapportionment was done?
7        A.  Yeah.  So I was moved out and put into 22.
8    And when I start looking at the numbers in 22,
9    that's when I picked up that that wasn't really a
10   black district, a minority district.  I say a black,
11   minority district.  It wasn't even reasonable to
12   have a district like that.  And that's when I
13   started to -- one of the things, you know, the
14   district, you're looking at Washington, Bolivar,
15   Humphreys, Sharkey, Yazoo and Madison was a sore
16   spot.
17       Q.  When you were in 21, did you have any role
18   with redistricting?
19       A.  No.
20       Q.  Which committees were you on?
21       A.  This happened after I was out of the
22   senate, that part.
23       Q.  Okay.
24       A.  I still can tell you the committees I was
25   on, but...

**Page 21**

1        Q.  Did you leave the senate before the
2    district changed?
3        A.  I did.  I didn't leave, I lost.
4        Q.  Okay.  Let's walk up to that election.
5        A.  Okay.
6        Q.  The election that you lost was in what
7    year?
8        A.  2008 -- 2007.
9        Q.  And the demographics in your district at
10   that time, was that District 21?
11       A.  21, that's right.
12       Q.  The demographics changed when, for that
13   district?
14       A.  After the 2008 election.  After the 2010
15   census, which we're looking at what, 2012 or so.
16       Q.  Okay.  Did you confer with anybody in the
17   senate about your concerns over the district and the
18   new configuration of the district from a racial
19   standpoint?
20       A.  I had, you know, as I got information, I
21   had been talking to people like Chris Herron, who is
22   Chief of Civil Rights Division in Washington, DC.
23       Q.  At justice?
24       A.  Justice, yeah.  People like Rush Noble,
25   you know, trying to get them to intervene.  Because

Joseph Thomas 1/16/2019

Page 22

1  I think as far as the state, all of this was pretty
2  much set.  They had voted on this and all that.  I
3  didn't have any say so in that.  I wasn't even
4  there.  But it had already been agreed upon and all
5  that had been done.  I was trying to keep the
6  Justice Department from preclearing it or from
7  approving that, which to no avail.
8       Q.  Well, let me ask you this.  Why were you
9  trying to keep the Justice Department from
10  preclearing it?
11      A.  Because it wasn't a minority district.
12      Q.  Okay.
13      A.  And we didn't have enough minority
14  districts in the first place based on our population
15  of this state.  It was just -- just wasn't fair.
16      Q.  Okay.  So did you contact the Justice
17  Department to complain of a violation?
18      A.  Yes.
19      Q.  I believe your lawyer gave us a couple of
20  documents I want you to look at.  One document is
21  dated August 20, 2012.  That's the Chris Herron?
22      A.  That's right.  I had talked with him and
23  basically --
24          MR. McDUFF:  He hasn't asked you a
25  question.

Page 23

1          THE WITNESS:  Okay.
2  BY MR. GRIFFIN:
3       Q.  Will you explain to me who Mr. Herron is
4  and why he's sending this letter?
5       A.  Okay.  He was the Chief Voting -- over the
6  Voting Civil Rights Division for US Department of
7  Justice.
8       Q.  Okay.  What made you send this letter to
9  him?
10      A.  He was over the division, so I wanted some
11  help.
12      Q.  Help to do what?
13      A.  To -- not to get -- not to approve the
14  State's plan.  Not to approve the State's plan.
15      Q.  On what basis did you believe it shouldn't
16  be approved?
17      A.  Because it wasn't a black winnable
18  district.  So why say it was a minority district?
19      Q.  Would it be fair to say that your concern
20  was rooted in the fact that you didn't feel like it
21  complied with the Voting Rights Act?
22      A.  Yes.
23      Q.  Let's flip over to a second letter that's
24  attached to this, stapled to this.  It's addressed
25  to the Chief Voting Section, Civil Rights Division,

Page 24

1  Department of Justice.  Is that your signature on
2  that document?
3       A.  It is.
4       Q.  Will you explain this letter to me and why
5  you sent it?
6       A.  This particular letter was sent probably
7  when -- I'm trying to see which one I sent first.  I
8  sent several -- more than I have, but I don't have
9  them with me.  But we were trying to let them
10  know -- I was trying to let them know -- for
11  instance, I said, this letter is a request to the
12  Department of Justice to take a hard look
13  Mississippi's plan.  So we wanted them to look at.
14  And I was thinking that they had the lawyers and
15  they had all of the expertise, that they would
16  really look at it and give us some relief.
17      Q.  And would this have been before you sent
18  the letter on August 20, 2012 or --
19      A.  I think this one was before.
20      Q.  You testified that you sent more letters
21  than these two, you just don't have access to all of
22  them right now?
23      A.  Letters and telephone calls.  And I think
24  it was other individuals that were communicating
25  with the Department of Justice about this -- about

Page 25

1  the -- not just this district, it was some other
2  districts, too.
3       Q.  And you were trying to -- strike that.
4          What were you trying to communicate
5  through these letters and phonecalls to the Justice
6  Department about Mississippi's senate plan?
7       A.  It wasn't fair.
8       Q.  When you say it wasn't fair, are you
9  trying to say that it was illegal under the Voting
10  Rights Act?
11      A.  I'm going to say that the Voting Right
12  Act, in my imagination would not allow this type of
13  shenanigans.
14          MR. GRIFFIN:  Okay.  I'd like to mark this
15  as an exhibit.
16          MR. McDUFF:  Off the record.
17          (Exhibit 2 marked for identification.)
18          (Exhibit 3 marked for identification.)
19  BY MR. GRIFFIN:
20      Q.  We went off the record to allow you an
21  opportunity to have a closer look at the documents
22  that have been marked.  We separated the two
23  documents and made them two separate exhibits, two
24  and three.
25          And after having reviewed them, do you

7 (Pages 22 to 25)

Joseph Thomas 1/16/2019

Page 26

1  have some testimony that you want to clarify about
2  those two documents?
3      A.  Yes, sir.
4      Q.  Go ahead.
5      A.  Okay.  The letter that I'd indicated that
6  was sent prior to the August 20 letter 2012.
7      Q.  That's Exhibit 3?
8      A.  Exhibit 3.  This letter was a composite
9  plan.  I think this plan was one -- a plan that was
10  kicked around.  It had not been adopted or passed by
11  the legislature to be precleared.
12      Q.  Okay.
13      A.  I think this was -- and this letter was
14  sent ahead of time trying to get the Justice
15  Department to really look at whatever might come up
16  the pipe, whatever might come from the legislature.
17      Q.  Okay.  Now, at this point, you were
18  actively communicating with lawyers from the Justice
19  Department?
20      A.  Yes.  Well, lawyers, yeah.
21      Q.  And did you have any other counsel that
22  you were represented by at that time?
23      A.  No.
24      Q.  And were the other individuals similarly
25  situated as you who wanted to run for office that

Page 27

1  you were conferring with about the senate plan in
2  2012?
3      A.  I don't know of any other individuals.
4  But we had groups and organizations, like NAACP that
5  was concerned about the districts and how the
6  districts are set up.  Not enough districts for
7  minorities.  And then not winnable districts for
8  minorities.
9      Q.  So is it your testimony that they had the
10  same concerns that you had?
11      A.  Same concerns, yes.
12      Q.  And do you know if any of them decided to
13  file suit?
14      A.  Not file suit, but they've had some
15  communication, letters -- letters that was written.
16      Q.  From whom to whom?
17      A.  From same, Justice Department.
18      Q.  From whom?
19      A.  NAACP.  Like Yazoo County chapter of
20  NAACP.
21      Q.  Do you know which individuals within the
22  NAACP may have sent those letters?
23      A.  Yes.
24      Q.  Who?
25      A.  President of the Yazoo County chapter of

Page 28

1  NAACP.
2      Q.  Who was that?
3      A.  His name was Robert Gunn.
4      Q.  Robert Gunn?
5      A.  Yes.
6      Q.  Is he still living in --
7      A.  He's still living in Yazoo.
8      Q.  Where does he work?
9      A.  He's retired.  I don't know whether he's
10  actively working.
11      Q.  Is there anyone else?
12      A.  He was the one that signed the letter that
13  was sent to the Justice Department.
14      Q.  Okay.  On behalf of the NAACP?
15      A.  The Yazoo County chapter NAACP.
16      Q.  I asked you earlier about the claims that
17  you and the others are making in the lawsuit.  And I
18  believe you testified that you referred to the
19  actions of the legislature or the state as being
20  shenanigans.  We need to kind of clarify what you
21  mean in terms of were you trying to say that you
22  thought that the plan as written violated the Voting
23  Rights Act?
24      A.  Yeah.  You know, needs to be some common
25  bond or common, you know -- it need to -- in terms

