IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                          PLAINTIFFS

v.                                                  NO. 3:18-cv-00441-CWR-FKB

**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
Secretary of State of the State of Mississippi;
and **JIM HOOD**, Attorney General of the
State of Mississippi, all in the official capacities
of their own offices and in their official
capacities as members of the State Board
of Election Commissioners                                      DEFENDANTS

DEFENDANTS' MEMORANDUM BRIEF IN SUPPORT
OF MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants have moved at the close of plaintiffs' evidence for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). For the reasons of law set forth hereafter, plaintiff cannot, as a matter of law, establish that Senate District 22, as defined by the Mississippi Legislature in Joint Resolution No. 201, contravenes the results test of § 2 of the Voting Rights Act, 51 US.C. § 10301. Additional reasons based upon the insufficiency of plaintiffs' evidence will be assigned orally in open court.

I.   THE RESULTS TEST OF § 2 IS NOT VIOLATED BY A SINGLE LEGISLATIVE DISTRICT WITH A MAJORITY BVAP.

Section 2(a) of the Voting Rights Act prohibits the imposition by a State of any "standard, practice, or procedure" which bears certain characteristics. The standard, practice, or procedure of which plaintiffs complain here is the border of Senate District 22 as adopted in 2012 by Joint Resolution No. 201. They claim that the border itself "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," within the meaning

of § 2(a). To make the necessary showing, § 2(b) requires plaintiffs, who are black, to prove, "based on the totality of circumstances, . . . that the political processes leading to nomination or election in the state . . . are not equally open to participation by members of" the black race "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

Plaintiffs' claim that the border of District 22 grants blacks "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" is a little peculiar, since blacks made up a majority of the voting age population of the district when the census was taken in 2010. As a matter of simple mathematics, it would seem that blacks have a greater opportunity than other residents of District 22 to elect a Senator of their choice. Plaintiffs nevertheless ask this Court to rule that a handful of other factors somehow reduce their opportunity below the level of equality, notwithstanding their unquestioned majority. They therefore ask this Court to impose a different border for District 22 which they speculate will give them a better opportunity.

The Supreme Court of the United States in *Bartlett v. Strickland*, 556 U.S. 1 (2009), rejected an invitation to permit courts to engage in speculation in the enforcement of § 2. Plaintiffs in this case argue that a majority may not be enough to guarantee equal opportunity; plaintiffs in *Bartlett* argued that less than a majority might be enough to guarantee equal opportunity. They contended that § 2 should be construed to allow them to prove the existence of a district in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id*., at 13 (opinion of Kennedy, J.). The Court rejected this contention, holding that § 2 does not require the creation of a district in which a minority group is still a minority:

2

> Nothing in § 2 grants special protection to a minority group's right to form political coalitions. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." [*Johnson v.*] *DeGrandy*, 512 U.S. [997], 1010 [(1994)].

*Bartlett*, 556 U.S. at 15 (opinion of Kennedy J.). The Court declined to require courts and legislatures "to scrutinize every factor that enters into districting to gauge its effect on crossover voting." *Id.*, at 22.

Instead, applying and explaining the holding of *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Court set a simple numerical standard for the evaluation of districts in a legislative apportionment to which § 2 might apply:

> Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area? That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2. . . . Where an election district could be drawn in which minority voters form a majority but such a district is not drawn, . . . then -- assuming the other *Gingles* factors are also satisfied -- denial of the opportunity to elect the candidate of choice is a present and discernable wrong that is not subject to the high degree of speculation and prediction attendant upon the analysis of crossover claims.

*Id.*, at 18-19 (opinion of Kennedy, J.) (citation omitted).

Here, the premise of *Gingles* is not satisfied, and the danger of speculation is as apparent as it was in *Bartlett*. This is not a case in which "such a district is not drawn." *Id.*, at 18. The 2012 Legislature actually drew "an election district . . . in which minority voters form a majority." *Id.* Plaintiffs ask this Court to speculate that the nature of the border deprives the black majority of an equal opportunity to compete with the white minority, but their effort to blame the border instead of other factors relies on just the sort of speculation that *Bartlett* rejected in favor of "an objective, numerical test." *Id.*

Of course, the Supreme Court has recognized the right of minorities to contest the number of majority-minority districts drawn in the apportionment of any legislative body. As the Court has explained:

> [I]n the context of a challenge to the drawing of district lines, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *DeGrandy*, *supra*, at 1008.

