**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS, et al.**                                         **PLAINTIFFS**

**V.**                                         **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                         **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

In July 2018, plaintiffs Joseph Thomas, Vernon Ayers, and Melvin Lawson filed this suit alleging that the boundaries of Mississippi Senate District 22 violate § 2 of the Voting Rights Act. Defendants Governor Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann deny the allegation and dispute that any violation can be remedied in time for the 2019 election. The parties presented evidence at trial on February 6 and 7, 2019.[1]

On February 13, after a thorough review of the evidence and arguments, the Court advised the parties and the Mississippi Legislature that the plaintiffs had proven their case. The Legislature was invited to redraw District 22 prior to consideration of any judicial remedy. The Court's findings of fact and conclusions of law are presented below.

## I.      Factual and Procedural History

### A.      The Parties

Plaintiff Joseph Thomas is a native of Yazoo City, Mississippi. He is a banker by profession, a community advocate by avocation, and in his spare time, a published historian of African-Americans in Yazoo City and Mississippi.[2]

---

[1] Discovery was completed on an expedited basis. *See* Docket No. 28. The trial was held at the first opportunity after accounting for the attorneys' conflicts and the Court's firm trial settings. At the hearing on the defendants' dispositive motion, defense counsel recognized that all have worked as expeditiously as possible.
[2] *See* Joseph C. Thomas, *Afro-American Sons & Daughters 1849-1949* (1997).

In 2003, Thomas turned his attention to public office. He ran for and won election as Mississippi State Senator for District 21. The District included Thomas's part of Yazoo County and predominantly African-American portions of Madison County, among other places, so its "Black Voting Age Population" (BVAP) was relatively high. He ran again in 2007 but lost in the primary to another African-American candidate. Thomas then sat out the 2011 cycle.

The decennial redistricting process resulted in changes to the Senate map in 2012. Thomas's residence wound up in District 22.

Thomas learned that District 22 now extended into areas of Madison and Bolivar Counties that ultimately led it to have a BVAP of only 50.8%. He was concerned that although technically a majority, such a low BVAP would negatively impact African-Americans' ability to elect their candidate of choice. After all, in District 22, African-Americans' candidate of choice had lost in the 2003, 2007, and 2011 elections.

Thomas contacted the U.S. Department of Justice and urged it to reject the new boundaries. He was not successful. DOJ precleared the plan in September 2012.

In 2015, Thomas decided to throw his hat in the ring. He ran in District 22 against Eugene "Buck" Clarke, the incumbent chairman of the Senate Appropriations Committee. Thomas thought it would be an uphill battle, but "ran hard" and spent "quite a bit" of his own money, he testified. He lost 54% to 46%. Thomas says he was "real disappointed" that his outreach to the majority-white precincts in Madison and Bolivar Counties had not garnered more votes.

Thomas did not file a Voting Rights Act lawsuit in 2015, 2016, or 2017. He testified that he was unaware that an individual could file a § 2 suit until he had a conversation with one of the attorneys in this case in summer 2018. This suit was filed several weeks later.

Plaintiff Melvin Lawson is also a voter in District 22. He has worked and volunteered for political campaigns, including his brother's campaign for Bolivar County Supervisor and Thomas's Senate campaign. Through this experience Lawson found that it is more difficult to get Delta voters to the polls in odd-numbered election years, *i.e.*, years without Congressional and Presidential races, because in odd-numbered years there are fewer transportation options available on Election Day.

In 2018, Lawson overheard concerned citizens talking about District 22. Weeks later he ran into attorney Ellis Turnage, co-counsel for the plaintiffs in this action, who told him about this suit. Lawson was interested and joined as a plaintiff.

We know little about plaintiff Vernon Ayers other than this: he is a registered voter in District 22. Neither side has elaborated on his situation.

Each plaintiff is African-American.

Defendants Governor Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann constitute the State Board of Election Commissioners.[3] All three are sued in their official capacities.

### B.    District 22

District 22 is the second-largest Senate District in Mississippi, encompassing 2,166 square miles and spanning more than 100 miles from tip to toe. It begins in Bolivar County, runs through Washington, Humphreys, Sharkey, and Yazoo Counties, and finds its end in Madison County. The District looks like this:

---

[3] *See* Miss. Code Ann. § 23-15-211.



Most of District 22 lies in the heart of the Mississippi Delta, the unique alluvial plain occupying the northwest quadrant of the state. The Delta is impossible to completely define, but my colleagues' description from 1982 is a good start:

> The Mississippi Delta consists of 19 Delta and part-Delta contiguous counties as follows: Bolivar, Carroll, Coahoma, DeSoto, Grenada, Holmes, Humphreys,

Issaquena, Leflore, Panola, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Warren, Washington, and Yazoo. This is a distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as "beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi." Since early times, concentrations of blacks have resided in the Delta area.[4]

John Dittmer calls the Delta "both a clearly defined geographical area and a state of mind."[5] The benefits of "some of the richest soil in the nation" were shared unequally: the land was worked by "tens of thousands of poor black families" for the benefit of "a relatively small number of white[]" landowners.[6] The Delta was "a place of appalling poverty for the blacks who tilled the land."[7]

As Mississippi has changed over the years, it remains true that "[b]lacks in Mississippi, especially in its Delta region, generally have less education, lower incomes, and more menial occupations than whites."[8] Updated socio-economic data for District 22 will be discussed below.

The plaintiffs introduced evidence confirming that the Delta is "totally different" from Madison County. Lawson agreed that the differences are geographical and cultural. The Delta is rural, agrarian, and contains "the largest concentration of black voting age population" in Mississippi.[9] Madison County is populous and suburban, bordering the State's Capitol City, Jackson.

The Madison County precincts situated in District 22, such as the Gluckstadt area, are especially different. A prior redistricting court designated them as a "high-growth area" of the State.[10] Cotton and soybeans are growing in the Delta. The population is not.