Page 29

1  of people being elected -- areas.  And my conception
2  of the Mississippi Delta, the counties that are in
3  the delta.  When I first saw that -- for instance, I
4  ran in 22 and I done real well.  And I won in the
5  minority, the counties, Washington, Bolivar,
6  Humphreys.  But they jumped over to Madison and
7  that's where the white voter block came into play.
8  Everybody -- the whites in Madison voted for, you
9  know, the Chairman of the Appropriations Committee
10  that I was running against.  And that was a uphill
11  climb, too.  And it was a -- and when I was running
12  against the Chairman of the Appropriations
13  Committee, Republican, then that was -- a lot of
14  things happened in that race.
15      Q.  That was in 2012?
16      A.  2015.
17      Q.  2015?
18      A.  Yeah.  A lot of things -- how can you win
19  in all the counties except one and then lose?  I
20  knew that was going to happen.  That's why I wrote
21  the letter prior to this.  And that's why other
22  organizations, other groups and individuals were
23  concerned because of running the district a hundred
24  and something miles, a hundred miles from -- to pick
25  up a group of white voters over in Gluckstat in

**8 (Pages 26 to 29)**

**Page 30**

1 Madison County, Gluckstat area.
2 Q. So is it your testimony --
3 A. And those are upper income people.
4 They're not low -- very low income people.
5 Q. So is it --
6 A. So you're mixing -- it's a situation now
7 where -- well, anyway, I don't want to get on a
8 soapbox. Go ahead. I'm sorry.
9 Q. No. Feel free to answer the question to
10 the extent you feel like you need to.
11 But is it fair to say that you're telling
12 me you were not surprised by the result of the
13 election in 2015, because that's what you expected
14 would happen?
15 A. Yeah, I think most people did.
16 Q. Based on what?
17 A. Based on the plan that was submitted
18 telling us that we had so many minority districts
19 and presenting that the Justice Department. And
20 that wasn't the case.
21 Q. So there wasn't --
22 A. So we lost out all around. Because
23 percentage wise, voters over 18, you're saying that
24 you can win in 15 districts and that wasn't the
25 case, hadn't happened and won't happen under the

**Page 31**

1 plan that we got. It will never happen.
2 Q. We're going to move on.
3 Can you describe your experience with
4 elections held in Senate District 22, including
5 those at the state, local and county levels? Let me
6 break it down for you.
7 A. Okay.
8 Q. Do you participate as a voter, candidate,
9 campaign supporter or any other role or in all those
10 roles? Just kind of tell me what your role --
11 A. Well, in District 22 -- I was in 21.
12 District 22, when I got put in 22 -- but prior to
13 that I had been helping minority candidates run for
14 the same office for senate. And there were some
15 good candidates. They ran good races, but -- and
16 minorities voted for them. They got the black vote
17 but they never could -- they never did win. Marla
18 Brooks, Jeruba (sic) Hill are some of them. Jeruba
19 (sic) was an attorney and she could not win in that
20 district. After the blacks delivered their votes,
21 they voted for her and she still could not win.
22 You got -- you got a gentleman that lives
23 in Hollandale, Mississippi that held that seat and
24 he couldn't even win his own county.
25 Q. Do you recall the years of those

**Page 32**

1 particular elections?
2 A. Going back to the first time that district
3 was -- well, 2007 -- I'm sorry, 2003, 2007 and 2012,
4 I think, and '15.
5 So if you're holding a seat and you can't
6 win the black vote in the counties that you're
7 representing...
8 Q. So you were aware of all of this and you
9 had developed an opinion about what it would mean in
10 terms of your being electable at the time the
11 Mississippi legislature approved the reapportionment
12 plan in 2012?
13 A. Yeah. When I ran in 22, we had -- I
14 honestly thought in my mind in -- when I ran for --
15 in 22, I knew it would be hard to win in 22 because
16 of the numbers. But we had worked hard. I mean, in
17 terms of working with -- not just the minority
18 community, we worked with the community as a whole
19 when I was in the senate. We brought millions of
20 dollars into our counties like Madison and Yazoo.
21 And we done a lot of constituent service. My wife
22 is a licensed social worker and I wasn't getting
23 compensated but I was a full-time senator. And we
24 helped a lot of people, especially elderly and
25 handicapped and so on. But I thought -- and

**Page 33**

1 education, I served on the Education Committee also.
2 So I honestly, in my mind, thought I would
3 have done better than I did and still ended up
4 losing. So I thought -- the reason I ran because I
5 thought I was going to win. In Madison County we
6 had just done -- I'm not campaigning now -- but I
7 had just did a state of the art nursing home for
8 developmental adults, bed patient adults. Had
9 lifted a Certificate of Need and got them a CON to
10 build a nursing home there.
11 So in that area, I thought I would have
12 done better than I did. And we really worked with
13 the black community and the white community. But
14 when it came down to voting that wasn't the case.
15 Q. When you mean that wasn't the case, can
16 you elaborate on that?
17 A. Well, the whites voted for whites.
18 Q. Are you saying that the white people,
19 including the groups that you helped did not vote
20 for you?
21 A. Whites voted for the whites.
22 Q. And have you done -- what have you done to
23 justify that conclusion?
24 A. Well, you know, like I said,
25 schoolteachers justified -- when I say whites, I had

**Page 34**

```
 1    some white votes now, don't get me wrong, but I
 2    didn't have enough to win.  So I'm not saying all
 3    the whites didn't vote for me, but I didn't get the
 4    numbers.  I campaigned, too.  I had a strong
 5    campaign committee, strong activity, associations
 6    like MAE and groups like that and Parents for Better
 7    Education, but it just didn't happen.
 8        Q.  Did --
 9        A.  But I shouldn't have had to work that hard
10    if it was a minority district, as hard as I did.  If
11    you're telling me my district is a minority
12    district.
13        Q.  Who told you that your district was a
14    minority district?
15        A.  The state.  The state told the federal
16    government that.
17        Q.  And what document are you referring to --
18        A.  The plan that they submitted.
19        Q.  So you were aware of the issues contained
20    in the plan before the election?
21        A.  Yes.
22        Q.  What do you think qualifies an individual
23    to be a successful candidate in the Mississippi
24    Delta?
25        A.  Wanting to serve the people.  Want to
```

**Page 35**

```
 1    help, want to make a difference.
 2        Q.  Can you describe --
 3        A.  And that goes back to that common bond,
 4    that common interest I was telling you about.
 5        Q.  Yeah.  Can you describe for me what
 6    specific qualities you think a candidate might have
 7    in order to be successful in the Mississippi Delta?
 8        A.  Care about people and be involved in the
 9    community and serve the whole community.  You know,
10    we're neighborhood people.  We're community people.
11    Not just about coming down here and serving in the
12    legislature three months out of the year.
13        Q.  Do you believe that in the Mississippi
14    Delta the race of a candidate will always determine
15    whether or not the candidate will be successful?
16        A.  The race of a candidate will always be
17    successful?
18        MR. McDUFF:  Object to the form.
19    BY MR. GRIFFIN:
20        Q.  Let me rephrase that for you.
21        Do you believe that in the Mississippi
22    Delta the race of a candidate will always be
23    determinative of whether or not the candidate will
24    be successful?
25        MR. McDUFF:  Object to the form.
```

**Page 36**

```
 1    BY MR. GRIFFIN:
 2        Q.  You can answer?
 3        A.  You know, if you look at the district now,
 4    we have -- the senate district that we're referring
 5    to, we have a white now that's in a all black
 6    district in terms of the delta, what we perceive as
 7    the delta.  Madison County is not in the delta.
 8        So we have a white there now.  All we're
 9    saying is, it shouldn't be a white all the time.  A
10    white need to get defeated, too.  So it need to be a
11    fair district.  We don't -- it would make me no
12    difference whether it's a white, black or green, but
13    it needs to be fair.  So whites don't need to win in
14    that district every time they have an election.
15        So to answer your question, we got a white
16    there now.  So no, it doesn't need to be black all
17    the time.  And it don't need to be white all the
18    time.
19        Q.  From 2010 to 2018, did you ever study
20    precinct level election returns of a state, county
21    or local election held within the bounds of Senate
22    District 22?
23        A.  Yeah, I've looked at composites and all
24    that stuff and demographics -- you know, returns.
25        Q.  Do you recall what specific returns you
```

**Page 37**

```
 1    locked at and for what elections?
 2        A.  The 2015 just say -- for 22 2015.
 3        Q.  Just 22?
 4        A.  Yeah.  I've looked at others, but 22 was
 5    the one I was interested in.
 6        Q.  From 2010 to 2018, did you ever study
 7    voter registration data for the areas within the
 8    bounds of Senate District 22?
 9        A.  Voter registration?  What document are you
10    referring to.
11        Q.  The actual voter registration information
12    that would have been kept in the clerk's office?
13        A.  Like the voter roll?
14        Q.  Yes.
15        A.  When you say study, I've looked at the
16    voter roll.  You're saying study?
17        Q.  In connection with preparation for a
18    campaign?
19        A.  Yes.
20        Q.  Do you recall which specific information
21    you looked at when you were preparing for a campaign
22    or for your campaign?
23        A.  Yeah.  Basic information, you know, where
24    you voters are, where they live at.  And you look
25    at -- you just try to glean from that document some
```