*League of United Latin American Citizens v. Perry*, 548 U.S. 399, 430 (2006). Unless plaintiffs can show that a legislative body failed to draw as many districts as could properly be drawn, no relief is available under § 2. They cannot complain that a majority-minority district should have encompassed a different set of members of a minority group. "If the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice." *Id*., at 429-30.

Here, plaintiffs have not challenged the total number of majority-minority districts created by J.R. No. 201, nor do they claim that an additional such district could have been created in the general vicinity of District 22. They simply argue that a different district should have been drawn which would give a different majority a better chance to win. If § 2 does not immunize a minority of black voters "from the obligation to pull, haul, and trade to find common political ground," *DeGrandy*, 512 U.S. at 1020, it certainly should not immunize a black majority from the need to do such hard political work within its own ranks.

Plaintiffs rely, in support of their suggestion that a black majority may be entitled to relief under § 2 upon a single Fifth Circuit decision, *Monroe v. City of Woodville*, 819 F.2d 507 (5th Cir. 1987).[1] In that case, however, the City confessed liability and the Fifth Circuit ruled that the District Court should have attempted to fashion a remedy. When the District Court tried the case, it again denied relief, and this time the Fifth Circuit affirmed. *Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989). The Court acknowledged that Fifth Circuit cases from the time before

---

[1] They also rely on a single decision of the Eighth Circuit. *See Mo. State Congress of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924 (8th Cir. 2018). Like *Monroe*, that case did not involve a challenge to a single-member district within a larger districting plan. Both cases involved challenges to the election of governmental bodies on an at-large basis. No reported decision of any court appears to have reached a similar result regarding a single-member district.

4

the 1982 amendment to § 2 had held that at-large forms of government could be attacked even where blacks held a voting age majority. The Court, however, expressed skepticism about the permanent vitality of such a rule:

> The caveat should be added that in *Zimmer*, [*v. McKeithen*, 485 F.2d 1297, 5th Cir. 1973 (en banc), *aff'd, sub nom. East Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636 (1976),] at least, the black majority had recently been freed from literacy tests and impediments to voting registration. As *de jure* restrictions on the right to vote mercifully recede further into the historical past, we should expect it to be increasingly difficult to assemble a *Zimmer*-type voting rights case against an at-large electoral district where a minority-majority population exists.

*Monroe*, 881 F.2d at 1333. Now, three decades later, the Fifth Circuit would expect to see evidence of discrimination and its still continuing effects, which plaintiffs have not offered, before extending those principles for the first time to single-member districts.

The practical implications of plaintiffs' contention are immense. Every decade, the Mississippi Legislature must redistrict the 52 Senators and the 122 Representatives. Plaintiffs can always offer to prove, as these plaintiffs do not, that any aspect of any district was created in violation of the intent test of § 2 and the Fourteenth and Fifteenth Amendments. *LULAC* permits a challenge under the results test of § 2 if plaintiffs can show that either chamber failed to create the maximum number of majority-minority districts meeting the requirements of *Gingles*. However, plaintiffs claim that, even where there is no evidence of discriminatory intent and no possibility of creating an additional district, the details of every single majority-minority district can require a trial in federal court. In 2012, the Legislature created 15 majority-minority Senate districts. Plaintiffs claim that every one of them could be subject to suit, and, of course, the same would be true of every majority-minority supervisor district or city council district.

The Supreme Court has never authorized such an inquiry into the details of legislative redistricting. The Fifth Circuit has never authorized such an inquiry. Plaintiffs have not cited any case from any court where it has been held that a majority-minority district violated § 2 because

5

other borders might have been more favorable to the electoral success of black voters and candidates.[2] Nothing in the language of § 2 or any precedent suggests that this Court should be the first to do so.