---

[4] *Jordan v. Winter*, 541 F. Supp. 1135, 1139 n.1 (N.D. Miss. 1982) (three-judge court).
[5] John Dittmer, *Local People: The Struggle for Civil Rights in Mississippi* 10 (1994).
[6] *Id.*
[7] Yasuhiro Katagiri, *The Mississippi State Sovereignty Commission: Civil Rights and States' Rights* 39 (2001).
[8] *Jordan v. Winter*, 604 F. Supp. 807, 812 (N.D. Miss. 1984) (three-judge court).
[9] *Smith v. Clark*, 189 F. Supp. 2d 529, 543 (S.D. Miss. 2002) (three-judge court).
[10] *Id.* at 544.

In the 2015 election, Thomas won the predominately African-American precincts in Washington, Sharkey, Humphreys, and Yazoo Counties. He lost the predominantly white precincts in Madison and Bolivar Counties.

**C.      The Experts**

**1.      The Plaintiffs' Experts**

The plaintiffs called two experts to testify at trial. Both were qualified by education and experience to give expert opinions in their respective fields, and have previously provided expert testimony in voting cases.

First to testify was Dr. Maxwell Palmer, a political scientist at Boston University. Dr. Palmer analyzed District 22's voting patterns with a technique called "ecological inference" (EI).

At heart, EI "is the process of extracting clues about individual behavior from information reported at the group or aggregate level."[11] It is useful in voting cases because "the secret ballot hinders the [research] process and surveys in racially polarized contexts are known to be of little value."[12] EI "estimates the underlying propensity of each group to turn out for an election and to vote for a particular candidate using the estimation technique of maximum likelihood."[13] The process is generally accepted in voting cases in this Circuit.[14]

Dr. Palmer testified that EI is a superior statistical method to use in this case. He said that among other benefits, EI allowed him to run 100,000 simulations of each election in the sample, and provided valuable statistical checks, such as confidence intervals, on the results.

---

[11] Gary King et al., *Ecological Inference: New Methodological Strategies* 1 (2004).
[12] *Id.*
[13] *Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).
[14] *E.g.*, *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 725, 731-32 (N.D. Tex. 2009); *Hall v. Louisiana*, 108 F. Supp. 3d 419, 433 (M.D. La. 2015) ("Experts from both Plaintiffs and Defendants employed the widely recognized Ecological Inference procedure developed by Dr. Gary King to derive their conclusions of voter preferences in this case.").

Dr. Palmer used precinct-level voting and Census data to analyze 10 elections in District 22. They consist of the 2003, 2007, and 2015 Senate District 22 elections (*i.e.*, the "endogenous" elections most relevant to this case), as well as the 2003 Lieutenant Governor and Treasurer elections, the 2007 Insurance Commissioner election, the 2011 Governor election, and the 2015 Agriculture Commissioner, Secretary of State, and Governor elections (*i.e.*, the "exogenous" elections with some relevance to this case).[15] All 10 featured contests between white and black candidates. The goal of the endogenous/exogenous comparison was to see if findings were consistent between the Senate races and statewide races also held in odd years in District 22.

This analysis led Dr. Palmer to present the following conclusions:

*First*, there is "strong evidence" that African-American voters in District 22 are politically cohesive, but that their candidates of choice are defeated by white bloc voting. Every African-American candidate lost in the 10 elections in the sample, for example.[16] Dr. Palmer also found that African-American and white voters in the District are highly racially polarized.[17] In the 2015 State Senate race, 92.8% of African-American voters chose Thomas, while only 11.4% of white voters did the same.

*Second*, there is a sizable turnout gap between African-American and white voters in District 22.[18] On average, white turnout is 10.2 percentage points higher than black turnout. This conclusion was statistically significant in three out of the four Senate District 22 races analyzed.

---

[15] The 2011 Senate race in District 22 was between two white candidates. Dr. Palmer found that 83% of African-American voters supported the Democrat and 84% of white voters supported the Republican. The Democrat lost.
[16] Among the endogenous elections, Thomas's 46% result in 2015 made him the highest-performing African-American candidate. Looking at the exogenous elections, Gary Anderson was the most popular African-American candidate in District 22; he earned 49.1% of the District's vote in the 2003 Treasurer race and 49% of the District's vote in the 2007 Insurance Commissioner election.
[17] This finding is statistically significant.
[18] The turnout analysis included the 2011 Senate District 22 election.

*Third*, African-Americans would have a "realistic opportunity" to elect their candidate of choice if the BVAP in District 22 was increased to 62%.

On cross-examination it became clear that the plaintiffs did not ask Dr. Palmer to determine whether a BVAP lower than 62% would be sufficient to elect the African-American community's candidate of choice; rather, the plaintiffs asked him to analyze the expected outcome of a 62% BVAP. Dr. Palmer's report states that the 62% threshold was derived from the map constructed by the plaintiffs' expert mapmaker. We turn now to that expert.

William Cooper was the plaintiffs' second and final expert witness. Cooper uses geographic information system (GIS) technology to create electoral maps.

In this case, the plaintiffs asked Cooper to determine whether District 22's boundaries could be reconfigured to increase the BVAP while honoring traditional redistricting criteria and minimizing disruption to adjacent Districts. The plaintiffs also asked Cooper to gather relevant socio-economic data for District 22.

Cooper concluded that yes, although African-American voters in District 22 are already sufficiently numerous and geographically compact as to constitute a majority, the District could be redrawn to increase the BVAP by at least 10 additional percentage points. He then prepared three maps demonstrating how District 22 could be reconfigured.

Plan 1 moves the Madison County precincts and eight Yazoo County precincts from District 22 to District 23. In exchange, the Issaquena County precincts and eight Warren County precincts would move in the opposite direction. A total of 28 out of Mississippi's 1,962 precincts (1.4%) would be shifted. No precinct lines would be redrawn. Approximately 70% of the population of District 22 would remain in District 22, while approximately 67% of the

population of District 23 would stay put. A total of 27,000 voters in these Districts would be affected.

Under Plan 1, the BVAP would rise to 61.98%.

Plan 1 is pasted below. The thick blue lines represent the Districts as currently constituted. The gold and pink areas show how the Districts would change.