**Page 38**

1  information that will help you be successful.
2      Q.  Would this be in the clerk's office?
3      A.  The Circuit Clerk's Office, yes.  And, you
4  know, you get information from other sources, too.
5      Q.  From 2010 to 2018, did you ever study any
6  election turnout data for state, county or local
7  elections held within the bounds of Senate District
8  22?  And if so, what specific turnout data did you
9  review and where did you get it from?  And keep in
10  mind I'm now talking about 2012 -- the last few
11  questions I've been talking about -- I'm sorry, 2010
12  to 2018?
13      A.  I've seen some data in terms of my race
14  and during the time I ran, you know, other -- you
15  know, the governor, lieutenant governor, secretary
16  of state, transportation, I looked at all of that
17  information.  I was trying to see in areas why
18  didn't I do as well.  And I had worked -- because of
19  the work I had done and involvement and investment
20  in the community.  I looked and I didn't do as well
21  as some of my -- you know, some of the whites that
22  ran in the same areas that I did.  And the only
23  thing I could see was that I was a minority and I
24  just didn't get the vote.  I'm not talking about
25  minority voters.  I got the minority voters.

**Page 39**

1      Q.  Was there any other reason that you could
2  possibly attribute to getting a smaller amount of
3  the vote other than race?
4      A.  Smaller amount of the --
5      Q.  The turnout?
6      A.  No.  Well, yeah, I do have -- I'm
7  thinking.  We had a problem getting minorities to go
8  vote.  They don't go and vote as they should.  And
9  they don't vote in high of numbers as they should
10  and that's a problem.
11      Q.  Were you involved in Mike Espy's recent
12  campaign for US Senate?
13      A.  No.
14      Q.  What was your --
15      A.  Now, you say involved.  I was -- what you
16  mean involved?
17      Q.  Having an active role in the campaign in
18  some official role?
19      A.  No, I didn't have an official role.  I did
20  attend some activities and helped.
21      Q.  What was your impression of his campaign?
22      A.  Well, I thought he was a good candidate
23  and I thought the results would have been different,
24  but that wasn't the case.  It goes back to what I
25  said earlier.  I wish I could sugar coat it, but it

**Page 40**

1  just -- whites voted for the whites.  And not
2  necessarily a better candidate.  I'm not saying --
3  but I thought he ran a good campaign.
4      Q.  Did you review the results of his
5  campaign -- strike that.
6          Did you review the returns from his
7  campaign and compare those returns to the African
8  American turnout in Senate District 22?
9      A.  No, I didn't.
10      Q.  Have you ever been involved in any of
11  Bennie Thompson's campaigns for House of
12  Representatives?
13      A.  Yes.
14      Q.  How were you involved?
15      A.  Manage like Yazoo County -- I did not do
16  the last couple, but I have been coordinator for
17  Yazoo County.
18      Q.  What was your impression of his campaign?
19      A.  Impression?
20      Q.  In terms of, was he able to generate
21  meaningful white support as well as meaningful black
22  support, minority support?
23      A.  No.
24      Q.  Can you further elaborate on that?
25      A.  Well, just take Yazoo County, for

**Page 41**

1  instance.  For a long time Congressman Thompson
2  could not carry Yazoo County because of the numbers.
3  We had a majority white -- now it's a majority
4  black, but in the past it has not been the case.  It
5  was a majority white county.  And he just got,
6  recently over the last ten years been able to carry
7  Yazoo County, over the last seven or eight years.
8      Q.  So has the population changed from more
9  blacks to whites?
10      A.  More blacks to white.
11      Q.  So is it your testimony that the reason he
12  has been able to carry the county is because the
13  population changed and more blacks were able to vote
14  for him than in the past?
15      A.  Yeah, more blacks will actually go and
16  vote.  Go and vote, getting blacks out.
17      Q.  In terms of issues, mobilization efforts,
18  staffing, financial support, networking and
19  endorsements, how do the Espy and Thompson campaigns
20  compare to more local races in Senate District 22
21  including those at the county and municipal level?
22      A.  In terms of financing?
23      Q.  Yes.
24      A.  Okay.
25          MR. McDUFF:  Object to the form.

Joseph Thomas 1/16/2019

**Page 42**

1   BY MR. GRIFFIN
2       Q.  You can answer.
3       A.  Well, I can speak for 22.  When I ran in
4   21, it wasn't against the chairman of the Senate
5   Appropriations Committee and it wasn't a white.  I
6   got funds in terms of contributions, special
7   interest groups and businesses and industries.  But
8   in 2015, the monies was shut.  There was no money to
9   democratic candidates, no money to my campaign.  I
10  need to ask a question, but I'm not going to ask
11  you.
12      Q.  So it's -- is it your testimony that in
13  the 2015 campaign people who -- or entities that had
14  traditionally supported you, had contributed to your
15  campaign refused to contribute and support your
16  campaign?
17      A.  Yes.  Or they couldn't.  I don't know what
18  their reasons -- and it wasn't just my campaign.  I
19  think democrats -- you know, I don't know the
20  reason.  I don't know why, but we couldn't get the
21  monies we needed to run our campaign.
22      Q.  Do you know if the same -- strike that.
23          Do you know if the white candidates suffer
24  from the same cash --
25      A.  They was getting the money.  They got the

**Page 43**

1   money, white Republicans.
2       Q.  Let me have you clear this up for me.  Are
3   you saying that the money was cut off to democrats?
4       A.  There you go.
5       Q.  And Republicans on the other hand, they
6   were able to get funds, the fundraiser money?
7       A.  That's what I said.
8       Q.  Okay.  Would you attribute that more to
9   the rise of conservatism around the country and in
10  Mississippi or would you attribute that to race?
11          MR. McDUFF:  Object to the form.
12  BY MR. GRIFFIN:
13      Q.  You can answer.
14      A.  Well, my concern was to -- I had put
15  myself out there to represent my people, to win.
16  And quite naturally I wanted to get some necessary
17  funds to -- I don't know how I would attribute that
18  really.  I wouldn't necessarily say.  Some might
19  have done better if they hadn't been intimidated or
20  scared or they just maybe didn't feel free.  I don't
21  know what happened.  The money -- somebody cut the
22  monies off.
23      Q.  Are you referring to -- when you say some
24  may have done better, are you referring to some
25  candidates may have done better?

**Page 44**

1       A.  Some candidates and some organizations
2   that make -- for instance, I had -- did have groups
3   like Mississippi Association of Educators, and
4   groups, I did have some contributions.  I didn't
5   mean that.  But traditionally the ones that I used
6   to have, those were cut off.  I don't know who cut
7   them off or what happened.  But we did not get any
8   contributions from the groups we had gotten
9   contributions from in 2007.  And other democrats,
10  I've been told, had the same situation.
11          MR. McDUFF:  Charles, can we take a short
12  break?
13          MR. GRIFFIN:  Yeah.
14          (Off the record.)
15  BY MR. GRIFFIN:
16      Q.  Is it fair to say that Barack Obama was a
17  minority candidate choice in the 2008 and 2012
18  presidential elections?
19      A.  Yes.
20      Q.  Is it fair to say that he received a
21  majority of the votes in the counties comprised of
22  Senate District 22?
23      A.  Yes.
24      Q.  To the best of your knowledge, have any
25  candidates of any race in Senate District 22 running

**Page 45**

1   for either state, county or local office ever used
2   racial appeals in their campaign?
3       A.  Racial appeals?  Repeat that.  I'm sorry.
4          MR. GRIFFIN:  Would the court reporter
5   please read back the question?
6          (Court reporter read portion of record.)
7       A.  Not to my knowledge.
8   BY MR. GRIFFIN:
9       Q.  Has this happened in the last 15 years, to
10  your knowledge?
11      A.  Not where they openly used race appeal?
12      Q.  Yes.
13      A.  No.  No, I did not.
14      Q.  Did you witness anyone else?
15      A.  No.
16      Q.  Are there early voting mechanisms
17  available for elections in the Mississippi Delta,
18  such as early voting, poling locations and absentee
19  ballots?
20      A.  Yes.
21      Q.  What affect does this have on the ability
22  of African American voters to vote in elections in
23  the delta and in Senate District 22 in particular?
24      A.  I think it enhances it.
25      Q.  Are you familiar with that absentee ballot

**12 (Pages 42 to 45)**

**Page 46**

1  process?
2      A.  Somewhat, yeah.
3      Q.  Can you describe it to the best of your
4  knowledge?
5      A.  Where a voter that cannot vote requests a
6  ballot -- requests a ballot and a ballot is mailed
7  out or sent out to the voter to execute and then
8  send back.  On the absentee, yeah.
9      Q.  Is it all done at one process, where the
10 ballot is requested over the phone, for example, and
11 then the clerk sends it to them?  Or is it in a
12 bifurcated process, which requires a voter to send
13 in an application for a ballot and then the clerk
14 has to review the application and send the ballot?
15     A.  Generally it's a form that you fill out
16 and request it and then you give it back to the
17 clerk and the clerk mails out a ballot.
18     Q.  So it's a bifurcated process?
19     A.  Yes.
20     Q.  You mentioned several times during the
21 course of the deposition the common interest and
22 bond between you and other voters in District 21 and
23 22.  Will you describe what that common interest and
24 bond was when you were Senator in District 21?
25         MR. McDUFF:  Object to the form.