**II.    ANY EXPANSION OF THE SCOPE OF § 2 MUST BE CONSIDERED IN LIGHT OF THE CANON OF CONSTITUTIONAL AVOIDANCE.**

Over the years since 1982, the Supreme Court has often been asked to consider the contours of the results test of § 2 as applied to different circumstances. Plaintiffs here ask this Court to take a road not previously taken by altering the border of a single-member legislative district to enlarge a majority-minority voting age population that already exists. When asked to resolve doubtful expansions of the reach of § 2, the Supreme Court has previously "resolve[d] that doubt by avoiding serious constitutional concerns under the Equal Protection Clause." *Bartlett*, 556 U.S. at 21 (opinion of Kennedy, J.).

The Supreme Court does not appear ever to have addressed the constitutionality of any application of § 2 in any circumstances. Plaintiffs, however, assert that the Fifth Circuit has approved the constitutionality of § 2 as applied in all circumstances, in *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984). *Jones* is not so broad.[3] As plaintiffs here acknowledge, the City argued that § 2 preserved the intent standard [Dkt. # 50 at 8], and the Fifth Circuit simply held, "Assigning a non-intent standard to an enforcement measure does not pose a serious constitutional obstacle." *Id.*, at 375. The Court added that "we perceive § 2 as merely prescribing a potion to remove vestiges of the past official discrimination and to ward off such discrimination in the future." *Id.*, at 375 n.6, quoting *Major v. Treen*, 574 F. Supp. 325, 347 (E.D. La. 1983).

---

[2] Although not controlling here, an identical claim was rejected in *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012).

[3] If it were, it would have been peculiar for five Judges of the Fifth Circuit to apply the canon of constitutional avoidance to a new application of § 2 in *Veasey v. Abbott*, 830 F.3d 216, 314-17 (5th Cir. 2016) (en banc) (Jones, J., dissenting). The majority upheld the constitutionality of § 2 "as applied here." *Id.*, at 253 n.47. The Court did not suggest that all possible applications of § 2 would prove constitutional.

Nothing can possibly be found in the language Congress adopted as § 2 to suggest that a single-member majority-minority district is in any way forbidden. No one has previously found in the legislative history or the case law any congressional authorization to strike down such a district "to remove vestiges of past official discrimination and to ward off such discrimination in the future." *Id*. To accept such an expansion § 2 so as to alter the border of District 22 to add new voters about whom nothing is known but their race runs squarely into the prohibition of using race as the predominant factor in devising legislative districts, as set forth in *Miller v. Johnson*, 515 U.S. 900, 916 (1975). Here, plaintiffs' invitation should be rejected.

## CONCLUSION

For the reasons stated herein and for the further reasons assigned orally in open court, this Court should enter judgment as a matter of law in favor of defendants.

This the 6th day of February, 2019.

    Respectfully submitted,

    *s/ Michael B. Wallace*
    MICHAEL B. WALLACE (MSB #6904)
    WISE CARTER CHILD & CARAWAY, P.A.
    Post Office Box 651
    Jackson, MS 39205-0651
    (601) 968-5534
    mbw@wisecarter.com

    ATTORNEY FOR DEFENDANTS PHIL
    BRYANT, GOVERNOR OF THE STATE OF
    MISSISSIPPI, AND DELBERT HOSEMANN,
    SECRETARY OF STATE OF THE STATE OF
    MISSISSIPPI

    TOMMIE S. CARDIN (MSB #5863)
    CHARLES E. GRIFFIN (MSB#5015)
    BENJAMIN M. WATSON (MSB #100078)
    B. PARKER BERRY (MSB #104251)
    BUTLER SNOW LLP
    Suite 1400 1020
    Highland Colony Park
    Ridgeland, MS 39157

                    Post Office Box 6010
                    Ridgeland, MS 39158-6010
                    Tel: (601) 985-4570
                    Fax: (601) 985-4500
                    E-mail: tommie.cardin@butlersnow.com
                    E-mail: charles.griffin@butlersnow.com
                    E-mail: ben.watson@butlersnow.com
                    E-mail: parker.berry@butlersnow.com

                    ATTORNEYS FOR ALL DEFENDANTS

## **CERTIFICATE OF SERVICE**

    I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

    This the 6th day of February, 2019.

                    *s/ Michael B. Wallace*
                    Michael B. Wallace