Cooper developed Plans 2 and 3 in response to the defendants' arguments during discovery. The defendants' expert had contended (among other things) that Plan 1 was unwieldy because it would split the City of Vicksburg between Districts 22 and 23. So in Plan 2, Cooper proposed another way to redraw those Districts that, while achieving the goals of Plan 1, would offset the splitting of Vicksburg by reuniting all of Yazoo City into a single District. Plan 2 ends up with a BVAP of 61.3%.

Plan 3 takes that idea one step further. While Vicksburg would again be split, Plan 3 redraws the boundaries to reunite Yazoo City *and* Cleveland, Mississippi—both of which are currently divided—resulting in a net decrease in split cities. The resulting BVAP is 66.1%.

The downside of Plan 3 is that it also involves adjusting the borders of District 13, thereby affecting more counties, precincts, and voters. It essentially presents a trade-off between municipal unification and pre-election disruption.

Plans 2 and 3 are shown below. Again, the thick blue lines represent the Districts as currently constituted, while the gold, pink, and in Plan 3, green areas indicate how the Districts would change.

PLAINTIFFS' ILLUSTRATIVE PLAN 2[19]          PLAINTIFFS' ILLUSTRATIVE PLAN 3



---

[19] At this scale Plans 1 and 2 may look identical, but Plan 2 features a small golden-colored section immediately to the left of the word "YAZOO."

All of Cooper's illustrative plans satisfy traditional redistricting criteria. They are contiguous, reasonably compact, reasonably shaped, satisfy one-person one-vote, and do not dilute minority voting strength. The incumbent Senator in District 23 remains in the same District. (The incumbent in District 22, Buck Clarke, is not running for reelection although his residence remains in the District.)

"To the extent possible, consistent with the constitutional and statutory requirements, federal redistricting courts attempt to preserve local political boundaries—city and county lines," since those lines often reflect "communities of interest."[20]

> In addition to the communities of interest represented by counties and municipalities, there are other communities of interest which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade. The preservation of regional communities of interest within a single district enhances the ability of constituents with similar regional interests to obtain effective representation of those interests.[21]

Cooper testified that Plan 1 better respects communities of interest than the current map. Issaquena County and part of Warren County are more like the other Counties in District 22, he said, while the Madison County precincts are closer in nature to the wealthier parts of Warren County already sited in District 23.

Finally, Cooper reviewed Census data showing a variety of substantial socio-economic disparities between African-Americans and whites in District 22 that likely reduce voter turnout.

The statistics are bleak. The African-American poverty rate in District 22 is nearly five times the white poverty rate. Educational attainment for African-Americans is depressingly low. African-Americans who work full time make a *median* wage of $20,256 a year, while the median

---

[20] *Smith*, 189 F. Supp. 2d at 542 (citations omitted).
[21] *Id.* at 543 (quotation marks, citations, and brackets omitted).

white full-time worker makes nearly double—$40,485.[22] These and similar disparities, some of which are reproduced below, reflect two populations that reside alongside each other yet experience vastly different opportunities and outcomes:

**SOCIO-ECONOMIC PROFILE OF DISTRICT 22**

|                                    | African-Americans | Whites   |
| ---------------------------------- | ----------------- | -------- |
| Poverty Rate                       | 41.2%             | 8.8%     |
| Median Household Income            | $23,741           | $66,736  |
| SNAP Participation                 | 40.3%             | 4.3%     |
| High School Dropout Rate           | 28.7%             | 9.8%     |
| Bachelor's Degree Attainment       | 14.0%             | 38.6%    |
| Median Full-time Wage              | $20,256           | $40,485  |
| Adults Without Health Insurance    | 29.1%             | 11.5%    |

Cooper proceeded to explain that the inclusion of Madison County voters added significantly to these disparities. County-level statistics reveal that Madison County's median household income is more than twice as much as any other County in District 22.[23] In Madison County, for example, the median household brings in $68,600 annually, a full $40,000 more than the median household in neighboring Yazoo County ($28,330). After Madison County, the second-wealthiest County in the District is Sharkey County, with a $30,033 median household income. Obviously, that is less than half of Madison County's figure.

The Mississippi Department of Employment Security has created a helpful map demonstrating county-level income differences as they existed in 2017. It shows that Madison County had the highest per-capita income that year in all of Mississippi:

---

[22] This means that half of working African-Americans in District 22 make below $20,256 a year.
[23] The statistics for the Gluckstadt area may be higher than the countywide figures, but they are not in evidence.



We now turn to the other side of this battle of the experts.

### 2.      The Defendants' Expert

The defendants' sole expert was Dr. Peter A. Morrison, an applied demographer from

Nantucket, Massachusetts. Dr. Morrison is retired from the RAND Corporation.

Dr. Morrison took a different approach to whether white bloc voting usually defeats

African-American-preferred candidates. He did not look at the Senate District 22 elections, but

instead compiled the results of local elections *within* the boundaries of District 22. From 2007-

onward, he found "152 separate instances in which a candidate favored by AA voters has been elected to local public office throughout the territory included in" District 22.

In Humphreys County, for example, Dr. Morrison examined the records of the 2007, 2011, and 2015 elections for local offices such as Chancery Clerk, Circuit Clerk, and Sheriff. From those records he identified a sample of 21 elections in which an African-American candidate ran and won. Of those, 14 races were uncontested and 7 were contested.

Dr. Morrison testified that based on this "simple counting operation—that's what demographers do," African-Americans are capable of winning elections within District 22. When asked about the possibility of white bloc voting defeating African-American-preferred candidates, he explained that he could not "see how that could possibly be the case" given the number of African-American elected officials. "The numbers speak for themselves."

Dr. Morrison took issue with Plan 1. He argued that splitting Vicksburg would subordinate traditional redistricting criteria to race. Dr. Morrison also claimed that African-Americans in District 23 would be harmed because their "influential" 42% BVAP would be reduced to 31%. "Overall," he wrote, "Plaintiffs' proposed alternative [Plan 1] would strip African-American voters of two districts in which they are now influential."