**Page 47**

1      A.  Well, you know, I live in the hood.  I
2  live -- you know, my constituents was my neighbors,
3  friends, church members, association members.  We,
4  you know -- when you go to the grocery store you see
5  your constituents.  It's a big difference between --
6  and church work.  I'm a deacon at my church and I
7  see people.  Go to different churches and you see
8  your constituents, you're available.  It's a big
9  difference between somebody you -- we have people in
10 our district who have never seen their senator.
11 Senator never been to church, never been to
12 organization meeting, never seen them in the grocery
13 store.  Just availability of being seen and being --
14 you know, living in a neighborhood.
15         You know, when I was the senator of
16 District 21 we had other senators come into our
17 county, but the people would call me because I was
18 there.  They would see me every day or they would
19 call me because they had my telephone number.
20     Q.  And this was in 2007?
21     A.  2004 to 2008, yeah.
22     Q.  Where did you live --
23     A.  In the same place.
24     Q.  Okay.
25     A.  Same place.  So the common interest is

**Page 48**

1  having a common thread, common bond where people --
2  you know, I had a vested interest in my district and
3  my community that I wanted to see something happen,
4  see some improvements.  I wanted some dollars to
5  come to my community.  I didn't want to come down
6  and vote for everybody else's community and didn't
7  do anything for mine.  So I was able to bring some
8  stuff into my community because I was sitting at the
9  table.  I knew what my people wanted.  When I say my
10 people I mean the citizens, not blacks, citizens of
11 Yazoo.
12     Q.  Constituents?
13     A.  Yeah, constituents.
14     Q.  Did that change when you ran in Senate
15 District 22?  Was there no longer a common interest
16 and bond?
17     A.  It was a stretch, because we had areas
18 like Gluckstat, Madison and just a different area
19 from -- it's a big difference.  I know you repeat
20 the question about common bond, common interest.
21 But if you are trying to -- you need to have
22 something in common, something that everybody can
23 buy into.  And my areas like Rolling Fork had a bond
24 because of the school systems and the community.
25 The community is pretty close.  Belzoni is close.

**Page 49**

1  It was a little stretch up around Delta State area
2  and Cleveland.  But it was a bigger stretch over in
3  Madison.  But with the people -- first of all, I
4  didn't know -- we didn't know the people.
5      Q.  Did you have a common interest and bond,
6  for example, with the people in Bolivar County?
7      A.  People in Bolivar County, pretty much we
8  had the same interest, same churches, same pastors,
9  same associations, same, you know, likes and
10 dislikes pretty much.
11     Q.  Was that -- did that remain the same from
12 2007 to 2012, 2013?
13     A.  I was out in 2008.  I mean, the community,
14 the network pretty much is the same, football games,
15 basketball games.
16     Q.  You still had that common interest and
17 bond?
18     A.  Yeah.  We had those compared to areas
19 which that did not exist.
20     Q.  What about Washington County?
21     A.  Same thing.  We're talking about very
22 limited resources in all those counties.  We have
23 very poor people.  And they have a particular need
24 that we were able to address, you know.
25         And I know in 21, we had people, you know,

Joseph Thomas 1/16/2019

**Page 50**

1    might be outside the scope of my job, but they had
2    situations that they needed to talk to somebody.  It
3    could be about a social service issue or need that
4    they had that we had to stop and try to assist them.
5    It could be somebody that wanted a wheelchair or
6    needed a ramp.  Or it could be somebody that funds
7    had been cut off or something, state agency or
8    federal something and we could get on the phone and
9    try to -- we knew where they was coming from.  And
10   we knew that they needed those services to survive.
11       And so, we would stop what we're doing and
12   try to assist them.  Set up a intake file and try to
13   see could we connect them with somebody that could
14   help them.  And these are constituent needs in areas
15   like especially Washington.  Especially what I'm
16   talking about, Washington, Bolivar for the new
17   district.  But the old district I had was Madison,
18   Holmes, Attala, which all had the same bond.
19   Pickens, Mississippi, Goodman, Mississippi, Camden.
20   Areas like Kosciusko coming back.  We didn't have
21   Kosciusko, but several communities going in to
22   Kosciusko.
23       But people that needed some assistance --
24   let me -- I had a lady that was 108 years old.  I
25   brought her to the state capital and we done a

**Page 51**

1    concurrent resolution for her.  And she was from
2    Eden, Mississippi.  She had never been able to --
3    during her productive years, she couldn't come into
4    the Mississippi Capital as the way she came.  The
5    only way she could come is if she was cleaning up or
6    something like that.  But situations like that, we
7    recognize -- we honored Gatemouth Moore, Dwight
8    Moore.  And BB King, another situation.
9       So we was able to work with a lot of
10   people that we knew their struggle, we knew where
11   they come from and try to show them that that was
12   their state capital, open doors.  We just brought in
13   a lot of people, lot of groups, a lot of church
14   groups, a lot of pastors, because we had a feel for
15   the community.  Students that wanted to be pagers,
16   we had a lot of that hands on.  But I reckon I'm
17   still talking about the common bond.
18      Q.  I was going to ask you about --
19      A.  It's a big difference between the Delta
20   and Madison County.  The part of Madison County I'm
21   talking about.  See you picked the elite part of
22   Madison County.  Now, Canton would have been a
23   different story.  But it wasn't Canton, Mississippi.
24      Q.  What about --
25      A.  And I had a supervisor too -- I'm cutting

**Page 52**

1    you off.  I had a supervisor that the areas that I
2    had in Madison County, he had been a supervisor for
3    30 years and lost.
4      Q.  Was that --
5      A.  Banks.
6      Q.  Carl Banks?
7      A.  Yeah, thirty years.  So something --
8    something happened.  If you want to talk about the
9    common bond or special interest or whatever.  You
10   can call it whatever you want to call it.  But you
11   don't need to win -- if you got six counties and you
12   win five and lose one.  So call it what you want to
13   call it.
14      Q.  What about the common bond with Issaquena
15   County?
16      A.  It's okay.
17      Q.  Humphreys County?
18      A.  Same.  We got the same pastors, same
19   schools, sports.  And when I go to a constituent's
20   home and home is not so nice and I know how to sit
21   on the couch and how to drink ice water and tea.
22   And you can't get too big to serve your people.
23      Q.  What about Yazoo County?
24      A.  Same thing.
25      Q.  And finally --

**Page 53**

1      A.  We're talking about very low income -- low
2    to moderate income people.
3      Q.  And finally, down in Madison County you
4    just didn't have any?
5      A.  Well, you put -- they put the elite part
6    of Madison County.  Lake Caroline and areas like
7    that in a minority district.
8      Q.  I want to ask you something now.  Do you
9    recall being rated by the NRA when you ran in 2015?
10      A.  Not offhand.
11      MR. McDUFF:  Object to the form.
12   BY MR. GRIFFIN:
13      Q.  Have you ever been rated by the National
14   Rifle Association as a candidate?
15      A.  I don't know.  Probably so, but I don't
16   know what the rating was or nothing like that.  Can
17   you -- for the record, I would like to know what the
18   rating was.
19      Q.  Would it surprise you to know that when
20   you ran in 2015, the NRA gave you a zero rating with
21   respect to your position as a candidate on gun
22   rights?
23      A.  No.
24      Q.  Had you taken a position that was adverse
25   to gun owners, if you recall?

**14 (Pages 50 to 53)**

Page 54

1  A.  Not that I know anything.  That might go
2  back to who I was running against and the problems
3  we had raising money, cutting my signs up and
4  intimidating calls.
5  Q.  Who was that?
6  A.  I don't know.  It don't make no
7  difference.  I'm just saying I don't know what
8  happened.  But I had not voted on anything that
9  would have been adverse -- that was adverse to
10  national gun rights folks.  I hadn't -- so what did
11  I -- I'm just asking, what did I do to them?
12  Q.  I honestly don't know.  I just ask the
13  question because it was --
14  A.  But I did have -- I had the common
15  interest, common bond, I did have some groups like
16  superintendents, teachers and parents, I had a A1
17  rating from Parents for Better Education.
18  Q.  And I understand you also had the
19  endorsement of the Mississippi Association of
20  Educators?
21  A.  Uh-huh (affirmative response).
22  Q.  Was that helpful during your campaign?
23  A.  It was helpful, but I don't know how
24  helpful it was in Gluckstat and Lake Caroline in
25  that area.