Finally, Dr. Morrison gathered Census data about voter turnout in Mississippi. Surveys from even-numbered election years spanning 2004-2016 show that African-Americans self-reported higher turnout rates than white voters. "These data furnish convincing evidence that African Americans in Mississippi have access to the political process and have participated in that process at ever higher rates in recent years," Dr. Morrison concluded.

**D.      Stipulations**

In case the Court's discussion has inadvertently omitted anything, the parties' stipulations are reproduced here in their entirety:

The Mississippi Senate is composed of 52 members, each of whom is elected from a single-member district. Elections for the Mississippi Legislature are held every four years in odd-numbered years at the same time other elections for most state and local elections are held.

The current plan for the Mississippi Senate was adopted in 2012.[24] The first election under it was held in 2015. The next election under it will be held in 2019. Under the current plan for the Mississippi Senate, District 22 consists of all of Sharkey County and parts of Bolivar, Washington, Humphreys, Yazoo, and Madison Counties. Under the current plan, District 22 is 50.77% African American in voting age population using 2010 census data.

Eugene "Buck" Clarke has represented Mississippi State Senate District 22 for approximately 15 years since January 2004. He is white.

In the 2003 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 9,004 votes and defeated African-American candidates Mala Brooks and Mark Crawford, who received 5,288 votes and 1,870 votes, respectively.

In the 2007 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 7,266 votes and defeated African-American candidate Sandra Jaribu Hill, who received 5,116 votes.

---

[24] At trial, the parties clarified that the Mississippi Senate adopted a plan in 2011, but it was not adopted by the Mississippi House and therefore never became final.

In the 2011 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 7,033 votes and defeated white candidate George Hollowell, who received 6,021 votes.

In the 2015 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 8,149 votes and defeated African-American Democratic candidate Joseph Thomas, who received 6,985 votes.

Plaintiff Vernon Ayers is an African-American resident and registered voter in Washington County who votes in District 22.

\* \* \*

At the end of trial, the parties also stipulated that the Mississippi Senate has never had more than 13 African-American members. The defendants argued that this fact, while true, was irrelevant. The objection is overruled. The relevance of this fact will become apparent later.

## II. Legal Standard

A state violates § 2 of the Voting Rights Act:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[25]

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[26]

The plaintiffs must begin by proving the three *Gingles* requirements. First is that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-

---

[25] 52 U.S.C. § 10301(b).
[26] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

member district."[27] Second, the plaintiffs must prove that "the racial group is politically cohesive."[28] The third requirement is that "the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate."[29] "[T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim."[30]

Courts are then to consider "the Senate factors":

1.    The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2.    The extent to which voting in the elections of the state or political subdivision is racially polarized;

3.    The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.    If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.    The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.    Whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7.    The extent to which members of the minority group have been elected to public office in the jurisdiction.[31]

The Senate factors are "neither comprehensive nor exclusive," and "there is no requirement that any particular number of factors be proved, or that a majority of them point one

---

[27] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (quotation marks and citation omitted).
[28] *Id.*
[29] *Id.* (brackets and ellipses omitted).
[30] *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).
[31] *Gingles*, 478 U.S. at 36–37 (quotation marks and citations omitted).

way or the other."[32] They simply "provide salient guidance from Congress and the Supreme

Court on how to examine the current effects of past and current discrimination and how those

effects interact with a challenged law.[33] The ultimate question continues to be "whether as a

result of the challenged practice or structure plaintiffs do not have an equal opportunity to

participate in the political processes and to elect candidates of their choice."[34]

"The Fifth Circuit has noted that it will be only the very unusual case in which the

Plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish

a violation of § 2 under the totality of the circumstances."[35]

## III.    Discussion[36]

### A.    The Board of Election Commissioners

The defendants first contend that they are improper parties because none of them caused

or can remedy the boundaries of District 22. Since 1965, however, state redistricting cases in

Mississippi have "always been directed primarily against the state executive officers charged

with administering Mississippi's election laws . . . the then members of the State Board of

Election Commissioners and their subordinates."[37] That is because although the Board has "no

power to create reapportionment," it does "control the continued election of members to a

legislative body found to be unconstitutionally constituted," and is "the only agency with

---

[32] *Id.* at 45 (quotation marks and citation omitted).

[33] *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (en banc).

[34] *Gingles*, 478 U.S. at 44 (quotation marks and citation omitted).

[35] *Benavidez*, 638 F. Supp. 2d at 713 (quotation marks and citation omitted).

[36] Parts III A and B resolve arguments first raised in the defendants' September 2018 motion for summary judgment.

[37] *Connor v. Winter*, 519 F. Supp. 1337, 1340 n.1 (S.D. Miss. 1981) (three-judge court). Our defendants' argument was actually made by the dissenting Judge in *Connor*. *See id.* at 1346 (Cox, J., dissenting) ("The majority herein has again cast a sovereign state into perilous and turgid waters to first be cast upon the rocky shores of Scylla because they were powerless to make the necessary changes, then only to be thrust into the dark brown vortex of Charybdis, when because of their impotency they are required to pay plaintiffs attorneys' fees, litigation expenses, and costs.").

statewide power to prevent the ballot placement of candidates for election to a malapportioned legislature."[38] The defendants' reply brief is silent on this caselaw. We will move on.

## B. Affirmative Defenses

The defendants next argue that the statute of limitations has expired. They contend that this case should have been filed within three years of the Department of Justice's September 2012 preclearance of the Senate map. Alternatively, the defendants say that laches should end this case because the plaintiffs' "six-year delay" in bringing this lawsuit is inexcusable and prejudicial.