Page 55

1  Q.  Did they contribute funds or did they get
2  out and canvas for you --
3  MR. McDUFF:  What year are you talking
4  about, Charles?
5  BY MR. GRIFFIN:
6  Q.  2015?
7  A.  '15?
8  Q.  Yeah?
9  A.  They supposed to had -- I think they did
10  get out and canvas in certain areas.  I don't know
11  what areas.  And they did give me a contribution and
12  I was appreciative of that.
13  Q.  Now, you did serve as Yazoo County
14  coordinator for Bennie Thompson.  And you were
15  involved in a management role for Thompson in Yazoo
16  County, correct?
17  A.  Yes.
18  Q.  But not for Espy in 2018.  Let's see.
19  Was there a particular reason that you
20  were not as involved in Espy's campaign as you had
21  been in Thompson's?
22  A.  Well, I have a son named the same thing,
23  Joseph.  My son was involved in Mike's.
24  Q.  Got you?
25  A.  Mike's daddy was -- like I told you, I was

Page 56

1  his banker, friend of the family, daddy and momma
2  and all that.  So he had several people that was
3  from Yazoo working, but I was -- I just wasn't out
4  front.  I wasn't the county coordinator or county
5  manager or nothing like that.  And I wasn't Bennie's
6  campaign manager.  I think I stopped -- the reason I
7  stopped, because my son started doing it and some
8  other people and I was involved in some other stuff
9  and have to -- when you get up in age you have to
10  slow it down, let some of the young folks -- but
11  that's basically it.
12  Q.  Got you.
13  A.  The Espy family and our family, all us
14  from Yazoo.  I was -- when Mike decided he was
15  not -- he was -- when he got the cabinet position
16  and the seat was open, I went with Henry Espy not --
17  Q.  Not Mike?
18  A.  No, not Thompson.  I went with Henry Espy
19  for congress.  But Henry didn't win, then I switched
20  over to Bennie.  And I stayed with Bennie.  I've
21  been with Bennie ever since.
22  Q.  Have you considered other factors which
23  may have contributed to your loss in the 2015
24  election, such as what you've testified about, about
25  the loss of campaign contributions?  Could that have

Page 57

1  contributed to your defeat?
2  A.  That hurt.  It hurt.
3  MR. McDUFF:  Object to the form.
4  BY MR. GRIFFIN:
5  Q.  Could party loyalty, that is party loyalty
6  between Republicans to Republicans, Democrats to
7  Democrats, could that have affected your defeat in
8  the election of 2015?
9  A.  See I'm -- in my area, the Mississippi
10  Delta, I don't know any -- talking about the towns
11  and cities, they don't have black Republicans.
12  Q.  Is it your testimony that they don't have
13  a Republican primary?
14  A.  They don't have black candidates or black
15  people that's in -- activity in the Republican
16  party.
17  Q.  Okay.
18  A.  I might be wrong, but I don't -- we don't
19  have candidates in Washington, Humphreys, Bolivar,
20  Sharkey that runs on a Republican ticket.  So we're
21  talking about whites.
22  Q.  Could incumbency of a particular candidate
23  have an impact?  Not necessarily in your race, but
24  in other races where a Democrat, for example, may
25  have been defeated by a Republican and the

Joseph Thomas 1/16/2019

**Page 58**

1   Republican was already the incumbent.  Could the
2   incumbency factor have had an impact on whether or
3   not the Democrat was able to win that race?
4         MR. McDUFF:  Object to the form.
5      A.  Republican --
6   BY MR. GRIFFIN:
7      Q.  Strike that.  Let me ask that a different
8   way.
9      A.  Okay.
10     Q.  In your view, does a incumbency have an
11  impact on races in the Mississippi Delta on District
12  22?
13        MR. McDUFF:  Object to the form.
14     A.  For a Republican incumbent had no affect.
15  It didn't really mean anything in District 22 in the
16  counties that I won.  I got the vote.  So it goes
17  back to race.
18  BY MR. GRIFFIN:
19     Q.  In 2015?
20     A.  2015.
21     Q.  You were not the incumbent, right?
22     A.  No.  I say the mere fact of him being the
23  incumbent had no points, no factor.
24     Q.  How do you know?
25     A.  Because he didn't get the black vote.

**Page 59**

1      Q.  I didn't qualify the question now just by
2   the black vote.
3      A.  But you said Republican.  I'm looking at
4   Republicans as being --
5      Q.  Synonomous with white?
6      A.  -- white.  Yeah, white.
7      Q.  But wouldn't you agree with me that there
8   are some white Republicans and black Republicans
9   just like there are some white Democrats and black
10  Democrats?
11     A.  Slim to none in the Delta, in the areas
12  that I represent.  I don't know of anyone -- I
13  really don't know of anybody that has ran as a
14  Republican, black that has ran as a Republican, I
15  don't.
16     Q.  I believe at some point, one point, did
17  Charles Evers run statewide as a Republican?  Do you
18  recall that?  Maybe I'm getting old.
19     A.  I didn't say nobody hadn't ran.  But
20  really in the Mississippi Delta, the Democrats are
21  black and the Republicans are white.  I wish I could
22  tell you differently, but that's just the way it is.
23     Q.  Now, in 2015, did your lack of funding
24  affect your ability to have access to media in terms
25  of commercials, television, for your campaign?

**Page 60**

1      A.  It did.  I mean, in terms -- what I did --
2   we were grassroots.  And the things we did we were
3   able to do and we was able to get the vote, which
4   was not TV.  If I -- I needed more money, but not
5   necessarily to get on TV.  That's what I'm trying to
6   say.
7      Q.  But your lack of funds led to lack of
8   media, which led to a deficiency in terms of your
9   voters?
10     A.  Yeah.  If we had had more funds, we could
11  have done a better job and maybe could have done a
12  better job in Madison, but we did not have.
13     Q.  Did you run any TV in Madison?
14     A.  No, TV.  We didn't have any -- you know,
15  the funds.
16     Q.  You didn't have the capital?
17     A.  Yeah, didn't have the capital.  That's
18  right.
19     Q.  Do you recall whether the --
20     A.  And not -- I don't mean to cut you off.
21     Q.  Go ahead.
22     A.  But neither did my opponent.  I don't
23  think he ran any TV ads either.
24     Q.  Do you recall what he did different in
25  Madison County?

**Page 61**

1      A.  I don't think he did anything in Madison
2   County.
3      Q.  Did you do an analysis after the election
4   to --
5      A.  No, we was out there with the people and
6   the groups and stuff and I never seen him.  I never
7   seen him at anything over there, anything in Yazoo
8   County.  I never seen him Washington County or
9   Bolivar, or Sharkey or Humphreys.  See I was
10  knocking on doors, going to meetings, going to
11  campaign activities.  I never did see him during the
12  whole campaign.
13     Q.  During the 2015 campaign, you were not in
14  the legislature at all then?
15     A.  No, I wasn't.
16     Q.  Was he still Chairman of Appropriations?
17     A.  Yes.
18     Q.  And being Chairman of Appropriations means
19  something, doesn't it?
20     A.  Yes.
21        MR. McDUFF:  Object to the form.
22  BY MR. GRIFFIN:
23     Q.  What does it mean?
24     A.  Being chairman?
25     Q.  Of Appropriations Committee?

**16 (Pages 58 to 61)**

Joseph Thomas 1/16/2019

**Page 62**

1   A. Yeah.
2   Q. That's a pretty --
3   A. It is.
4   Q. -- powerful position?
5   A. It is.
6       MR. McDUFF: Object to the form.
7   BY MR. GRIFFIN:
8   Q. Will you explain to me the significance of
9   an individual who serves as a Chairman of the
10  Appropriations Committee?
11      MR. McDUFF: Object to the form.
12  A. Well, it's one of the -- two of the most
13  powerful committees in the legislature in the state
14  senate. That's what you're saying?
15  BY MR. GRIFFIN:
16  Q. He has a checkbook?
17  A. Yeah. And a lot of people, they cater to
18  that or look up to that.
19  Q. He has a checkbook?
20  A. Yeah, he has a checkbook, yeah. But the
21  people that you need to respond to are the people
22  back in your district. And those are the people
23  that you represent and not the state agencies or
24  groups or groups that you're writing checks for.
25      So basically all I was saying, all I'm

**Page 63**

1   saying now is in these districts, the common
2   interest, common bond, you need people to represent
3   you that's available and people that's out there
4   with you.
5   Q. I believe you've already testified that
6   the black voting population did not always turnout
7   at the same rate that majority voting age population
8   turned out?
9   A. Yes.
10  Q. Was what the case in 2015?
11  A. I think I got -- not really. But I think
12  I got 46 percent of the vote. So they came out, but
13  they could have came out better. I could have
14  gotten more. I don't know whether I would have
15  gotten enough to win, but I could have gotten more
16  than the 46 percent.
17  Q. Got you. Well, 46 percent, if they had
18  came out much more it could have carried you over
19  the edge, couldn't it?
20      MR. McDUFF: Object to the form.
21  BY MR. GRIFFIN:
22  Q. You can answer.
23  A. I will say no. Because what really kicked
24  me -- what really got me was the 10,000 white voters
25  that was added to a black district.