### 1. Statute of Limitations

The Court assumes for present purposes that a Voting Rights Act suit "for injunctive relief brought by a private litigant could be barred by the running of an analogous state statute of limitations."[39] Even so, the plaintiffs' suit is timely because: (1) they filed within three years of the last District 22 election "which improperly implemented" the Act,[40] and (2) they allege that District 22's boundaries present a continuing violation of § 2 that will harm them again in the upcoming 2019 election cycle.[41]

### 2. Laches

#### a. Substantive Law

"Laches is an inexcusable delay on the part of the plaintiff that results in prejudice to the defendant."[42] "It assures that old grievances will some day be laid to rest, that litigation will be

---

[38] *Id.* at 1343.
[39] *Dotson v. City of Indianola*, 514 F. Supp. 397, 401 (N.D. Miss. 1981) (three-judge court). *But see Jeffers v. Clinton*, 730 F. Supp. 196, 201 n.5 (E.D. Ark. 1989) (three-judge court) (noting that the state defendants presented a laches defense in lieu of a statute of limitations defense).
[40] *Dotson*, 514 F. Supp. at 401.
[41] *See Blackmoon v. Charles Mix Cty.*, 386 F. Supp. 2d 1108, 1115 (D.S.D. 2005).
[42] *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) (citation omitted).

decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them."[43]

To succeed with a laches defense, the defendants must show "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."[44] "Whether laches bars an action in a given case depends upon the circumstances of that case."[45]

"Measuring prejudice entails balancing equities."[46] "When a district court is making an equity determination such as laches, the scope of its powers is broad, for breadth and flexibility are inherent in equitable remedies."[47] "The Court must weigh the facts and interests on both sides, summon up the discretion of a chancellor, remember that it is a court of conscience and not of legal stricture, and come as close as it can to a fair result. Frequently there are some good arguments on both sides, and that is the case here."[48]

There is some uncertainty as to whether laches applies where there is a statute of limitations. A statute of limitations "itself takes account of delay," and the "principal application" of laches "was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."[49] In the redistricting context, the nature of laches as a "gap-filling, not legislation-overriding" doctrine suggests that it is best considered as a defense to

---

[43] *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 481 (5th Cir. 1980).
[44] *Id.* at 478 (citations omitted).
[45] *Id.*
[46] *Id.* at 479.
[47] *Radiator Specialty*, 207 F. App'x at 362 (quotation marks and citation omitted).
[48] *Jeffers*, 730 F. Supp. at 202.
[49] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014); *see also Alexander*, 614 F.2d at 478; *Dotson*, 514 F. Supp. at 400 (discussing and rejecting a laches argument predicated upon "the plaintiffs' delay exceed[ing] the applicable limitations period").

last-minute requests for injunctive relief, and should not be wielded more than a year before an election—as our defendants have done by filing a dispositive laches motion in September 2018.[50]

Other authority suggests that laches is unavailable in cases like ours, where the plaintiffs allege an ongoing injury and seek a permanent injunction. In *Miller v. Board of Commissioners*, for example, the Middle District of Georgia held that "laches does not apply to voting rights actions wherein aggrieved voters seek permanent injunctive relief insofar as the electoral system in dispute has produced a recent injury or presents an ongoing injury to the voters."[51]

To put any doubts to rest, though, the Court will proceed to analyze the defense.

### b.     Analysis

The laches argument quickly fails as to plaintiffs Ayers and Lawson. There is no evidence that either had any indication of a problem with District 22's boundaries and slept on his rights. The mere fact that they are voters in District 22 is not enough, and there is no basis to conclude that DOJ preclearance vests voters with the knowledge of a claim sufficient to hold them accountable via laches.

On the other hand, the defendants make a compelling case that plaintiff Thomas unnecessarily delayed bringing this suit. Prior to preclearance, he expressed to DOJ his belief that the boundaries violated the Voting Rights Act. He then did not act on that belief after DOJ precleared the plan.

Thomas testified that in 2012, he did not know that private parties could bring a § 2 suit. He learned about this legal remedy in mid-2018. Laches, however, "does not depend on

---

[50] *Petrella*, 572 U.S. at 680; *see Blackmoon*, 386 F. Supp. 2d at 1115 (concluding that voting rights cases in which the laches defense prevailed involved plaintiffs who "waited until either elections or deadlines relating to elections were imminent before filing their claims").
[51] 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998) (citation and emphasis omitted).

subjective awareness of the legal basis on which a claim can be made."[52] It instead asks whether plaintiffs have "an adequate indication" of the problem, which means "[information] enough to alert them to the claim that the authorities were not acting legally."[53] The evidence shows that Thomas had that information. His unawareness of the law in 2012, while credible, is not enough to excuse his delay in pursuing a remedy.

Yet there are other facts that render Thomas's delay excusable. Thomas did not perceive a legal violation in 2012 and then sit on his laurels. He decided to take a risk and enter the 2015 election in an attempt to prove that an African-American *could* win District 22 despite its boundaries. In other words, the time between 2012 and 2015 is excusable, if not laudable, because Thomas sought to remedy the problem through the political process.[54]

The defendants hammer the idea that District 22's BVAP cannot constitute a § 2 violation because, as the Supreme Court wrote, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics."[55] But "pull, haul, and trade to find common political ground" is exactly what Thomas did in the 2015 election cycle. He should be credited for turning to the political process first—for attempting to make this litigation unnecessary—rather than penalized for the time that elapsed between preclearance in 2012 and the November 2015 election.

---

[52] *Alexander*, 614 F.2d at 479.

[53] *Id.*

[54] In notable contrast is the defendants' principal case, in which the plaintiff admitted that he delayed filing suit because he was not "a political person" and "kept thinking at some point that somebody would step up to protect the interest of Lincoln Parish." *Maxwell v. Foster*, No. 98-1378, 1999 WL 33507675, at *3 (W.D. La. Nov. 24, 1999) (brackets omitted).

[55] *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994). Twenty-five years later, Americans are likely more aware that racism can spike just as it can wane. *See, e.g.*, John Eligon, *Hate Crimes Increase for the Third Consecutive Year, F.B.I. Reports*, N.Y. Times, Nov. 13, 2018.