**Page 64**

1   Q. And that was in 2012?
2   A. For 2015.
3   Q. Right. And of course you complained to
4   the Justice Department, correct?
5   A. Uh-huh (affirmative response).
6   Q. You complained to the lawyers at the
7   Justice Department, correct?
8   A. Uh-huh (affirmative response).
9   Q. The NAACP complained to the Justice
10  Department, correct?
11  A. Uh-huh (affirmative response).
12  Q. All of this was in 2012?
13  A. For '15, for the next election, which was
14  in '15. Yeah, well, that's what -- so it -- it
15  would have been tough. Because you always want
16  more. If the 46 would have been 48 I would have
17  felt better. But when they put the -- but I still
18  only lost by 1300 votes.
19  Q. 1300?
20  A. Uh-huh (affirmative response).
21  Q. Now what election -- this was 2015?
22  A. 2015.
23  Q. Let me get the chronology straight on the
24  dates that you ran for senate. Let's see. You were
25  elected to serve in 2004, correct?

**Page 65**

1   A. Yes, sir.
2   Q. So you ran in 2003?
3   A. Yes, that's right.
4   Q. And then you served from 2004 to 2008.
5   What happened in 2008?
6   A. I was getting -- I qualified to run and I
7   had an accident. I broke my ankle and I broke it at
8   church.
9       MR. McDUFF: Excuse me. He's asking you
10  about what happened in the 2007 election, or the
11  term beginning in 2008; is that right?
12      MR. GRIFFIN: Right.
13  BY MR. GRIFFIN:
14  Q. I'm asking why -- essentially I'm trying
15  to -- strike that. Let me rephrase it.
16      You weren't in the legislature after 2008,
17  correct?
18  A. No. That's what I was trying to explain.
19  Q. Tell me why you weren't in --
20  A. I qualified to run as a Democrat.
21  Q. Okay.
22  A. And I was at a NAACP meeting at a
23  church --
24      MR. McDUFF: Mr. Thomas, he's asking you
25  about 2007 not 2011.

**17 (Pages 62 to 65)**

**Page 66**

```
 1        THE WITNESS:  See, I was in the senate
 2   from 2004 to 2008.
 3   BY MR. GRIFFIN:
 4        Q.  Right.
 5        A.  You're talking about what happened after
 6   then?
 7        Q.  No, I'm talking about 2007.  Remember at
 8   2008 you stopped.  You were -- at the end of that
 9   year you got out of the senate.
10        A.  That's right.
11        Q.  I'm trying to find out, did you just
12   retire?
13        A.  Oh, okay.  I'm sorry.  I was going to run
14   again, but I'm saying I broke my ankle.
15        Q.  So you were explaining --
16        MR. McDUFF:  But he's asking you about the
17   2007 election.  And you've already testified that
18   you were defeated in that election?
19        THE WITNESS:  Yeah.
20   BY MR. GRIFFIN:
21        Q.  Who defeated you in that election?
22        A.  Senator Kenny Wayne Jones.
23        Q.  Is he white or is he African American?
24        A.  He's African American.
25        Q.  And what do you attribute -- strike that.
```

**Page 67**

```
 1        Do you recall how much he defeated you by
 2   in terms of percentage in that election?
 3        A.  I think it was about a hundred votes.
 4        Q.  It was very close?
 5        A.  Yeah.
 6        Q.  And what county was he from?
 7        A.  It was Madison, Yazoo, Holmes and Attala.
 8        Q.  So that was District 21?
 9        A.  Twenty-one.
10        Q.  Were you competing against him in a
11   primary or general election?
12        A.  Primary.
13        Q.  Democratic primary?
14        A.  Democratic primary.
15        Q.  Did you have or did he have a Republican
16   opponent, if you recall?
17        A.  No.
18        Q.  So following your loss in 2007, you didn't
19   decide to run again until 2015?
20        A.  Okay.  I qualified the next four years,
21   which would have been 2012.
22        MR. McDUFF:  2011.
23        A.  That's when I qualified to run again.  But
24   I didn't run because I broke my ankle about a month
25   after -- really after I qualified.  And I couldn't
```

**Page 68**

```
 1   walk for about three or four months so I just got
 2   out.
 3   BY MR. GRIFFIN:
 4        Q.  Due to health related reasons you couldn't
 5   do it?
 6        A.  Yes.
 7        Q.  During that timeframe, did you maintain
 8   communication, continuity of interest with your
 9   constituents or prior constituents or common
10   interest and bond or did you just take it to the
11   house and --
12        A.  No, I stayed involved.
13        Q.  Now, was the first opportunity to run
14   again after you broke your ankle, was that first
15   opportunity to run again in 2015?
16        A.  Yes.
17        Q.  And that's when you decided to run but
18   your district had changed?
19        A.  That's right.  They changed my district,
20   kicked me out of 21.  I didn't want to get out of 21
21   now.
22        Q.  They didn't kick you out.  It was actually
23   Kenny Wayne who was in there, right?
24        A.  Yes.
25        Q.  So the district had changed.
```

**Page 69**

```
 1        So do you know why -- did Kenny Wayne run
 2   in the Democratic primary against you?
 3        A.  I had beat him before.
 4        MR. McDUFF:  What year are you talking
 5   about?
 6        MR. GRIFFIN:  2015.
 7        A.  I beat him in 2003.
 8   BY MR. GRIFFIN:
 9        Q.  Okay.  Did anybody run against you in the
10   Democratic primary in 2015?
11        A.  No.
12        Q.  You were unopposed?
13        A.  Yes.
14        Q.  Have you been elected or appointed to any
15   political office since 2015?
16        A.  No.
17        Q.  Other than the political offices that
18   you've been elected to and that you've testified
19   about so far, have you been elected to or appointed
20   to any other political offices that we have not
21   talked about?
22        A.  I was appointed to a special task force by
23   a former governor, economic development task force
24   for the state.
25        Q.  Which governor?
```

**Page 70**

1      A. Musgrove.
2      Q. What year?
3      A. I've forgotten the year. It's been a few
4  years. But it was a special task force for economic
5  development for our state.
6      Q. How long did that appointment last?
7      A. Four years probably. That's been a long
8  time ago. And then I told you about the appraisal
9  board, I set that up.
10     Q. Right. Anything else?
11     A. No, I can't think of anything.
12        MR. GRIFFIN: Let's take a break.
13        (Off the record.)
14 BY MR. GRIFFIN:
15     Q. All right. Mr. Thomas, I want to ask you
16  some questions about your voting in the past. Do
17  you recall whether you voted in 2003?
18     A. Yes.
19     Q. What about 2007?
20     A. Yes. Talking about all the elections or
21  just what?
22     Q. The presidential elections -- well,
23  actually all of the elections?
24     A. Yeah. The only one election I did not
25  vote in, I was in the hospital or sick and then I

**Page 71**

1  broke my ankle. Other than that I should have.
2      Q. What year would that have been?
3      A. I don't know. That was during the
4  timeframe that we were talking about, 2011 maybe
5  during the time of the election.
6        MR. McDUFF: Just for the record, your
7  record -- Ms. Lennov (sic) gave an affidavit saying
8  he did vote in 2011 in the general election.
9        MR. GRIFFIN: Okay.
10        MR. McDUFF: So I just -- for whatever
11  that's worth. I just wanted to make that clear.
12 BY MR. GRIFFIN:
13     Q. In 2015 you voted?
14     A. Yes.
15     Q. In 2007?
16     A. Yes.
17     Q. Now, you testified earlier that a lot of
18  things happened. I believe we were talking about
19  during the 2015 campaign. Do you remember that
20  testimony?
21     A. Yes, sir.
22     Q. I believe you testified that some signs
23  got cut up?
24     A. Uh-huh (affirmative response).
25     Q. And I didn't thoroughly investigate what

**Page 72**

1  exactly you were talking about in terms of who did
2  what and what was going on. So let's explore that a
3  little bit more fully, so I can get a better
4  understanding of what was going on and who was doing
5  it.
6      A. I don't know who was doing it, so I can't
7  answer that. I did have some signs that were
8  destroyed, some large signs.
9      Q. Yard signs?
10     A. No. Four by eight signs. You know large
11  signs, 4 feet by 8 feet.
12     Q. Right. The kind that you put like at a
13  corner at an interaction on an empty lot?
14     A. Yeah, large sized signs. Four by eight
15  that you have to have posts on both sides, both ends
16  and something -- it's good if you got something in
17  the middle to kind of keep them stationary.
18     Q. Were they vandalized?
19     A. Somebody took a box cutter and just cut
20  them. It was in white areas, too.
21     Q. Did you report those acts to the police?
22     A. No, we didn't.
23     Q. Did you ever learn who did it?
24     A. No.
25     Q. Do you have -- strike that.