What remains is prejudice. "It is difficult to say that a government agency can be prejudiced by forcing it to comply with the law," the Fifth Circuit has observed.[56] But plainly there are circumstances where prejudice to the government warrants application of the doctrine. In *Alexander*, for example, the court found that a suit against the Army Corps of Engineers was properly dismissed because the plaintiffs had inexcusably delayed while the Corps spent $176 million on the project in question.[57] And in the defendants' principal case, *Maxwell v. Foster*, the court found laches appropriate because the plaintiffs had inexplicably delayed a suit seeking to declare the *entire* state legislative map unconstitutional. No. 98-1378, 1999 WL 33507675, at *4 (W.D. La. Nov. 24, 1999).

The evidence in our case weighs against a finding of undue prejudice. The plaintiffs filed this suit in July 2018. That was 16 months before the 2019 general election, 13 months before the primaries, and eight months before the qualification deadline. This timeframe is more than enough to litigate their single-district, single-count claim.[58] It is not remotely comparable to the $176 *million* sum the *Alexander* court noted or the statewide relief the plaintiffs in *Maxwell* sought.

The Court will turn to the merits.

## C.    Section 2 of the Voting Rights Act

### 1.    The *Gingles* Preconditions

The evidence on the first and second *Gingles* preconditions is not contested.

---

[56] *Alexander*, 614 F.2d at 480.

[57] *Id.*

[58] There is the matter of the flip-side of the argument. Thomas filed this suit only after running in the first election under the current boundaries. Had he filed before running, the defendants would almost certainly be asking the Court to dismiss the action because it is a district that theoretically can be won by an African-American. *He should at least try first*, they would say. In 2015, however, Thomas tried, and he now makes a compelling case (as explained more fully below) as to why new boundaries should be drawn.

African-Americans in District 22 are already a sufficiently large and geographically compact group as to constitute a majority in a single-member district; the present BVAP exceeds 50%. The plaintiffs' three alternative maps show that the BVAP can be increased without impairing the District's compactness.[59]

It also is undisputed that African-American voters in District 22 are politically cohesive. Dr. Palmer's analysis is sound and Dr. Morrison did not attempt to opine otherwise, as he admitted that he has never run EI and does not perform that kind of analysis. Dr. Morrison also did not dispute Dr. Palmer's finding of racially polarized voting.

The parties genuinely dispute the third *Gingles* precondition: whether white bloc voting usually defeats the African-American community's candidate of choice. But the defendants' expert opinions on this point turned out to be flawed in important ways.

We should start by observing that some of Dr. Morrison's methods were unreliable and led him to incorrect facts. In several instances he inaccurately coded winning officials as having lost, or incorrectly coded a candidate's race—an error apparently caused by the fact that he discerned a candidate's race via Facebook and other public websites.[60] At other times, he did not have any evidence as to whether a candidate was in fact preferred by the African-American community, and simply assumed that black candidates were preferred by the black community.

---

[59] Although Dr. Morrison noted at trial that he did not contest the first *Gingles* precondition, his report asserted that Plan 1 would "damage" District 23's compactness. This assertion is not borne out by the facts. Cooper's supplemental report shows that redrawn Districts 22 and 23 would satisfy the Polsby-Popper test and have Reock scores well-within the range of Mississippi's 2012 Senate and House maps.

[60] This kind of coding is truly perilous. *Cf. Fish v. Kobach*, 309 F. Supp. 3d 1048, 1092–93 (D. Kan. 2018) ("Richman and a graduate student assistant went through the suspense list and determined which names were, in their view, foreign. Neither Dr. Richman nor his assistant had any experience in identifying so-called foreign names. By his own admission, their determinations were subjective and based primarily on whether the name was 'anglophone,' meaning originating in the British Isles. Dr. Richman also testified that their work was performed quickly, and that they made many mistakes along the way. A review of their coding revealed inconsistencies; for example, of five individuals with the last name of 'Lopez,' two were coded as foreign and three were coded as non-foreign. On cross examination, Dr. Richman admitted that he would have coded Carlos Murguia, a United States District Judge sitting in this Court, as foreign.").

Dr. Morrison's decision to include uncontested races in his analysis is curious, too; on cross-examination he admitted that these only shed light "indirectly" on the third *Gingles* precondition.[61, 62]

The more significant problem lies in the scope of Dr. Morrison's review. In looking at local elections *within* Counties, he never stepped back to consider whether white voters across *the entirety of* District 22 engage in bloc voting. It is no surprise that voters in Humphreys County would elect an African-American Circuit Clerk. But Senate District 22 spans five other Counties. Dr. Morrison never considered how the aggregate population of District 22 tends to vote when electing a Senator to represent the entire area.

Dr. Morrison is an experienced demographer. He knows the problems with his testimony: he admitted that endogenous elections have more persuasive value than the local elections he compiled, he did not look at voter turnout in odd-numbered years, and he conceded that the Census explicitly cautions that survey respondents overreport their voting behavior.[63] He may also be hemmed in by the instructions given to him by his clients.

Whatever Dr. Morrison's reasons, though, in this matter his review was too narrow. He is like a climatologist arguing that December is a warm month solely because December 9, 10, 18, and 31 were warm days; the limited facts he has gathered do not support his broad conclusions. It is not credible to draw a conclusion about white bloc voting in District 22 based exclusively on

---

[61] Uncontested elections present "special circumstances." *Gingles*, 478 U.S. at 51, 57.

[62] It also is not clear if Dr. Morrison's definition of viable candidate satisfies Fifth Circuit caselaw. *Compare* Defendants' Exhibit 14 at 6 n.4 *with Teague v. Attala Cty., Miss.*, 92 F.3d 283, 289 (5th Cir. 1996). The Court does not recall hearing evidence on this point and declines to make any findings on it.