**Page 73**

1        As we sit here today, is it fair to say
2  that you have no idea who did that?
3      A. Yes, I don't know who did it.
4      Q. Other than cutting up --
5      A. But it did not happen in the minority
6  areas.
7      Q. So it only happened -- would it be your
8  testimony that it only happened in Madison County?
9      A. In Bolivar.
10     Q. Now, in Bolivar, which precinct are we
11  talks about; do you recall?
12     A. No, I don't.
13     Q. Okay.
14     A. I had one other sign that's questionable.
15  They never could keep it up and that was in another
16  county. But where I actually had them cut with a
17  box cutter was -- it was across from -- and I do
18  have witnesses that it was cut. Somebody could
19  testify to that. But it was across from -- I'm
20  trying to think -- it was maybe on Stribling Road,
21  somewhere in that area. Across from, what's the
22  high school in Gluckstat? The high school? The
23  Mavericks.
24        MS. MIRACLE: Germantown.
25     A. Germantown. It's a vacant lot that sits

## Page 74

1  behind the football field in that area.
2  BY MR. GRIFFIN:
3      Q.  Do you believe -- strike that.
4      Do you know if any other candidates had
5  similar complaints about signs being cut?
6      A.  No, I don't know of any.
7      Q.  So there could have been, you just don't
8  know?
9      A.  Yeah.
10     Q.  And you did not report this to the sheriff
11 or to the police?
12     A.  No.
13     Q.  What about -- I believe you testified
14 about some intimidating calls.
15     A.  Yes.  But getting back to the signs.  I
16 had -- the sign that was on 14, and that would be
17 the intersection of 14 and 61, I had problems with
18 somebody just taking those down and putting them on
19 the ground.  Same thing with Bolivar.  The only one
20 I had that actually was with a box cutter that was
21 cut up into pieces and that's where I -- I
22 questioned that one.  I was concerned about not so
23 much somebody taking it down, but cutting it up with
24 a box cutter.  And that was the one across from
25 Germantown school.

## Page 75

1      Q.  But the other ones were -- you said they
2  laid them down?
3      A.  Yeah.  Every time I put them up they'd
4  take them down.
5      Q.  Okay.  Could you tell whether or not they
6  had been pulled up out of the ground or --
7      A.  No, the stakes would still be there.  You
8  know the stakes.
9      Q.  The stakes would be standing up, but the
10 sign would be down?
11     A.  The sign would be down.  Uh-huh
12 (affirmative response).
13     Q.  It would be gone or it would just be down?
14     A.  Down or -- you know, down.
15     Q.  Could you tell definitively whether they
16 had been intentionally removed or whether they had
17 -- the wind --
18     A.  I think they were intentionally.  Because,
19 you know, we had people going through and they would
20 see them and somebody had been taking them down. but
21 they didn't destroy -- the only signs I had
22 destroyed, you know, that I couldn't use no more was
23 the Madison.
24     Q.  And you didn't report any of this to law
25 enforcement?

## Page 76

1      A.  No, I didn't.  And that was probably an
2  error on my part, but anyway.
3      Q.  All in all, how many signs would you say
4  we're talking about?
5      A.  I had two signs destroyed over there in
6  Madison.
7      Q.  And how many did you have that were pulled
8  down?
9      A.  Probably three or four, but I would put
10 them back up.
11     Q.  Okay.
12     A.  They weren't destroyed.  Just we were
13 using little ties and just put new ties on them,
14 little pull things.
15     Q.  So would you say it was a total of five
16 percent of your signs or --
17     A.  I wouldn't say that much.
18     Q.  One percent, two percent?
19     A.  Yeah, something like that.
20     Q.  A nominal amount?
21     A.  Yeah.
22     Q.  Okay.
23     A.  What concerned me was mainly, was somebody
24 taking a box cutter.  Because you could tell the
25 cuts were straight.  Somebody had taken a cutter and

## Page 77

1  cutting my signs up.  I didn't like that.
2      Q.  I understand.  In terms of the
3  intimidating calls, what happened with that?
4      A.  We had -- we have our calls forwarded from
5  my home phone to my wife's cell phone.  And we would
6  be on the road campaigning and it was -- it was the
7  same person it looked like that just kept calling.
8  And I think she -- I don't know whether she had it
9  traced or whatever.  But she found out it coming fro
10 the delta, Rosedale or somewhere up in that area.
11     But the person basically would tell --
12 would want to talk to me.  Basically the person
13 would say something like, you know, you ought to get
14 out of the race, but I can help you if you get out
15 the race, stuff like that.
16     They would say your son has a trespassing
17 -- what is it when somebody go to the police
18 department and they file a warrant or something, a
19 trespassing warrant.  They said your son, he's going
20 to be arrested, you need to go on and get out of the
21 race.  You know, stuff like that.  And he just kept
22 calling and kept calling.  And I didn't -- we didn't
23 turn that over to the police.  We was busy and we
24 didn't want to get distracted.  And it wasn't no
25 cursing words, just conversation, conversation.  And

**Page 78**

1    I told him the second, maybe third or fourth time to
2    stop calling me.  I said, if my son has an affidavit
3    then the police need to arrest him.
4        Q.   Did you save the telephone number?
5        A.   I think she probably can get the numbers.
6    She can go back off the record.  I'm sure she can
7    get that, hopefully.
8        Q.   Why didn't you call the police?
9        A.   Well, it wasn't anything harassing.  It
10   was harassing, but it wasn't --
11       Q.   Threatening?
12       A.   -- threatening to the extent that I'm
13   going to do something to you.  They supposed to been
14   trying help me.  Come to find out with my son, it
15   was -- he had a girlfriend or something and she had
16   filed a trespassing something, but she dropped it.
17   She said it wasn't nothing to it.  They was just
18   arguing and I think he had gone by the house and was
19   on the porch or something and ended up she had filed
20   a trespassing for him not to come back.
21       Q.   How old is he or was he at the time?
22       A.   Forty years old.
23           (Laughter.)
24       Q.   Okay.
25       A.   I told the gentleman, I said -- he just

**Page 79**

1    wanted me to get out the race.  He said, you need to
2    go on and get out because your son is going to jail.
3    I said, well, tell them to go on and get him and
4    take him to jail.
5           But anyway, I don't know where that was
6    coming from.  I bought that up to say that it was a
7    difficult election.  It wasn't the usual -- it
8    wasn't like one I had had before.
9        Q.   What happened in the one you'd had before?
10       A.   Well, it was a black -- see blacks can run
11   against blacks and you don't get all this.  Looked
12   like when I ran against the Chairman of the
13   Appropriations Committee I started having problems.
14       Q.   What other problems?
15       A.   And that takes it back to race.  When you
16   cut my signs up, I don't like that.  Now, I don't
17   know who cut the signs up.  I'm not saying he did or
18   nothing.  And I worked with him in the legislature.
19   I don't have any problems with him and we worked
20   together good.  He's a good man.  But I don't think
21   that he should be in that the seat, whether I run or
22   get back in there or not, it's a black district.
23       Q.   Got you.
24           And it's your belief that the district --
25   strike that.

**Page 80**

1        Q.   Is it your brief that the districts in the
2    Delta should be apportioned so that you have
3    majority white and majority black districts?
4        A.   The Delta is black.
5        Q.   So is it your position that the --
6        A.   Let's look at this -- look at the state.
7    Do we have a black governor, lieutenant governor or
8    do we have a black commission of insurance?  Do we
9    have a black -- I'm just throwing some things out,
10   transportation commission, public service
11   commission, all those positions are white, yet we're
12   comprised of 40 percent of the state population.
13           So if you look at the Delta, so you don't
14   want us to have those senate seats that's supposed
15   to be black?  You want to take those too?
16       Q.   So is it your position that based on the
17   politics, statewide politics that the Delta
18   districts should be majority black?
19           MR. McDUFF:  Object to the form.
20       A.   If you cannot win where the black people
21   live, where can you live at -- where can you win at?
22   You can't win a black district, a white going to win
23   that.  So we might as well just pack up and don't
24   vote.
25       Q.   Now you say you worked with Clark.  Have

**Page 81**

1    you ever had occasion -- you worked with him in the
2    senate?
3        A.   What Clark?
4        Q.   I'm sorry --
5        A.   Talking about Buck Clark?
6        Q.   Yeah, Buck?
7        A.   Yes.
8        Q.   But have you ever had the occasion to need
9    to call him for constituent services while he's been
10   the senator?  I mean, did you need to call him for
11   something just as a constituent?
12       A.   No, I hadn't called him as constituent.
13   No.
14       Q.   Would you have any reservation in doing --
15       A.   No.
16       Q.   -- so if you needed to?
17       A.   No.  If I needed to call him, I would call
18   him.  We were freshmen together in -- none of this
19   is personal.  And it goes back to common interest
20   and bond and all that.
21           When we have been, as a race of people,
22   we've been deprived of services and having senators
23   in our community and having representatives and
24   senators and people of those nature, we don't have
25   them in the Delta.  I think the whites are well