[63] Dr. Morrison testified that the plaintiffs' alternate maps engage in packing and cracking. He is incorrect. There is neither, since African-Americans would not "constitute an excessive majority" in District 22, *Voinovich*, 507 U.S. at 154 (quotation marks and citation omitted), and because District 23 would remain an influence district, *see Smith*, 189 F. Supp. 2d at 536-37. The fact that BVAP in District 23 would "necessarily be reduced" in a redrawn map is no basis to enter judgment for the defendants; some "loss of influence" is "found in every § 2 case." *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994).

the fact that there are some black elected officials in parts of the District.[64] The Fifth Circuit rejected this reasoning 25 years ago when it found that "municipal elections in Bruce and Vardaman do not demonstrate that black citizens have an equal opportunity to elect their preferred candidates to county-wide offices."[65]

The defendants certainly attempted to discredit Dr. Palmer's competing report. They pointed out that in the 2015 Senate District 22 election, approximately 1,500 voters in Bolivar County received ballots for the wrong Senate race. Dr. Palmer freely agreed that this was a "significant election administration error" which justified his decision to exclude those precincts, in that race, from the EI analysis. He explained that the analysis remains valid because EI identifies the pattern of behavior running through a series of elections over time.[66] The defendants presented no evidence indicating that Dr. Palmer's approach was in error or would cast any shadow on his conclusions.[67]

Considering all of the expert testimony, the Court finds Dr. Palmer's thorough and largely unrebutted analysis to be persuasive. It accepts his findings as to white bloc voting and rejects Dr. Morrison's alternate perspective.[68] The result is that the plaintiffs have established that white

[64] Perhaps due to the concerns raised on cross-examination, defense counsel did not attempt to rehabilitate Dr. Morrison's testimony and waived redirect of his only expert.

[65] *Clark*, 21 F.3d at 97. "Thus, in analyzing voting patterns in Calhoun County, the district court should accord greater weight to the virtual absence of black electoral success in county-wide elections as opposed to their limited electoral success in municipal elections." *Id.*

[66] *See Gingles*, 478 U.S. at 57 ("[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election."); *Teague*, 92 F.3d at 288–89 ("Vote dilution is a determination that must be made over time and over the course of many elections.").

[67] Defense counsel later speculated that Thomas's efforts to draw white crossover votes had *succeeded*—maybe white voters in Bolivar County *would* vote for black candidates if only given the chance, he said—but the votes had gone uncounted because these voters were given the wrong ballot. Counsel for the plaintiffs called it "fantastical" to assume that these predominantly white precincts would have voted for Thomas, given the long, documented history of white bloc voting in Mississippi. Of course, none of this argument constitutes evidence. What is in evidence, however, is Thomas's testimony that he also pursued white crossover votes in Madison County—a place without election maladministration—and still did not garner enough to prevail.

[68] *See Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1330 (5th Cir. 1989) ("At the outset, we note that the district judge discounted the statistical evidence presented by the appellants as severely flawed. The weaknesses he observed are particularly damaging to the appellants' case because this information constituted the bulk of their

bloc voting in District 22 defeats the African-American community's candidate of choice. The plaintiffs have proven all three *Gingles* preconditions.

## 2.      The Senate Factors

The next considerations are the Senate factors, which through different angles try to shed light on whether African-Americans in District 22 have an equal opportunity to elect their candidate of choice. Answering this ultimate question "depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process."[69]

First, Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote.[70] To their credit, the defendants acknowledged this fact.

The plaintiffs supplemented this history with reports from Fred Banks, a former Legislator and Justice of the Mississippi Supreme Court, and John Horhn, a State Senator for the past 26 years. Banks and Horhn described the slow gains African-Americans made in running for and winning seats in the Mississippi Legislature. They also described racial appeals they experienced and observed during their decades in elective office.[71] Their reports will be discussed more below.

Second, Dr. Palmer presented expert testimony that voting in District 22 features "a high level of racial polarization." The defendants' expert did not challenge this factor.

The third and fourth factors are irrelevant. Neither side presented evidence that District 22 has unusual practices that enhance the opportunity for racial discrimination or a candidate slating process.

---

evidence on the issues of black political cohesiveness and white bloc voting. Dr. Love, appellants' statistical expert, faced difficulties in producing useful data for the court.").

[69] *Gingles*, 478 U.S. at 45 (quotation marks and citations omitted).

[70] *See Teague*, 92 F.3d at 293–94 ("That Mississippi has a long and dubious history of discriminating against blacks is indisputable.").

[71] Defense counsel objected to the reports' descriptions of racial appeals, believing them to be stale. The following discussion will show that the Court has considered the reports but given them appropriate weight.

Fifth, the plaintiffs presented evidence of substantial socio-economic disparities between District 22's African-American and white populations. There are vast differences between the two groups on education, employment, income, housing, and health indices, among others, that ultimately reflect the effects of slavery and segregation.

The plaintiffs, although "not required to prove a causal connection between these factors and a depressed level of political participation," introduced evidence that these socio-economic factors likely negatively impact voter turnout and that African-American communities in the Delta are less likely to have transportation options that facilitate voter turnout in odd-year elections.[72] Their evidence is consistent with the Supreme Court's recognition "that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."[73]

The defendants' expert sought to minimize the on-the-ground realities by pointing to statewide data showing that African-American Mississippians report higher voter turnout than white Mississippians in even-year elections. These data points fail to persuade. They look at the wrong jurisdiction, the wrong election years, and rely upon known issues with self-reported voting surveys—issues that EI, in contrast, seeks to overcome. The fifth Senate factor supports the plaintiffs.

The sixth Senate factor asks about overt or subtle racial appeals. The Banks and Horhn reports described several overt racial appeals made in elections up to 2004, but the plaintiffs did not put on evidence of any recent racial appeals.[74]

---

[72] *Id.* at 294.
[73] *Gingles*, 478 U.S. at 69 (citations omitted).
[74] There have been overt racial appeals in Mississippi elections since 2004. During the hotly-contested Initiative 42 campaign in 2015, for example, State Representative Bubba Carpenter told the Tishomingo County Midway

Seventh, the plaintiffs presented evidence that African-Americans have not been elected to the Senate from District 22. The defendants' attempt to reframe the issue and look at local offices within District 22—which, not incidentally, have higher BVAPs—is not persuasive for the reasons already discussed at length.