Joseph Thomas 1/16/2019

**Page 82**

1    represented all over the state.
2        So, you know, if you cannot have a
3    minority senator or representative in these
4    counties, especially the counties in the Delta --
5    but you need somebody that's available.
6        For instance, if you call 90 percent of
7    the people, in some cases it might be a hundred
8    percent in some of these areas, they don't know who
9    their senator is and never met him.  Never been to a
10   meeting, never been to a organization, never been
11   to -- you know, that's where the common bond
12   interest I was talking about.  You need to know your
13   senator, know your representative.
14       MR. GRIFFIN:  Tender the witness.
15       MR. McDUFF:  I have no questions at this
16   time.
17       (End of Proceedings.)
18       (Time Noted:  3:28 p.m.)
19       SIGNATURE/NOT WAIVED
20
21   ORIGINAL:  CHARLES GRIFFIN, ESQ.
22
23
24
25

**Page 84**

1        CERTIFICATE OF COURT REPORTER
2        I, Lori W. Busick, Court Reporter and
3    Notary Public, in and for the State of Mississippi,
4    hereby certify that the foregoing contains a true
5    and correct transcript of the testimony of Joseph
6    Thomas, as taken by me in the aforementioned matter
7    at the time and place heretofore stated, as taken by
8    stenotype and later reduced to typewritten form
9    under my supervision by means of computer-aided
10   transcription.
11       I further certify that under the authority
12   vested in me by the State of Mississippi that the
13   witness was placed under oath by me to truthfully
14   answer all questions in the matter.
15       I further certify that, to the best of my
16   knowledge, I am not in the employ of or related to
17   any party in this matter and have no interest,
18   monetary or otherwise, in the final outcome of this
19   matter.
20       Witness my signature and seal this the
21   24th day of January, 2018.
22
23
24       Lori W. Busick
     My Commission Expires:
25   August 22, 2022

**Page 83**

1        CERTIFICATE OF DEPONENT
2    DEPONENT: Joseph Thomas
     DATE: January 16, 2019
3    CASE STYLE:  Thomas, et al vs. Phil Bryant, et al
     ORIGINAL TO:  Charles Griffin, Esq.
4        I, the above-named deponent in the
     deposition taken in the herein styled and numbered
5    cause, certify that I have examined the deposition
     taken on the date above as to the correctness
6    thereof, and that after reading said pages, I find
     them to contain a full and true transcript of the
7    testimony as given by me.
         Subject to those corrections listed below,
8    if any, I find the transcript to be the correct
     testimony I gave at the aforestated time and place.
9    Page    Line         Comments
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16
17   This the ____ day of _____, 2019.
18   _____
         Joseph Thomas
19
     State of Mississippi
20   County of _____
21   Subscribed and sworn to before me, this the
     _____ day of _____, 2019.
22
23   My Commission Expires:
24   _____
         Notary Public
25

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS; VERNON AYERS;
and MELVIN LAWSON**                                                    **PLAINTIFFS**

**v.**                                               **CIVIL ACTION NO. 3:18-cv-441-CWR-FKB**

**PHIL BRYANT, Governor of the State of
Mississippi; DELBERT HOSEMANN,
Secretary of State of the State of Mississippi;
and JIM HOOD, Attorney General of the
State of Mississippi, all in their official capacities
of their own offices and in their official capacities
as members of the State Board of Election Commissioners**          **DEFENDANTS**

<u>**NOTICE OF DEPOSITION**</u>

Please take notice that the Defendants will take the deposition of **JOSEPH THOMAS,**

by and through their counsel of record, on **Wednesday, January 16, 2019, beginning at 1:00**

**p.m.,** at the offices of Robert McDuff, 767 N. Congress Street, Jackson, MS 39202.

The deposition will be taken upon oral examination before a court reporter or other

officer authorized to administer oath.  The deposition will continue from day-to-day thereafter

until completed.  Counsel for the parties are invited to attend and participate as appropriate under

the law.

THIS the 14th day of January, 2019.

Respectfully submitted,

Governor Phil Bryant, Secretary of State Delbert
Hosemann, and Attorney General Jim Hood in their
official capacities of their respective offices and in
their official capacities as members of the State
Board of Election Commissioners

BY:   */s/ Charles E. Griffin*
        CHARLES E. GRIFFIN (MB #5015)

ONE OF ITS ATTORNEYS

EXHIBIT 1
WIT: Thomas
DATE:
Brooks Court Reporting

OF COUNSEL:

BUTLER SNOW LLP
Suite 1400
1020 Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel:  (601) 985-4583
Fax: (601) 985-4500
E-mail: charles.griffin@butlersnow.com

## CERTIFICATE OF SERVICE

I, Charles E. Griffin, hereby certify that on this day I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this, the 14th day of January, 2019.

/s/ Charles E. Griffin
CHARLES E. GRIFFIN

45685072.v1

08/20/2012

Mr. Chris Herron
Chief, Voting-Civil Rights Division
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenues, N W
Washington, D C 20530

Dear Mr. Herron,

This letter is a request for the Department of Justice to look hard at the Mississippi Senate
Redistricting plan. This plan has violated section 5and 2 of the Voting Right Bill.
Please take at look at District 21, 22, 34, City of Yazoo MS, and the overall plan that
reduce blacks voting strength.

Fact:
Mississippi has over 37% black population with a large percentage being in the
Mississippi Delta. District 21 was moved out of Yazoo City which was the beginning of
the Mississippi Delta.   Yazoo City was in District 21 which had a 66.02%-  18+BLK.
Now the new State Plan reduces Yazoo City to a 50.77, which will not allow us to elect a
black. District 22 is 50.77% black. This district consists of all black towns and cities in
the Mississippi Delta. This includes Hollandale, Belzoni, Louise, Isola, Rolling folk,
Yazoo City and many other smaller towns.  Most of these cities and towns are over 80 to
90% Black. Example- Yazoo City's population is around 11,000-85% black with a black
Mayor and four out of five black Aldermen.

Mississippi's plan says District 22 is one of the 15 black senate Districts. They failed to
tell that it is a Federal Prison in Yazoo City with a population way over 2000 inmates.
These inmates cannot vote and will make this district fall below 50% black. The Senator
in this District is white and lives in Hollandale a majority black city and no black has
been able to win in this district. The reason is they all way go out of the community of
common interest to fine white voters when they have enough black voters in these cities
and towns. District 22 denies black voters by going over 80 miles from a white Senator's
hometown, a rural community to an urban community in Madison County- (Gluckstadt
MS) - nine miles from Jackson, Mississippi the State Capital. This area is an upscale
white community, with no common interest to the very poor Mississippi Delta.

Finally, the State Plan clearly reduces over 17 impact districts with 30to 40% black
population. These districts were doing well and had influences with numbers.

Once again please do not approve Mississippi's plan.

Sincerely,

Joseph C. Thomas

EXHIBIT __2__
WIT: _____
DATE: _____
Brooks Court Reporting

Chief, Voting Section-Civil Rights Division

Room 7254-NWB Department of Justice

950 Pennsylvania Ave, NW.

Washington,   D C   20530


Dear Department of Justice,


This letter is a request for the Department of Justice to look hard at the Mississippi Senate Plan-"Composite2" when it come to you for pre- approval. This Plan has taken majority black Cities and Towns in the Mississippi Delta and reduced their voting rights by adding white's voters that do not live in the Mississippi Delta. This plan will reduce the number of black senators in our state. Mississippi is about 40% black and the plan call for 13 senators and two more districts with a %18+, 50.36 and 50.29. These two district uses Delta voters for example- current district 21 is a 66% black it includes Yazoo City-County. The Proposed  new Senate Plan takes Yazoo out of 21 and places it in 22. This is regression for Yazoo City and county – being in a 66% district and now in a 50.36 % District. Both proposed district 22 and 29 are not winnable districts by using any standards, they were set up to keep the number of black Senators at 13, while saying they have 15 black districts.

Yazoo City is over 80% black and Yazoo County has over 50% black and the census will indicate we held our population well during the last ten years. The Senate plan will cut Yazoo in to two Senate Districts and both are not winnable for blacks- example:  50.36% black and 41.50% blacks.

The Senate Plan will take four large Majority Black Counties and place Gluckstadt in Madison County, a white community 9 miles from Jackson metropolitan areas with no common interest to the Delta.  They also gave this district the highest deviation of 2,777 or 4.88%.

Once again, please look hard at this plan to protect our voting rights.


Sincerely Yours,

Joseph C. Thomas

EXHIBIT 3
WIT: _____
DATE: _____
Brooks Court Reporting