Even after considering all of these factors, the Supreme Court has instructed district courts to be cautious about finding a § 2 violation where the "districting scheme" features "majority-minority districts in substantial proportion to the minority's share of voting-age population."[75] Electoral maps that "apparently provid[e] political effectiveness in proportion to voting-age numbers" typically do not "deny equal political opportunity" and should not be the basis for liability.[76]

That concern is unwarranted here. The 2010 Census data showed that Mississippi was 59.1% white and 40.9% non-white. After redistricting with these data, therefore, one might have expected fresh maps to result in an upper legislative chamber with something like 31 white Senators and 21 non-white Senators. But there are only 15 majority-minority Senate Districts and

---

Republican Rally that "[i]f 42 passes in its form, a judge in Hinds County, Mississippi, predominantly black—it's going to be a black judge—they're going to tell us where the state education money goes." Sam R. Hall, *Rep. Carpenter injects race into Initiative 42*, The Clarion-Ledger, Oct. 18, 2015. His pitch was an appeal to racism and fear, not a statement of fact: the Hinds County bench was divided equally between "blacks" and whites.

As recently as November 2018, U.S. Senator Cindy Hyde-Smith was criticized for saying, at a public campaign rally in Tupelo, that she was so loyal to one of her friends (who she then brought out from the audience) that "I would fight a circular saw for him. . . . If he invited me to a public hanging, I'd be on the front row." Caleb Debillion, *Hyde-Smith deflects questions about 'public hanging' comments*, Daily Journal, Nov. 12, 2018. Some thought she was making an "inartful compliment." *Did Cindy Hyde-Smith's inartful compliment of a supporter go too far?*, Y'all Politics, Nov. 11, 2018. Others thought she was making a "sick" reference to lynching, *see* Matthew Haag, *Mississippi Senator's 'Public Hanging' Remark Draws Backlash Before Runoff*, N.Y. Times, Nov. 12, 2018—a sensitive subject given that her opponent in the runoff election was African-American and Mississippi has a history of "brutal and terrifying lynchings." Eric Etheridge, *Judge Carlton Reeves: Resurrecting the Nightmarish Specter of Lynchings in Mississippi*, Breach of Peace, Feb. 11, 2015, https://breachofpeace.com/blog/?p=612.

These examples are not in evidence and will not be considered further. Even if they were in evidence, on this record, the Court would still find that no racial appeals, overt or implied, have been recently made in District 22 or have had an effect on any District 22 election within the timeframe of the plaintiffs' case.
[75] *De Grandy*, 512 U.S. at 1013.
[76] *Id.* at 1014.

the Senate has never had more than 13 African-American members.[77] In plain English, Mississippi's Senate is much whiter than Mississippi.

Congress has emphasized that the representation gap is not itself a sufficient reason to redistrict the Senate and create additional majority-minority districts. Section 2 of the Voting Rights Act explicitly denies "a right to have members of a protected class elected in numbers equal to their proportion in the population."[78] The representation gap instead suggests that the Mississippi Senate does not provide political effectiveness in proportion to minority voting-age numbers and, therefore, that the defendants do not qualify for the kind of § 2 immunity the Supreme Court set forth in *De Grandy*.

\* \* \*

Having satisfied the three *Gingles* preconditions, and given the persuasive evidence on Senate factors one, two, five, and seven, the plaintiffs have established that District 22's lines result in African-Americans having less opportunity than other members of the electorate to elect the State Senator of their choice.

### D.    Additional Arguments

The defendants seek judgment as a matter of law by contending that "as a matter of simple mathematics," a minority group that has a voting-age population of 50% or more cannot prove a denial of equal opportunity under § 2. Put bluntly, the claim is that African-Americans' low turnout in odd-year elections is their problem. The Fifth Circuit, however, foreclosed this line of reasoning in *Monroe v. City of Woodville, Mississippi*.[79] "Unimpeachable authority from

---

[77] Demography is not necessarily destiny, of course. It should go without saying that voters can (and do) cross racial lines to vote for their candidate of choice: communities of color sometimes elect white politicians, and vice versa. In the Jackson region, District 29 is a majority-minority area (with a BVAP of 53.4%) that continues to elect a white person to the Senate.
[78] 52 U.S.C. § 10301(b).
[79] 881 F.2d 1327, 1329 (5th Cir. 1989).

our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution."[80] Put differently, "low minority voter turnout does not militate against finding a Section 2 violation."[81]

The defendants then argue that finding a § 2 violation in this case will open the floodgates for plaintiffs to challenge every majority-minority district in Mississippi. But this is at odds with Dr. Morrison's (accurate) observation that Mississippi has a substantial number of African-American elected officials. In the hundreds of municipal and county districts in which they sit, the presumptive plaintiffs will be unable to prove a § 2 violation precisely because they will have experienced electoral success despite the legacy of discrimination. The Court fundamentally disagrees that this ruling will have significant reach outside of Districts 22 and 23.

### E.    Remedies

As the Court recited in its February 13 Order, the Legislature is entitled to the first opportunity to redraw District 22 and, if it chooses, extend the March 1 qualification deadline for candidates in the affected Districts.[82] "Although it may be difficult for the Legislature to adopt a plan," a "legislative plan is unequivocally to be preferred over a court-ordered plan . . . . [W]e encourage the Legislature to act."[83]

## IV.    Conclusion

The plaintiffs have established by a preponderance of the evidence that the present boundaries of Mississippi Senate District 22 violate § 2 of the Voting Rights Act. The Court will decline to order any specific relief while the Mississippi Legislature considers whether to redraw

---

[80] *Id.* at 1333 (citation omitted). Practically speaking, this prohibits entrenched political powers from drawing a series of extremely marginal majority-minority districts with the expectation that the majority-minority group will be unable to turn out in numbers sufficient to ever elect a candidate of their choice.
[81] *Benavidez*, 638 F. Supp. 2d at 725 (collecting cases).
[82] *See LULAC*, 548 U.S. at 416.
[83] *Smith*, 189 F. Supp. 2d at 511-12.

the District and extend the candidate qualification deadline. A hearing will be set for the near future.

      **SO ORDERED**, this the 16th day of February, 2019.

s/ Carlton W. Reeves        
UNITED STATES DISTRICT JUDGE
